RECEIVED

2021 OCT 18 PM 2:20

S. COURT OF APPEALS
FOURTH CIRCUIT

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

## INFORMAL BRIEF

**RE:** 6:20-cv-02270-JD

1.  **Declaration of Inmate Filing**
    An inmate's notice of appeal is timely if it was deposited in the institution's internal mail system, with postage prepaid, on or before the last day for filing. Timely filing may be shown by:
    - a postmark or date stamp showing that the notice of appeal was timely deposited in the institution's internal mail system, with postage prepaid, or
    - a declaration of the inmate, under penalty of perjury, of the date on which the notice of appeal was deposited in the institution's internal mail system with postage prepaid. To include a declaration of inmate filing as part of your informal brief, complete and sign the declaration below:

---

### Declaration of Inmate Filing

I am an inmate confined in an institution. I deposited my notice of appeal in the institution's internal mail system on _____ [insert date]. First-class postage is being prepaid either by me or by the institution on my behalf.

I declare under penalty of perjury that the foregoing is true and correct (see 28 U.S.C. § 1746; 18 U.S.C. § 1621).

Signature: _____        Date: _____

---

2.  **Jurisdiction**
    Name of the court or agency from which you are appealing:
    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION
    Dates of the order or orders for which review is sought:
    09/20/2021

3.  **Issues for Review**
    Use the following spaces to set forth the facts and argument in support of the issues you wish the Court of Appeals to consider. The parties may cite case law, but citations are not required.

**Issue 1.**
The Magistrate Judge "Report and Recommendation"; and, the District Court Judge "Opinion and Order" are prejudicial. The improper findings of the lower court, lead the lower court to make decisions and judgements on an improper basis. This case should not have been adjudicated as a patent infringement case.

**Supporting Facts and Argument.**

The S.C. District Court Judge stated in his Opinion & Order", pg. 5: The Report correctly concluded that: "Indeed, the plaintiff, who unsuccessfully sought damages against many of the defendants in the court for patent infringement in Case Numbert 6:19-cv-2557-DCC, here, appears to seek relief for the same infringing actions by dressing the case as asserting violations of the of the Sherman Act, the Clayton Act, and various South Carolin Laws"... "[f]urther, the Report noted that the "plaintiff patent infringement claims are subject to dismissal because the Plaintiff has fail to include factual allegations..."

**Issue 2.**

Appellant alleged "patent misappropriation", not "patent infringement". "Despite the opportunities for conflict... a central goal of both patent and antitrust law is the promotion of the public benefit through a competitive economy."

**Supporting Facts and Argument.**

The Supreme Court described the tort of misappropriation as "an unauthorized interference with the normal operation of [a] complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not. Misappropriation is a common-law form of unfair competition... "unfair competition as an " umbrella for all statutory and nonstatutory causes of action," ... "In the context of patent misappropriation, the thing appropriated would be a patented invention."

**Issue 3.**

The Sherman Act; the Clayton Act; S.C. Unfair Trade Practices Act; Conspiracy, Restraint to Trade; Price Fixing; Unjust Enrichment; Joint Patent-Misappropriation; and, Conspiratorial Patent-Misappropriation.

**Supporting Facts and Argument.**

Joint patent-misappropriation is the wrongful acquisition of another's patent and the subsequent profitable use of that patent by multiple parties working in concert. Joint patent-misappropriation claims are a superior solution because they are not pre-empted by federal patent law. For conspiratorial patent misappropriation, the underlying tortious act is patent misappropriation. If the jury finds all the elements of a patent-misappropriation claim, and all the elements of a civil conspiracy claim, the defendants would typically be liable for "conspiratorial patent misappropriation" .

**Issue 4.**

"Frivolous or Malicious". The Court has never described exactly what is it about my pleading that makes it "frivolous or malicious". "[a] frivolous claim, refers to a lawsuit, motion or appeal that is intended to harass, delay or embarrass the opposition"

**Supporting Facts and Argument**

Appellant believes the Defendants brought embarrassment upon themselves when they allegedly conspired to keep the owner of the intellectual property out of the market. When they allegedly misled consumers and the SEC that they own the intellectual property rights of the CMDC (smartphone) device. It is the lower court who has created delays in this case by not admitting their mistakes.

4. **Relief Requested**

   Identify the precise action you want the Court of Appeals to take:
   Remand this case back to the District Court with an order for service of process;
   an order for a jury trial; and an order for preliminary injunctive relief.

5. **Prior appeals (for appellants only)**

   A.   Have you filed other cases in this court?
        ☐ Yes      ☑ No

   B.   If you checked YES, what are the case names and docket numbers for those
        appeals and what was the ultimate disposition of each?


   _____
                    Signature
           [Notarization Not Required]

   Larry Golden
   _____
           [Please Print Your Name Here]


### CERTIFICATE OF SERVICE
   **************************

I certify that on _____ I served a complete copy of this Informal Brief on all
parties, addressed as shown below:
No service of process has been granted


   _____
                    Signature


| NO STAPLES, TAPE OR BINDING PLEASE |
| --- |

No: _____

---

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

LARRY GOLDEN
*Petitioner*

v.

APPLE INC., SAMSUNG ELECTRONICS USA, LG
ELECTRONICS USA INC., QUALCOMM INC., FORD GLOBAL
TECHNOLOGIES LLC, GENERAL MOTORS COMP., FCA USA
LLC
*Defendants*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

IN 6:20-cv-02270-JD

JUDGE JOSEPH DAWSON III

---

## INFORMAL BRIEF: MEMORANDUM OF LAW

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing ProSe

October 16, 2021

1

## STATEMENT OF JURISDICTION

This is an appeal from the Opinion and Order, filed 09/20/2021 in the United States District Court for the District of South Carolina; Greenville Division; Case No. 6:20-cv-0227-JD; Judge Dawson III presiding. Attached is a copy of the Trial Court's Final Decision and "opinion and Order" **(Exhibit A)**.

This Appeal seeks relief in the form of remanding this case back to the Trial Court with an order for service of process; an order for a jury trial; and, an order granting injunctive relief.

The Notice of Appeal was filed October 13, 2021. The U.S. Court of Appeals has jurisdiction under 28 U.S.C. § 1295(a)(1).

## RELEVANT TRIAL COURT FAILURES

The Trial Court fail to examine the history of the alleged "restraint of trade", and the reasons why the alleged "restraint of trade" was imposed: "Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'" *Am. Express*, 138 S. Ct. at 2283 (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Id.* (alterations in original) (emphasis added) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) ("Under this rule, we examine 'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,' to determine the effect on competition in the relevant product market." (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978))). "The goal is to 'distinguish between restraints with anticompetitive effect that are harmful to the

consumer and restraints stimulating competition that are in the consumer's best interest.'" *Am. Express*, 138 S. Ct. at 2284 (alteration in original) (quoting *Leegin Creative Leather Prods.*, 551 U.S. at 886).

The Trial Court fail to examine if there's enough "factual allegations" to support a "restraint of trade" claim that has an anticompetitive effect either "directly or indirectly": A plaintiff may prove that a restraint has anticompetitive effect either "directly or indirectly." *Am. Express*, 138 S. Ct. at 2284. Direct evidence includes 'proof of actual detrimental effects [on competition],' *id.* (alteration in original) (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986)), "such as reduced output, increased prices, or decreased quality in the relevant market," *id.* (citing 1 J. Kalinowski, Antitrust Laws and Trade Regulation § 12.02[2] (2d ed. 2017); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 390 (8th Cir. 2007); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2nd Cir. 2001)). Indirect evidence involves "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citing 1 Kalinowski § 12.02[2]; *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2nd Cir. 1998); *Spanish Broadcasting Sys. of Fla. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004)).

The Trial Court fail to allow a jury to decide if the Defendants had conspired, or combined to monopolize:  Whereas, § 1 of the Sherman Act targets *concerted* anticompetitive conduct, § 2 targets *independent* anticompetitive conduct. *Am. Needle, Inc.*, 560 U.S. at 190. The statute makes it illegal to "monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To establish liability under § 2, a plaintiff must show: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and, (c) causal antitrust injury." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)

(quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) ("Allied Orthopedic")).

The Trial Court fail to differentiate the provisions of a "Antitrust Law Violation" cause of action from that of a "Patent Infringement" cause of action: Antitrust law, like patent law, is "aimed at encouraging innovation, industry and competition." *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) (citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 876–77 (Fed. Cir. 1985)). "Despite the opportunities for conflict . . . a central goal of both patent and antitrust law is the promotion of the public benefit through a competitive economy." *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 427 (4th Cir. 1986); *see also Am. Express*, 138 S. Ct. at 2290 ("[I]t is '[t]he promotion of interbrand competition,' after all, that 'is . . . the primary purpose of the antitrust laws.'" (Some alterations in original) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007))). Indeed, the Federal Circuit, which frequently examines cases at the intersection of patent and antitrust law, has commented that "[t]he patent and antitrust laws are complementary, the patent system serving to encourage invention and the bringing of new products to market by adjusting investment-based risk, and the antitrust laws serving to foster industrial competition." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999) (citing *Loctite Corp.*, 781 F.2d at 866–67).

## PATENT INFRINGEMENT CAN VIOLATE ANTITRUST LAWS

Patent infringement can be considered anticompetitive conduct under federal antitrust law, according to a ruling issued by the U.S. District Court for the Eastern District of Texas.

This ruling arose out of a dispute between Retractable Technologies, Inc. (Retractable) and Becton, Dickinson and Company (BD), *See, Retractable Technologies, Inc., et al. v. Becton,*

*Dickinson and Co.*, Case No. 2:08-CV-00016 (E.D. Tex.), in which Retractable [Plaintiff-Appellant] alleges, among other claims, that BD's [Qualcomm, Apple, Samsung, LG, GM, Ford, & FCA's] infringement of Retractable's [Plaintiff-Appellant's] patents foreclosed competition and maintained BD's [Qualcomm, Apple, Samsung, LG, GM, Ford, & FCA's] monopoly power in the hypodermic syringe [mobile device, chipset/SoC, & automotive] markets, thereby violating Section 2 of the Sherman Act. 15 U.S.C. § 2. *(added Defendants for emphasis).*

To prove a violation of Section 2 of the Sherman Act, [Plaintiff-Appellant] must demonstrate that the defendant (1) possesses monopoly power, and (2) acquired, enhanced, or maintained that power by exclusionary or anticompetitive conduct, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966). "[] BD asked the court to find that, as a matter of law, patent infringement can never be considered "exclusionary or anticompetitive conduct," and therefore cannot be the basis of a Section 2 monopolization claim. BD argued that no court has ever found patent infringement to be an "anticompetitive" act under Section 2 and that Retractable's claim makes no economic sense, because patent infringement actually increases competition by making more products available to consumers." https://www.natlawreview.com/article/federal-court-rules-patent-infringement-can-violate-antitrust-laws

On September 9, 2013, U.S. District Court Judge Leonard Davis adopted the recommendations of U.S. Magistrate Judge Roy S. Payne's "Report and Recommendation" and issued an order denying BD's motion. Judge Davis agreed with Judge Payne that the only binding precedent offered by BD in support of its arguments held that patent infringement is not an injury recognized under the Sherman Act, (the [Plaintiff-Appellant] must prove antitrust injury in order to recover damages), but this has nothing to do with patent infringement as anticompetitive conduct. Both judges noted the U.S. Supreme Court's statement in *U.S. v.*

*American Tobacco Co.* that the Sherman Act covers "every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed", 221 U.S. 106, 181 (1911).

Judge Payne further explained in his Report that while patent infringement often increases competition and benefits the end consumer despite harming a specific competitor, in this case Retractable [Plaintiff-Appellant] alleges that the effect of BD's [Qualcomm, Apple, Samsung, LG, GM, Ford, & FCA's] patent infringement was to decrease competition by keeping BD's [Qualcomm, Apple, Samsung, LG, GM, Ford, & FCA's] [] products on the market and preventing the sale of other, better [] safety [] products. *(added Defendants for emphasis).*

# **PREJUDICIAL ERROR**

The South Carolina District Court in this case has fail to recognize, or acknowledge the difference between a "cause of action" of "patent infringement", "conspiratorial patent infringement", "patent-misappropriation", "civil conspiracy", civil conspiracy-South Carolina", and "conspiratorial patent misappropriation". Adjudicating Appellant's cause of action as alleged patent infringement by the Magistrate Judge and the District Court Judge, is a mistake made by the lower court judges that has cause a substantial amount of harm to the Appellant.

**Patent Infringement:**

Patent infringement is a federal, civil cause of action alleging that one person used another person's patented item without the patent owner's permission. A federal lawsuit against the Defendants for patent infringement means the Plaintiff in this case is alleging that the Defendants made and is using Plaintiff's patented inventions without Plaintiff's authorization. In

this case Plaintiff has not alleged "patent infringement", and the case should not have been adjudicated on the provisions of "patent infringement" which states:

> "Under 35 U.S.C. § 271, anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent. Anyone who actively induces someone else to infringe the patent is also liable as an infringer. Similarly, anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer."

Generally, to enforce a patent against an infringing product, a patent owner will sue the infringer in a civil lawsuit. Determining whether there was infringement involves a two-step analysis by the court. The first step is claim construction, based on the claim language, the written description of the specification, the patent prosecution history, and extrinsic evidence when necessary to understand the patent. Claim terms are given their ordinary meanings, unless the specification describes a special definition. Next, the court will look at whether a particular device literally infringes the claim. The elements of each of the patent's claims will be compared with the invention that is claimed to be infringing. If these elements match the elements of the invention, an infringement will be found.

What if the infringement is not literal, but only some minor aspect of the patent has been tweaked in the accused product? Under the "doctrine of equivalents," if the individual claim limitations and the infringing invention are sufficiently equivalent both in what they do and how they do it, infringement will also be found **(Exhibit B)**. The doctrine of equivalents also applies when two elements are interchangeable and someone with ordinary skill in the art out of which the invention arises would have known the elements were interchangeable at the time of infringement.

The issue is whether any differences are "insubstantial." There are different ways of analyzing whether a difference is insubstantial. Under the triple identity test, the difference is insubstantial if the feature in the accused product performs substantially the same function, in substantially the same way, and to yield substantially the same outcome as the limitation articulated in the patent claim.

There's nothing in this case that alleges "patent infringement", and the harm caused by the lower court is uncalled-for. This kind of procedural error is a mistake about court procedures, and about the law, that was made by the lower court judges, [that] has caused an extensive amount of harm to the Appellant.

**Conspiratorial Patent Infringement**

Conspiratorial patent infringement has been proposed to mend the joint patent infringement loophole. Such a claim would create liability for entities collaborating to infringe a patent. The current Patent Act, however, does not recognize this claim as a viable cause of action. Consequently, at least one commentator has urged Congress to create liability for it. But thus far, Congress has declined to do so. Courts have also declined to recognize conspiratorial patent infringement as a viable cause of action. *In Digene Corp v Ventana Medical Systems, Inc.*, 476 F Supp 2d 444 (D Del 2007). and *Conceal City, LLC v Looper Law Enforcement, LLC*, 917 F Supp 2d 611 (ND Tex. 2013), the respective plaintiffs asserted claims for civil conspiracy to commit patent infringement. But the courts adjudicating these cases determined that federal patent law conflict-preempts (Conflict preemption applies when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Hunter Douglas, Inc v Harmonic Design, Inc*, 153 F3d 1318, 1332 (Fed Cir 1998)), this state law claims because conspiracy to infringe does not include an additional element that is distinct from an

inducement claim under 35 USC § 271(b). *See Digene*, 476 F Supp 2d at 450-51 ("[The plaintiffs claim] alleging civil conspiracy, under Delaware law, to infringe Digene's asserted patents is preempted by conflict with the federal patent laws."); *Conceal City*, 917 F Supp 2d at 618 ("Conceal City's Texas-law claim for civil conspiracy to infringe the [] patent is preempted by federal patent law and must be dismissed."). *See also Mopex, Inc v Chicago Stock Exchange, Inc*, 2003 WL 715652, *5 (ND III) ("[P]laintiffs conspiracy claim must be [conflict] preempted because it is symmetrical with infringement and alleges nothing in addition to that required by the patent laws.").

There's nothing in this case that alleges "conspiratorial patent infringement", and the harm caused by the lower court for suggesting as such, is uncalled-for. This kind of procedural error is a mistake about court procedures [suggesting a cause of action by implying as such], and about the law, that was made by the lower court judges, [that] has caused an extensive amount of harm to the Appellant.

## PATENT MISAPPROPRIATION

Unlike patent infringement claims, a successful misappropriation claim does not require that a single entity perform each and every element of the patent claim. Patent misappropriation is simply an application of the old and well-known misappropriation doctrine to activity in the patent law context. Most importantly, such claims do not subvert patent law or congressional intent.

In order for Plaintiff to establish that the patent misappropriation cause of action is better than patent infringement, it is important to understand misappropriation doctrine more generally. Misappropriation is a common-law form of unfair competition. See Elaine Stoll, Comment, *Hot*

*News Misappropriation: More Than Nine Decades after INS v. AP, Still an Important Remedy for News Piracy*, 79 U Cin. L Rev 1239, 1241 (2011) ("The tort of misappropriation is a species of unfair competition."). See also *United States Sporting Products, Inc v Johnny Stewart Game Calls, Inc*, 865 SW2d 214, 217 (Tex. App 1993) (characterizing unfair competition as an "umbrella for all statutory and nonstatutory causes of action," such as misappropriation, "arising out of business conduct which is contrary to honest practice in industrial or commercial matters").

The Supreme Court described the tort of misappropriation as "an unauthorized interference with the normal operation of [a] complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not." *International News Service v The Associated Press*, 248 US 215, 240 (1918). In the context of patent misappropriation, the thing appropriated would be a patented invention.

**Joint Patent Misappropriation**

Joint patent-misappropriation is the wrongful acquisition of another's patent and the subsequent profitable use of that patent by multiple parties working in concert. See Heather Richtarcsik, Note, *Misappropriation in Massachusetts and around the Country: How Technology Will Utilize This Tort*, 35 New Eng. L Rev 717, 729 (2001). See also *Black's Law Dictionary 1088 (West 9th ed 2009) (defining "misappropriation" as "[t]he application of another's property or money dishonestly to one's own use"*). Joint patent-misappropriation claims are a superior solution because they (1) are not preempted by federal patent law; (2) are pragmatic-plaintiffs simply pursue the claims in state court; and (3) include a requisite *mens rea* of at least knowledge, thereby protecting unknowing consumers. Furthermore, the joint patent-

misappropriation cause of action is an attractive solution to the joint patent infringement problem because the misappropriation doctrine is generally not as restrictive as patent infringement law.

Joint patent-misappropriation occurs when multiple actors misappropriate a plaintiff's patent in concert, and no single actor does so alone. Because misappropriation is a common-law tort, the plaintiff must rely on third-party liability under traditional tort doctrines to recover from defendants in those cases. See Edmund J. Sease, *Misappropriation Is Seventy-Five Years Old: Should We Bury It or Revive It?* 70 ND L Rev 781, 781 (1994) (explaining that the Supreme Court recognized the misappropriation cause of action under federal common law). The most relevant tort doctrines are: (1) liability for conspiring to commit a tort, *Torts § 876(a) (1979)*. (2) liability for aiding and abetting commission of a tort, *Torts § 876(b) (1979)*. and (3) liability for inducing a tort, *Torts § 877(a) (1979)*. The ensuing discussion identifies three joint patent-misappropriation claims based on these tort doctrines of conspiratorial patent misappropriation; aiding-and-abetting patent misappropriation; and, induced patent misappropriation.

**Conspiratorial patent misappropriation.** Establishing a civil conspiracy requires Plaintiff to prove: "(1) an association of two or more persons; (2) an unlawful objective; (3) an agreement, understanding, or 'meeting of the minds' regarding the objective and the means of pursuing it; (4) commission of an unlawful act in furtherance of the agreement; and (5) injury resulting from the conspiracy, *Truong*, Note, 103 NW U L Rev at 1923 (cited in note 107). For conspiratorial patent misappropriation, the underlying tortious act is patent misappropriation. (See Plaintiff's original complaint, attached as **(Exhibit C)** for this cause of action)

**Aiding-and-abetting patent misappropriation.** Generally, aiding and abetting occurs when one party advises or encourages another party to perform an underlying tort, *See Adams*, 42 U Richmond L Rev at 640 (cited in note 156). A claim for civil aiding and abetting is similar

to one for civil conspiracy. There are, however, some subtle differences. Although the line is not always clear, a crucial distinction is that aiding and abetting requires an agreement, while conspiracy does not. Another important distinction is that civil aiding and abetting requires "substantial assistance", but civil conspiracy does not, ("[F]or conspiracy liability, a defendant need only provide the assistance inherent within the agreement itself."). Thus, a defendant may be liable for civil conspiracy even if he did not substantially assist his co-conspirators, while aiding and abetting requires deeper involvement.

The requisite scienter for aiding and abetting varies by state, but the general elements of aiding-and-abetting liability are consistent: (1) the existence of an underlying tort, (2) the defendant's knowledge of the underlying tort, and (3) the defendant's substantial assistance in the commission of the underlying tort. *See* Mark Bartholomew and Patrick F. McArdle, *Causing Infringement*, 64 Vand L Rev 675, 696 (2011). Here, the underlying tort in aiding-and-abetting-patent misappropriation claims is patent misappropriation.

**Induced patent misappropriation.** Civil inducement covers situations in which one party orders or induces another party's tortious conduct. *See Adams*, 42 U Richmond L Rev at 642 (cited in note 156). Such claims are different from aiding-and-abetting claims in that they do not require substantial assistance; however, the two types of claims often overlap. For instance, a party that orders or induces tortious conduct might also substantially assist with carrying out the tortious acts. The general elements of inducement are provided in *Torts § 877(a)*: (1) the existence of an underlying tort, (2) the defendant's actual or constructive knowledge of the underlying tort, (3) the defendant's inducement of the performance of the underlying tort, and (4) the defendant's specific intent to bring about the underlying tort. Again, the underlying tort in induced-patent-misappropriation claims is patent misappropriation.

The District of South Carolina dismissed Plaintiff's Antitrust action stating: "adopting the Magistrate Judge's Report and Recommendation to dismiss Plaintiff's Antitrust cause of action *on the same basis* the Magistrate Judge recommended, and the S. C. District granted, dismissal in Plaintiff's previous case alleging patent infringement claims." *Golden v. Apple Inc.*, et al., 2021 WL 4260782, at \*3 (D.S.C. Sept. 20, 2021)". There decisions are prejudicial. "[w]ithin legal civil procedure, prejudice is a loss or injury, and refers specifically to a formal determination against a claimed legal right or cause of action. *Black, Henry Campbell (1910). Black's Law Dictionary. West Publishing Co. pp. 931*

Patent misappropriation, just like that of Conspiracy, is a cause of action in itself and no other act need be committed. But here, in the current case, Plaintiff has merged the lesser cause of action of patent misappropriation into the larger cause of action of a violation of Antitrust law violations (i.e., conspiracy, restraint to market, price fixing, etc.)

Appellant is asking the appellate court to review the lower court record(s) in this case and decide if a legal mistake(s) was made that changed the outcome of this case. Certain kinds of legal errors (mistakes) are:

- Prejudicial error: This kind of error is a mistake about the law or court procedures that causes substantial harm to the appellant. Prejudicial error can include things like mistakes made by the judge about the law... The mistakes must have harmed the appellant.

- No substantial evidence: The appellant can ask the appellate court to determine if there was no substantial evidence that reasonably supported the trial court's decision.

## CIVIL CONSPIRACY

**Sherman Act § 1: "Motive to Form a Conspiracy": (Apple, Samsung, LG, Qualcomm)**

Evidence of the Defendants' (Apple, Samsung, LG, Qualcomm), motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion. The Defendants' (Apple, Samsung, LG, Qualcomm), as government own or ran companies, and/or third-party government contractors—under contract to perform work for the Government—was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the development, manufacture, commercialization, and pricing of product(s), there would not be any reasonable substitute for their product or service.

The Defendants' "motive to form a conspiracy" accelerated after the decision in *ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

> "We conclude that under § 1498, the United States is liable for the use of a method patent only when it practices every step of the claimed method in the United States. The court therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims... The United States contracted with Lockheed Martin Corporation ("Lockheed") to design and build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material made from Nicalon silicon carbide fibers. These fibers are partially carbonized and manufactured into sheets in Japan, which are then imported into the United States. The second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are manufactured exclusively in Japan, but they are processed into mats in the United States. *Zoltek*, 58 Fed. Cl. at 690... Zoltek brought suit in the Court of Federal Claims under § 1498(a), alleging that the United States and Lockheed used the methods claimed in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber products used in the F-22. Zoltek alleges that the mats and sheets were made, for the United States, using the claimed methods...The government moved for partial summary judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in

Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred Zoltek's claims under § 1498(a)... The federal government is immune from any legal action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498. Section 1498(a) provides, in pertinent part: Whenever an invention described in and covered by a patent of the United States *is used . . . by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture... This court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims."

## The Conspiracy: (Apple, Samsung, LG, Qualcomm)

After the events of 9/11 the Plaintiff introduced to the United States ("government") three economic stimulus and terrorism prevention packages: The packages were titled: the "ATPG" project; the "SafeRack" project; and the "V-Tection" project. The Plaintiff submitted the packages to President Bush and his administration, the U.S. Senators and U.S. Congressmen that

was in office during the Bush administration beginning in the year 2003. Beginning in year 2004, the Government began enforcing and administering the Plaintiff's intellectual property subject matter strategies. The packages outlined how the Government could stimulate the economy following the 9/11 attacks and provide protection against future terrorist activities. Because the Plaintiff's residence is in South Carolina, and the Plaintiff's business is in South Carolina, the stimulus packages would have benefited the Plaintiff and the Plaintiff's Class through royalty compensation for the Plaintiff, new jobs growth, low unemployment, increase S.C. tax revenue, and a decrease, if not totally eliminate, South Carolina's debt. The Defendants' (Apple, Samsung, LG, and Qualcomm) collusion, and conspiracy to hinder trade, destroyed all possibilities for the Plaintiff to receive royalty compensation and for the Class to eliminate its South Carolina taxpayer debt.

The Plaintiff's CMDC device is, designed for integration with any of the products grouped under the "ATPG" project, the "SafeRack" project, and the "V-Tection" project. The CMDC device was designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across all industries, agencies, groups, demographics, race, ages, and gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment. The Defendants (Apple, Samsung, LG, and Qualcomm) colluded and conspired under the protection of a Government contract to develop a "new and improved cell phone" (i.e., smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across all industries, agencies, groups, demographics, race, ages, and gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

The US Department of Homeland Security (DHS), NASA's Ames Research Center, (the United States), entered into cooperative agreements (contracts) with Qualcomm Inc., LG

Electronics, Apple Inc., and the Samsung Group for the development of a new and improved cell phone (i.e., smartphone) that is capable of detection for chemical and biological agents. The agreements were entered into after Defendants receive notices of the Plaintiff's intent to develop his own CMDC device for commercialization. The Defendants (Apple, Samsung, LG, and Qualcomm) colluded and conspired under the protection of a Government contract to develop a "new and improved cell phone" (i.e., smartphone). The motive to form a conspiracy for the Defendants, was to avoid being sued for infringement because the Defendants (Apple, Samsung, LG, and Qualcomm) was performing the work under a Government contract. The Defendants (Apple, Samsung, LG, and Qualcomm) also conspired not to perform all of the Plaintiff's patented process within the United States. By not performing all of the Plaintiff's patented process in the United States, "government liability does not exist pursuant to section 1498(a) for patent infringement", See *Zoltek,* 2006.

**Apple and Samsung's Contract**: Apple first used SoCs in early versions of the iPhone and iPod touch. They combine in one package a single ARM-based processing core (CPU), a graphics processing unit (GPU), and other electronics necessary for mobile computing. The APL0098 (also 8900B or S5L8900) is a package on package (PoP) system on a chip (SoC) that was introduced on June 29, 2007, at the launch of the original iPhone. It includes a 412 MHz single-core ARM11 CPU.

The Apple A4 is a PoP SoC manufactured by Samsung, the first SoC Apple designed in-house. It combines an ARM Cortex-A8 CPU – also used in Samsung's S5PC110A01 SoC – and a PowerVR SGX 535 graphics processor (GPU), all built on Samsung's 45-nanometer silicon chip fabrication process. The design emphasizes power efficiency. The A4 commercially debuted in 2010, in Apple's iPad tablet, and was later used in the iPhone 4 smartphone.

The Apple A5 is an SoC manufactured by Samsung that replaced the A4. The chip commercially debuted with the release of Apple's iPad 2 tablet in March 2011, followed by its release in the iPhone 4S smartphone later that year. Compared to the A4, the A5 CPU "can do twice the work" and the GPU has "up to 9X the graphics performance", according to Apple.

The Apple A6 is a PoP SoC introduced on September 12, 2012, at the launch of the iPhone 5. The A6 is manufactured by Samsung on a high-κ metal gate (HKMG) 32 nm process. The A6 is said to use a 1.3 GHz custom Apple-designed ARMv7 based dual-core CPU.

The Apple A9 is a 64-bit ARM-based SoC that first appeared in the iPhone 6S and 6S Plus, which were introduced on September 9, 2015. Apple states that it has 70% more CPU performance and 90% more graphics performance compared to its predecessor, the Apple A8. It is dual sourced, a first for an Apple SoC; it is manufactured by Samsung on their 14 nm FinFET LPE process and by TSMC on their 16 nm FinFET process. It was subsequently included in the first-generation iPhone SE, and the iPad (5th generation). The Apple A9 was the last CPU that Apple manufactured through a contract with Samsung, as all A-series chips after are manufactured by TSMC.

It is the belief of the Plaintiff, that the Defendants (Apple, Samsung, LG, and Qualcomm) have been unjustly enriched through the non-payment of royalty compensation to the Plaintiff that should have been paid as a percentage of the Defendants gross annual revenue for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices. "Verto Analytics looked at the numbers of Apple, Samsung, and LG (CMDC devices) smartphones currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S.

smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market."

It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants' (Apple, Samsung, LG, and Qualcomm) unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) act together in ways that limit competition by hindering Plaintiff's businesses from entering the market, while exercising an unreasonable horizontal restraint of trade. The Defendants' (Apple, Samsung, LG, and Qualcomm) agreements are considered unreasonable because the Defendants interact to such a degree that they were no longer acting independently, and the collaboration gave the Defendants the ability to wield market power together.

It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation.

It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm), through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators.

**Sherman Act § 1: "Motive to Form a Conspiracy": (GM, FCA, and Ford)**

Evidence of the Defendants' (GM, FCA, and Ford), motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion. The Defendants' (GM, FCA, and Ford), as government own or ran companies, and/or third-party government contractors—under contract to perform work for the Government—was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the development, manufacture, commercialization, and pricing of product(s), there would not be any reasonable substitute for their product or service.

The Defendants' "motive to form a conspiracy" accelerated after the decision in *ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

> "We conclude that under § 1498, the United States is liable for the use of a method patent only when it practices every step of the claimed method in the United States. The court therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims... The United States contracted with Lockheed Martin Corporation ("Lockheed") to design and build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material made from Nicalon silicon carbide fibers. These fibers are partially carbonized and manufactured into sheets in Japan, which are then imported into the United States. The second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are manufactured exclusively in Japan, but they are processed into mats in the United States. *Zoltek*, 58 Fed. Cl. at 690... Zoltek brought suit in the Court of Federal Claims under § 1498(a), alleging that the United States and Lockheed used the methods claimed

in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber products used in the F-22. Zoltek alleges that the mats and sheets were made, for the United States, using the claimed methods...The government moved for partial summary judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred Zoltek's claims under § 1498(a)... The federal government is immune from any legal action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498. Section 1498(a) provides, in pertinent part: Whenever an invention described in and covered by a patent of the United States *is used. . . by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture... This court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a process cannot be used within' the United States as required by section 271(a) unless each of the steps is performed 'within' this country." *Id.* at 1318 Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims."

**The Conspiracy: (GM, FCA, and Ford)**

Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if they would like to participate with Plaintiff in responding to a Department of Homeland Security (DHS) solicitation: (Broad Agency Announcement; BAA 07-02A). The Plaintiff's primary contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown. Mr. Culbertson's response to me was, "I need time to find out if we have those capabilities and if there is interest from upper management". After several conversations and several failed attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new, "Stolen vehicle slow down system" that was being offered by GM/OnStar beginning the following year on their 2009 models. GM/OnStar's "Stolen vehicle slow down system" is substantially the same as the Plaintiff's "stall, stop, and vehicle slowdown systems (SSVSS)" that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months of 2007. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791. Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms. Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not leave a message. On April 14, 2008, Plaintiff faxed a letter of interest to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

"The federal government took over GM... in March 2009. The Government fired GM CEO Rick Wagoner. GM entered bankruptcy on June 1, 2009. By the end of July, GM emerged

from bankruptcy reorganization, became two separate companies and spun off GMAC into Allied Financial. The Treasury Department began selling off its ownership of GM in 2010. The Obama administration used the take-over to set new auto efficiency standards design to improved air quality and forced U.S. automakers to be more competitive against Japanese and German firms. On December 18, 2014, the Treasury Department ended the bailout. That's when it sold its last remaining shares of Ally Financial, formerly known as General Motors Acceptance Corporation. It had bought them for $17.2 billion to infuse cash into the failing GM subsidiary. The Treasury Department sold the shares for $19.6 billion, making a $2.4 billion profit for taxpayers. On June 1, 2009, GM entered bankruptcy. It had $82 billion in assets and $172.8 billion in liabilities. That month, sales hit their low point of 9.545 million cars and trucks. The government lent GM $30.1 billion to fund operations through June and July while it went through bankruptcy reorganization. It also guaranteed GM's extended warranties. In return, it bought 60 percent of the company in warrants for common stock and preferred stock.

The Canadian government bought 12 percent. A union health trust received 17.5 percent stock ownership. That was in lieu of the $20 billion needed to cover benefits for 650,000 retirees. Bondholders received 10 percent stock ownership in lieu of $27 billion in bonds. Stockholders lost all their investment. GM promised to repay the $30 billion loan by 2012 when it planned to break even. The company pledged to cut its debt by $30 billion by converting debt ownership for equity. It agreed to pay union health care benefits to retirees by 2010. It promised to sell its Saab, Saturn, and Hummer divisions, reducing the number of models for sale to 40. It shut down 11 factories, closed 40 percent of its 6,000 dealerships, and cut more than 20,000 jobs. Government funding also provided the following incentives for new car buyers: The government backed all new car warranties; the economic stimulus bill allowed new car buyers to deduct all car sales and

excise taxes; Congress approved TARP-funded subsidies of zero percent financing for some Chrysler vehicles. The government intended to make GM more efficient. That would allow it to become profitable when sales returned to 10 million vehicles a year. That happened in July 2009, when sales hit 10.758 million. GM emerged from bankruptcy on July 10, 2009, as two separate companies. Old GM held most of the debt. New GM held the assets, $17 billion in debt, the contract with unions, and its underfunded pension funds. This allowed it to move forward as a profitable company. The new company only has four brands: Chevrolet, Cadillac, GMC, and Buick. The company sold Saab and discontinued Saturn and Hummer. In April 2010, New GM repaid its $6.7 billion TARP loan. In November 2010, Treasury revealed it would sell half its ownership of GM. That sale allowed an initial public offering on the stock market of $33 a share. It had already gotten back $37.2 billion by selling its ownership in GM. In November 2013, the Treasury Department announced it would sell its remaining 31.1 million shares in GM. In December 2014, Treasury sold its remaining shares in Ally Financial."

https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

"The federal government took over Chrysler in March 2009. The Government required Chrysler to merge with Italy's Fiat S.p.A. Chrysler entered bankruptcy on April 3, 2009. By the end of July, Chrysler emerged from bankruptcy reorganization and became a brand owned mostly by Fiat. Chrysler paid off the last of its loans by 2011. On January 16, 2009, the Treasury Department approved a $1.5 billion loan for Chrysler Financial. The interest rate for the loans was one point above Libor. In return, Chrysler Financial promised to pay the government $75 million in notes and reduce executive bonuses by 40 percent. As a result, car buyers got zero percent financing for five years on some models. Chrysler received $4 billion of the $7 billion bridge loan it originally requested. In return, its owner Cerberus vowed to convert its debt to

equity. Chrysler had also asked for $6 billion from the Energy Department to retool for more energy efficient vehicles. Chrysler wanted the Big Three to partner with the federal government in a joint venture to develop alternative energy vehicles. That didn't happen, and Chrysler didn't get the loan from the Energy Department. Instead, it pledged to debut an electric vehicle in 2010 and ramp up its production to 500,000 by 2013. On April 30, 2009, Chrysler filed for bankruptcy. Treasury Secretary Tim Geithner agreed to lend it $6 billion to fund operations while in bankruptcy. It emerged as a new company; 58.5 percent of which automaker Fiat S.p.A. of Italy now partly owned. This Fiat-Chrysler merger created the world's sixth largest automaker. The rest was owned by the United Auto Workers Retiree Medical Benefits Trust. Chrysler closed underperforming dealerships as part of its bankruptcy proceedings. In May 2011, Chrysler repaid $11.2 billion of its outstanding $12.5 billion in TARP loans six years ahead of schedule. Total cost to taxpayers was $1.3 billion. In 2013, Fiat CEO Sergio Marchionne announced plans to take Chrysler public on the New York Stock Exchange. This allowed Fiat to purchase the rest of the company and merge the two into a more competitive global automaker. In October 2014, it was listed under the ticker symbol "FCAU." The new company was called Fiat Chrysler Auto Company N.V. Its 2017 market capitalization was $17 billion." https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

> "Ford Credit received its bailout from the Term Asset-Backed Securities Loan Facility, not TARP. That was a government program for auto, student, and other consumer loans. Although Ford did not receive TARP funds, it did receive government loans. These were critical because banks were not lending during the financial crisis. It requested a $9 billion line-of-credit from the government. In return, it pledged to spend $14 billion on new technologies. On June 23, 2009, Ford received a $5.9 billion loan from the Energy Department's Advanced Technology Vehicles Manufacturing program. In return, it pledged to accelerate development of both hybrid and battery-powered vehicles, close

dealerships, and sell Volvo. It upgraded factories in Illinois, Kentucky, Michigan, Missouri, and Ohio to produce hybrid vehicles. Ford used the funds to switch its focus to commercial electric vehicles. In 2016, CEO Mark Fields said, "We want to become a top player in electrified solutions. The company wants to lead…we can win such as with our commercial vehicles." Eighty-one percent of the funds went to create new efficiency technologies for gas-powered vehicles. For example, they helped fund Ford's aluminum bodies in the F-series pickups. The Congressional Research Service estimated the loans saved 33,000 jobs. Ford will repay this loan by 2022. Many argue that Ford needed the funds to sustain its cash flow during the recession. Ford says it was in better shape than the other two (e.g., GM and FCA) because it had mortgaged its assets in 2006 to raise $23.6 billion. It used the loans to retool its product lineup to focus on smaller, energy efficient vehicles. It got the United Automobile Workers to agree it could finance half of a new retiree health care trust with company stock. By April 2009, it retired $9.9 billion of the debt it had taken out in 2006." https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

**Conspiratorial Patent Misappropriation:** Connectivity is now more important to new-car consumers than ever before, and as we move toward autonomous driving, it will continue to play a major role. Your smartphone has become an extension of your car's infotainment system, expanding its capabilities beyond just navigation and radio. Apple CarPlay And Android Auto Make Things Easier.

The arrival of Apple CarPlay and Android Auto (i.e., for Samsung and LG devices), enabled consumers to better integrate their smartphones with their vehicles. Since then, many drivers have found them to be indispensable. In some cases, automakers don't even offer onboard navigation, turning to Google Maps, Apple Maps and Waze instead. If you look closely at the latest crop of infotainment systems, many of them mimic the functionality of mobile devices.

With the introduction of telematics apps, automakers allow you to do more with your vehicle than ever before. That includes starting your vehicle from your smartphone.

It is the belief of the Plaintiff, that the Defendants (GM, FCA and Ford) have been unjustly enriched through the non-payment of royalty compensation to the Plaintiff that should have been paid as a percentage of the Defendants gross annual revenue for Plaintiff's Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV). GM's total revenue between the years 2013 and 2019; FCA's total revenue between the years 2013 and 2019 = $701.15B; and, Ford's total revenue between the years 2013 and 2019 = $1,065.4B.

It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants' (GM, FCA and Ford) unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) act together in ways that limit competition by hindering Plaintiff's businesses from entering the market, while exercising an unreasonable horizontal restraint of trade. The Defendants' (GM, FCA and Ford) agreements are considered unreasonable because the Defendants interact to such a degree that

they were no longer acting independently, and the collaboration gave the Defendants the ability to wield market power together.

It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford), through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators.


## CIVIL CONSPIRACY: SOUTH CAROLINA

If a person or business is harmed by the wrongful plans and acts of others working together, the harmed entity has an avenue for recovery through pleading a civil conspiracy claim. Since 1981, South Carolina courts have required a pleading of special damages due to a Supreme Court ruling known as the *Todd* decision. In the recent decision of *Paradis v. Charleston Cty. Sch. Dist.*, No. 2018-002025 (May 19, 2021), the South Carolina Supreme Court explained that courts in this state have long misinterpreted the *Todd* decision. The [Our] Supreme Court's ruling in *Paradis* has effectively eliminated the special damages requirements that had resulted from the misinterpretation of the *Todd* decision.

As a result, the bar for pleading a civil conspiracy claim is now lowered, opening avenues for recovery for more plaintiffs. Damages can be divided into two categories: general damages and special damages. These are often referred to as noneconomic and economic damages, respectively. General damages are damages that are hard to place a monetary value on and result

from injuries such as pain, suffering, and emotional distress. Special damages are those that relate to tangible items such as loss of future earnings:

> "Section 4(a) of the Clayton Act 15; U.S.C. § 15(a), authorizes private parties to recover triple damages for antitrust violations by providing that "any [1] person who shall be [2] injured in his [3] business or property [4] by reason of [5] anything forbidden in the antitrust laws may sue therefore . . . and shall recover [6] three-fold the damages by him sustained, and [7] the cost of suit, including [8] a reasonable attorney's fee."

Prior to the *Paradis* decision, South Carolina required a claimant to plead special damages that go beyond the damages alleged in other claims asserted to state a cause of action for civil conspiracy. In *Paradis*, the S.C. Supreme Court ruled that a plaintiff must now only plead that the defendant committed a wrong that resulted in damages that are beyond the damages alleged in other claims. In light of *Paradis*, the elements of a civil conspiracy cause of action have been clarified to include:

1. the combination or agreement of two or more persons,

2. to commit an unlawful act or a lawful act by unlawful means,

3. together with the commission of an overt act in furtherance of the agreement, and

4. damages proximately resulting to the plaintiff.

The first element merely requires that two or more individuals or legal entities engage to commit a conspiracy.

The second element requires the co-conspirators to agree to do an unlawful thing for the detriment or hurt of another or for them to do a lawful thing in an unlawful manner.

The third element requires one of the parties to commit an act in furtherance of the conspiracy planned by the parties. This means that one conspirator's action alone can create liability.

The fourth element requires the plaintiff to show that his damages were caused by the act. As discussed, these can be general damages that result from the foreseeable consequences of the defendant's conduct. Following this decision, South Carolina now returns to a long-standing precedent and rejoins the majority of jurisdictions in defining a civil conspiracy claim. Rosen Hagood (2021, May, 21). *Civil Conspiracy in South Carolina*. Retrieved from: https://rosenhagood.com/blog/civil-conspiracy-in-south-carolina/

*In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) ("[A]n antitrust defendant's unlawful conduct need not be the sole cause of the plaintiff's alleged injuries; to prove a 'causal connection' between the defendant's unlawful conduct and the plaintiff's injury, the plaintiff need only 'demonstrate that [the defendant's] conduct was a substantial or materially contributing factor' in producing that injury."); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 887 (6th Cir. 2007) ("The plaintiff 'bears the burden of showing that the violation was a material cause of its injury, a substantial factor in the occurrence of damages or that the violation was the proximate cause of the damage.' . . . [T]he defendant's actions need not be the sole proximate cause of any alleged injuries.").

## CONSPIRATORIAL PATENT MISAPPROPRIATION

Establishing a civil conspiracy requires Plaintiff to prove: "(1) an association of two or more persons; (2) an unlawful objective; (3) an agreement, understanding, or 'meeting of the minds' regarding the objective and the means of pursuing it; (4) commission of an unlawful act in furtherance of the agreement; and (5) injury resulting from the conspiracy, *Truong*, Note, 103 NW U L Rev at 1923 (cited in note 107). For conspiratorial patent misappropriation, the underlying tortious act is patent misappropriation.

30

For conspiratorial patent misappropriation, the underlying tortious act is patent misappropriation. *Accordingly, if the jury finds all the elements of a patent-misappropriation claim, and all the elements of a civil conspiracy claim, the defendants would typically be liable for "conspiratorial patent misappropriation".*

## QUALCOMM'S ACTION ALONE CAN CREATE LIABILITY

The fourth requirement of a civil conspiracy cause of action, requires one of the parties to commit an act in furtherance of the conspiracy planned by the parties. This means that one conspirator's action alone can create liability.

*In Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, the United States Supreme Court held that patent holders (i.e., Qualcomm) are subject to antitrust claims under section 2 of the Sherman Act, or section 4 of the Clayton Act.

Sherman Antitrust Act, Ch. 647, § 2, 26 Stat. 209 (1890) (current version at 15 U.S.C. § 2 (1994)). Section 2 provides:

> "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

Clayton Act, Ch. 323, § 4, 38 Stat. 731 (1914) (current version at 15 U.S.C. § 15 (1994)). The relevant part (a) Amount of recovery; prejudgment interest; of § 4 reads:

> "Except as provided in subsection (b) of this section, any person [Appellant] who shall be injured by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found

or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him [or her] sustained, and the cost of the suit, including a reasonable attorney's fee ..."

## Qualcomm's "Misappropriation" of Appellant's Patented CPUs

Plaintiff's "central processing units (CPUs)", are interconnected to, integrated with, or embedded into Plaintiff's CMDC devices (i.e., new and improved cell phones, smartphones, smartwatches, laptops, tablets, etc.). Appellant's CPU invention conception date is December 16, 2002; USPTO disclosure date is November 17, 2004; and, first patent application date is April 5, 2006. Appellant's CPU invention is claimed in at least twenty-five (25) independent patent claims of Appellant's '497, '752, '189, '439, & '287 patents.

The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, detectors, etc.) **(Exhibit D—sensors and detectors)** and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU

32

processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.

All of the different components that make up a computer's processor have to be condensed to fit in the smartphone **(Exhibit E)**, where they exist as a mobile application processor, or a System-on-a-Chip (SoC), or a Chipset. Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. The performance of the CPU, that's a part of the chipset, is vital for processing instructions.

**Qualcomm's Alleged Conspiracy Started with the 300M Consumers Targeted by DHS**

According to the Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, the Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA, *"Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks"* **(Exhibit F)**, Qualcomm's alleged conspiracy, restraint of trade, and other anticompetitive actions began with the DHS S&T Cell-All project:

- "[R]esearchers focused on understanding the needs of the equipment, in terms of power and physical profiles, and determining whether the sensors could work within the "ecosystem of the phone."… which led to the creation of six workable first-generation prototypes, including a "form factor phone" developed by Qualcomm …" (U.S. Department of Homeland Security, 2011a).

- "DHS also sought to standardize (with Qualcomm's SEPs) the data reporting protocols so that data from different devices could be received and processed by a centralized network

operations center. Research contracts were awarded by DHS through HSARPA and the Small Business Innovation Research Portfolio, with some of the primary recipients being Qualcomm..." (U.S. Department of Homeland Security, 2011b).

- "DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the ''commercialization of technology developed for government purposes'' (U.S. Department of Homeland Security, 2010). **(Exhibit G)**

- "With Qualcomm's help, DHS assessed commercial viability through market research, asking what conditions would need to be met for the public to both accept and pay for the system. Based on this market research, DHS concluded: '[p]eople will actually turn in their [current] phone, get a new phone, if it provides them with a magnitude of personal protection'". (Dennis, 2011)

- "Enrolling members (target market of 300M) of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: ''Let's take advantage of the 300 million cell phones that are out there today. They're always with us'' (Hoffman, 2011). Widespread participation is needed, with members of the public serving as passive data-collection nodes..."

- "Cell-All is managed and funded by HSARPA, the technologies and infrastructures are being developed by third party contractors [added: Qualcomm, Apple, Samsung, & LG] who received funding from DHS for those purposes and who can then profit further from

the sale of any resulting systems or services" (U.S. Department of Homeland Security, 2011a & c).

- "Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iPhone operating systems."

- "[T]he task is seen as finding ways to entice industry to "partner" with government agencies [added: industry partners include the alleged co-conspirators Apple, Samsung, & LG. As a result, Apple, Samsung, & LG were able to capture and maintain between 85 – 88 percent of the cell phone market], mainly by ensuring profitability for private companies (Monahan, 2010b). This orientation is evinced by Cell-All's early-stage market research, paid for by HSARPA and administered by Qualcomm."

- Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. (Accessed 17.09.12).

**The FTC should have included Qualcomm's Alleged "Conspiracy" with the Original Equipment Manufacturers (OEMs); Apple, Samsung, LG, GM, Ford, & FCA**

Under this civil conspiracy cause of action case, Plaintiff has alleged Qualcomm committed an act in furtherance of the conspiracy planned by the other co-conspirators; Apple, Samsung, & LG, named in the alleged conspiracy related to the DHS S&T Cell-All project.

Plaintiff believes Qualcomm conspired with the Original Equipment Manufacturers (OEMs), of GM, Ford, & FCA, *See Amici Curiae Continental Automotive Systems, Inc. and Denso Corporation* ("[J]ust as in the smartphone industry, many cellular SEP-holders restrict their licensing in the automotive industry solely to the manufacturers of consumer goods (here,

the Big Three and other automakers), meaning that upstream manufacturers like amici are left out in the cold.")". t

Plaintiff-Appellant believes Qualcomm conspired to open up a market for its standard enterprise patents (SEPs) for cellular-modems, that's integrated with Plaintiff's patented CPUs for automobiles. Plaintiff further believes that when the automobile OEMs licensed Qualcomm's standard enterprise patents (SEPs) for cellular, the automobile OEMs knew they were also getting Plaintiff's patented CPUs for a "Stall, Stop, and Vehicle Slowdown System". (especially for driverless and self-drive vehicles). Qualcomm's motive to conspire with OEMs GM, Ford, & FCA, is the same as Qualcomm's motive to conspire with OEMs Apple, Samsung, & LG:

1. Automotive OEM-level licensing allows Qualcomm to obtain the maximum value for their patented technologies while avoiding the problem of patent exhaustion, whereby "the initial authorized [or licensed] sale of a patented item terminates all patent rights to that item." *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008); *see also Adams v. Burke*, 84 U.S. 453, 457 (1873) (when a patented item is "once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee or his assignees or licensees"). Due to patent exhaustion, if Qualcomm licensed its SEPs further "upstream" in the manufacturing process to competing chip suppliers, then its patent rights would be exhausted when these rivals sold their products to OEMs. OEMs would then have little incentive to pay Qualcomm for patent licenses, as they could instead become "downstream" recipients of the already exhausted patents embodied in these rivals' products. The licensing of its SEP patents to OEMs only, and not licensing its SEP patents to rival competitors, violated Qualcomm's FRAND agreement.

2. Qualcomm, GM, FCA, & Ford's, motive to conspire and motive to restrain trade means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and *standardized products*. Concentrated markets are, by nature, more conducive to collusion. Qualcomm, GM, FCA, & Ford, as government own or ran companies, and/or third-party government contractors—under contract to perform work for the Government—was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the development, manufacture, commercialization, and pricing of product(s), there would not be any reasonable substitute for their product or service, and potentially avoid a lawsuit for direct infringement.

3. At the time the alleged conspiracy began between Qualcomm, Apple, Samsung, & LG; and, the alleged conspiracy began with Qualcomm GM, Ford, & FCA, the alleged conspirators' motive to conspire was to avoid being sued for patent infringement in the District Courts. Plaintiff believes the conspirators, as government contractors, or a company(s) owned by, or a company ran by a government, conspired to perform at least one step of the patented process abroad. See *Zoltek Corp. v. United States*; 04-5100, -5102 (Fed. Cir. 2006): "We conclude that under § 1498, the United States is liable for the use of a method patent only when it practices every step of the claimed method in the United States. The court therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims... [t]his court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a process

cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims." The above decision was overturned in 2012.

Qualcomm's anticompetitive behavior not only harm the Plaintiff, but also harm the OEMs in the mobile device manufacturing industry; the OEMs in the automotive manufacturing industry, and the American consumers at large for both industries with the pricing of products.

**The FTC should have included Qualcomm's Alleged "Conspiratorial Patent Misappropriation" with the OEMs; Apple, Samsung, LG, GM, Ford, & FCA**

Qualcomm's standard enterprise patents (SEPs) are licensed to every OEM that wants to include cellular capability in their devices. Because they are standards accepted and authorized by the Government, no smartphone device can function without Qualcomm's cellular-modem.

Likewise, Plaintiff believes Qualcomm, and its OEMs co-conspirators, knew Qualcomm's cellular-modem cannot function without being interconnected to Plaintiff's CPU. Therefore, Plaintiff believes Qualcomm integrated its cellular-modem with Plaintiff's patented CPUs for mobile devices and commercialized it as its "Snapdragon System-on-a-chip or Chipset". This strategy of Qualcomm and certain other OEMs (i.e., Apple, Samsung, LG, GM, Ford, & FCA), developing, manufacturing, and commercializing products that should have included Plaintiff's patented CPUs, blocked or restrained Plaintiff and other CPU manufacturers from entering the market.

The Supreme Court described the tort of misappropriation as "an unauthorized interference with the normal operation of [a] complainant's legitimate business precisely at the

point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not." *International News Service v The Associated Press*, 248 US 215, 240 (1918). In the context of patent misappropriation, the thing appropriated would be a patented invention.

For conspiratorial patent misappropriation, the underlying tortious act is patent misappropriation. Accordingly, if the jury finds all the elements of a patent-misappropriation claim, and all the elements of a civil conspiracy claim, the defendants would typically be liable for "conspiratorial patent misappropriation".

## The FTC should have included Qualcomm's Alleged "Tying" of Plaintiff's Patented CPUs (the tied products), with Qualcomm's Patented Cellular-Modems (the tying products)

Multiple intellectual property rights may themselves be combined into packages (Qualcomm's Snapdragon chipsets). Mandatory package licensing occurs when Qualcomm refuses to license its SEPs cellular-modems unless a licensee accepts an entire package that includes Plaintiff's patented CPUs (or where Qualcomm's royalty scale has this effect).

For example, in the DOJ's enforcement action against Microsoft, using a tie to maintain a monopoly in the tying product was among the most notable liability findings upheld by the *en banc* D.C. Circuit: "Microsoft maintained its dominance in computer operating systems (the tying product) by "[t]echnologically binding" the Internet Explorer browser (the tied product) to the Windows operating system, to prevent other browsers from competing with Windows as a platform on which users could access computer applications." *Microsoft*, 253 F.3d at 60-67. *Microsoft* shows that there is no rule that conditioning the sale of one product on another can be unlawful only if it meets the standards for a traditional tying claim. Rather, courts must actually

assess the practice's effects in the monopolized market—here, chips. Likewise, in this case, it is Qualcomm's chips.

Linking intellectual property with other intellectual property can take many forms, such as offering licenses that cover tying the sale of two patented goods or one unpatented and one patented good. Classic "contractual" patent tying occurs when the tying product (Qualcomm's cellular-modem) is patented, the tied product is an unpatented commodity used as an input for the tying product. A "technological tie" may be defined as one in which "the tying and tied products are bundled together physically or produced in such a way that they are compatible only with each other." The government's tying claim against *Microsoft* involved both the contractual and technological bundling of the Internet Explorer web browser (the tied product) with its Windows operating system (the tying product).

Qualcomm protects and profits from its technological innovations through its patents, which it licenses to original equipment manufacturers ("OEMs") whose products (usually cellphones, but also smart cars and other products with cellular applications) practice one or more of Qualcomm's patented technologies.

**Qualcomm's Exclusive Agreements with Apple**

In 2007, Apple released the first iPhone using Intel (then Infineon) baseband processor chipsets. Qualcomm required licensing fees for using these chipsets. Rather than grant Apple a direct license on FRAND terms, Qualcomm has instead entered into confidential licenses with specific Apple contract manufacturers ("CMs"), the third-party manufacturers who make and assemble Apple products. The CMs pay the exorbitant royalties Qualcomm demands and pass the costs along to Apple.

The 2009 Strategic Terms Agreement ("STA") addresses the process by which Qualcomm supplies chipsets and associated software to Apple. It also restricts Apple's ability to sue Qualcomm for patent infringement concerning Qualcomm chipsets. While Apple generally negotiates firm supply commitments with its component vendors, Qualcomm refused to provide Apple such a commitment, instead arbitrarily capping its liability for failure to supply, and reserving for itself the ability to terminate its obligation to supply chipsets to Apple's CMs. Qualcomm's unilateral right to terminate supply of chipsets to Apple's CMs was retained in the Amended and Restated Strategic Terms Agreement ("ASTA"), effective February 28, 2013.

The Japan Fair Trade Commission ("JFTC") has been investigating Qualcomm since 2006. In September 2009, the JFTC concluded that Qualcomm violated the Japanese Antimonopoly Act by forcing licensees to cross-license their patents on a royalty-free basis and agree to a non-assert provision, and ordered the company to cease these practices. In July 2009, the KFTC levied the largest fine it had ever imposed on a company -- $207 million -- on Qualcomm for abusing its dominant share of the CDMA chipset market.

Since 2011, when Apple introduced the first CDMA version of its products, Qualcomm has charged Apple a monopolistic premium for access to CDMA chipsets that are in all other respects identical to chipsets sold to Apple without CDMA functionality enabled. Qualcomm prices its CDMA chipsets without regard to competitive alternatives. Specifically, since 2011, Qualcomm has conditioned billions of dollars in rebates on exclusivity from Apple.

The District Court analyzed the FTC's third claim regarding Qualcomm's exclusive agreement with Apple, focusing on the two companies' contractual agreements from 2011 to 2013. In 2011, Apple and Qualcomm entered into an agreement in which Apple received incentive payments, intending to encourage them to transition towards the usage of Qualcomm's

chips. Under this agreement, Apple was conditioned to meet a certain volume target; however, they could face termination if the company sold products that did not use Qualcomm's chips. In 2013, the parties extended their agreement to expand into the usage of Qualcomm's chips in Apple's iPhones and iPads. The court ruled that the two companies' contractual agreements from 2011 to 2013 were "*de facto*" exclusive agreements that "coerced" Apple into buying a substantial portion of its chips from Qualcomm.

The court ruled that the agreements violated antitrust laws seeing that it harmed competition by preventing rivals from accessing a substantial market.

As part of their agreement for Apple to exclusively use Qualcomm chips between 2013 and 2016, Qualcomm agreed to pay Apple a $1 billion rebate annually. Part of this agreement included Apple not cooperating with regulators, and not working with other chip makers.

## Qualcomm, Inc. Snapdragon Processors for Samsung and LG Devices

Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung; LG). They are also used in cars and wearable devices

such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Qualcomm® Snapdragon™ 820 Automotive Platform for GM, Ford, & FCA US:**

"With its power-efficient and custom-designed CPU, stunning GPU performance, lightning-fast Qualcomm® Snapdragon™ X12 LTE modem capable of Cat 12 speeds, and powerful video processing capabilities, the Qualcomm® Snapdragon™ 820 automotive platform is empowering automakers everywhere with scalable solutions that are more connected, smart and aware." *Qualcomm's website*

Connected: The convenience of continuous secure Wi-Fi connectivity in your vehicle via the available X12 LTE modem - which integrates advanced 4G LTE technologies. Smart: Interconnected systems securely and safely enable intuitive and personalized interaction between all brought-in personal devices and your car. *Narrowing the gap between mobile experience and the connected auto experience*. Aware: Vehicle sensor integration provides cognitive awareness for driver assistance using Zeroth Machine Learning Platform and HVX-computer vision engine, location navigation using integrated GNSS and automotive dead reckoning. Features: Optional integrated super-fast LTE Advanced connectivity; Automotive heterogeneous compute processor with machine learning; 64-bit Qualcomm® Kryo™ CPU architecture – high performance with support for ARM V8/Hypervisor; Qualcomm® Adreno™ 530 GPU with improved performance for advanced graphics and 4K resolution; Support for multiple camera sensors and high-resolution 4K displays; Zeroth Machine Intelligence Platform supporting cognitive computing and computer vision for real-time recognition of potential hazards on the road; and, scalable platforms allowing integrated driver assistance features such as turn-by-turn navigation overlaid on live camera data. https://www.qualcomm.com/products/snapdragon-820-automotive-platform

According to Glyn Moody, a journalist specializing in tech policy, the car industry is bothered by Qualcomm's patent practices because "cars are essentially becoming computers on wheels", as the industry continues to develop more advanced connected cars.

Prof Mark Lemley of Stanford Law School is director of the Stanford Program in Law, Science and Technology. He has been following Qualcomm's various court cases for several years. "Qualcomm made a commitment that it would license its chips on reasonable and non-discriminatory terms, because they wanted their chips to be included in the industry standards, and then they created a structure to avoid doing this," he said. "I think they are in fact violating the antitrust laws."

A successful misappropriation claim generally requires proof that (1) the plaintiff "made a substantial investment of time, effort, and money in creating the thing misappropriated such that the court can characterize that 'thing' as a kind of property right"; (2) the defendant [added: Qualcomm] "appropriated the 'thing' at little or no cost, such that the court can characterize [the] defendant's actions as 'reaping where it has not sown'"; and (3) the defendant's acts injured the plaintiff. David W. Barnes, *Misappropriation of Trademark*, 9 NC J L & Tech 171, 174 (2008). In the context of patent misappropriation, the thing Qualcomm allegedly appropriated in furtherance of the agreements and alleged conspiracy planned by the parties, would be Appellant's patented CPU for automobiles (i.e., SoC, Chipset) invention.

## QUALCOMM'S DISTRICT COURT DECISION

In January 2017, the FTC sued Qualcomm for equitable relief, alleging that Qualcomm's interrelated policies and practices excluded competitors and harmed competition in the modem chip markets, in violation § 5(a) of the FTC Act, 15 U.S.C. § 45(a), and §§ 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1, 2. After a ten-day bench trial, the district court concluded that "Qualcomm's licensing practices are an unreasonable restraint of trade under § 1 of the Sherman Act and exclusionary conduct under § 2 of the Sherman Act." *Qualcomm*, 411 F. Supp. 3d at 812 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001)). The district court ordered a permanent, worldwide injunction prohibiting Qualcomm's core business practices. *Id.* at 820–24.

The district court's decision consists of essentially five mixed findings of fact and law: (1) Qualcomm's "no license, no chips" policy amounts to "anticompetitive conduct against OEMs" and an "anticompetitive practice in patent license negotiations"; (2) Qualcomm's refusal to license rival chipmakers violates both its FRAND commitments and an antitrust duty to deal under § 2 of the Sherman Act; (3) Qualcomm's "exclusive deals" with Apple "foreclosed a 'substantial share' of the modem chip market" in violation of both Sherman Act provisions; (4) Qualcomm's royalty rates are "unreasonably high" because they are improperly based on its market share and handset price instead of the value of its patents; and (5) Qualcomm's royalties, in conjunction with its "no license, no chips" policy, "impose an artificial and anticompetitive surcharge" on its rivals' sales, "increase[ing] the effective price of rivals' modem chips" and resulting in anticompetitive exclusivity. *Qualcomm*, 411 F. Supp. 3d at 697-98, 751-62, 766, 771-92 (citations omitted). "Collectively," the district court found, these policies and practices "create insurmountable and artificial barriers for Qualcomm's rivals, and thus do not further competition on the merits." *Id.* at 797.

The district court concluded that "[b]y attacking all facets of rivals' businesses and preventing competition on the merits, [Qualcomm's] practices 'harm the competitive process and thereby harm consumers.'" *Id.* (quoting *Microsoft*, 253 F.3d at 58). Accordingly, the district

court held that the FTC met its burden under the Sherman Act of proving "market power plus some evidence that the challenged restraint harms competition." *Id.* at 804 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)). Furthermore, the district court held that it could "infer" a causal connection between Qualcomm's conduct and anticompetitive harm because that conduct "'reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'" *Id.* at 804–05 (alterations in original) (quoting *Microsoft*, 253 F.3d at 79).

## CONCLUSION

Many antitrust cases contain an element of concealment due to the very nature of the claims, but heightened pleading is not required. *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 n.10 (N.D. Ill. 2011) ("If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data."); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at *11 (N.D. Ill. Oct. 22, 2018) ("specific allegations" of the "who, what, where, and when" not required in antitrust cases).

In the context of the Complaint, it is clear that the consumer protection claims arise out of unfair business conduct, namely the *antitrust conspiracy*. Therefore, Plaintiff must only meet the pleading standards of Rule 8(a), where "[a] complaint need not narrate all relevant facts or recite the law; all it has to do is set out a claim for relief." *Camasta*, 761 F.3d at 736 (citing *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963 (7th Cir.1992))

The S. C. District Court in this case suggested Plaintiff's claim under the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-140(a) (SCUTPA) fails because of statutory

bars to consumer protection actions. The Court fail to cite to any cases to support their position. The District Court in *In re Broiler Chicken Antitrust Litig.* looked at whether plaintiffs with similar allegations could bring a claim under SCUPTA and found they were not barred from bringing a claim under SCUTPA. 290 F. Supp. 3d at 818; *see also In re Packaged Seafood Products Antitrust Litig.*, 242 F. Supp.3d 1033, 1086 (S.D. Cal. 2017) (finding Shady Grove did not bar SCUTPA claim); *In re Hydroxy Cut Marketing & Sales Practices Litig.*, 299 F.R.D. 648, 652-53 (S.D. Cal. 2014) (same). Likewise, here, Plaintiff's claim under SCUTPA should proceed because it is not barred by any statutory bar.

Plaintiff has satisfied the requirements for bringing an "unjust enrichment" claim under South Carolina State Law against the Defendants in this case. Plaintiff believes Qualcomm is being unjustly enriched for "tying" its cellular-modem to Plaintiff's patented CPUs; Apple, Samsung, & LG are being unjustly enriched for the commercialization of Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices; and GM, Ford, & FCA are being unjustly enriched for the commercialization of Plaintiff's patented stall, stop, and vehicle slowdown systems.

Plaintiff has also demonstrated; the existence of a duty owed the Plaintiff by the Defendants and that Plaintiff was actually injured and continues to suffer a loss. "Under South Carolina law, a plaintiff bringing a claim for unjust enrichment must establish three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value." *Columbia Wholesale Co. v. Scudder May N.V.*, 440 S.E.2d 129, 130 (S.C. 1994). As part of the claim, the plaintiff must establish the existence of a duty owed to him or her by the defendant. *See Myrtle Beach Hosp., Inc. v. City of Myrtle Beach,*

532 S.E.2d 868, 873 (S.C. 2000) ("[S]ince the only duty on the City is that imposed by the Due Process Clause of the federal constitution… we do not perceive any inequity in not requiring the City to reimburse the hospital.")."

> "[t]he majority of cases the Court has found have ruled that a duty need not be alleged and have squarely rejected Defendants' interpretation of their cited cases. *See e.g. In re Auto. Parts Antitrust Litig.*, 29 F.Supp.3d at 1026 (finding there is no requirement to allege the existence of a duty under South Carolina law and distinguishing *Ellis*); *In re Pork Antitrust Litig.*, Civil Nos. 18-1776, 19-1578, and 19-2723 (JRT/LIB), 2020 WL 6149666, \*29 (D. Minn. Oct. 20, 2020) (finding duty is not owed under South Carolina and finding *In re Microsoft Corp. Antitrust Litig.* and *Pitts* were based upon a misinterpretation of South Carolina law); *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and Co.*, No. 13-cv-01180-BLF, 2015 WL 4755335, \*30 (N.D. Cal. Aug. 11, 2015) (discussing *Pitts* and finding no requirement to allege duty in South Carolina law); *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 1:14-md-2508, 2015 WL 5166014, \*37 (E.D. Tenn. June 24, 2015) (discussing *Ellis, Pitts,* and *In re Microsoft Corp. Antitrust Litig* and deciding that alleging a duty is not a requirement in South Carolina to state an unjust enrichment claim) . The thorough analysis of South Carolina unjust enrichment law performed by these courts is persuasive. The Court denies the motion to dismiss Plaintiff's South Carolina unjust enrichment claim."

Plaintiff-Appellant believes Qualcomm has successfully "tied" its standard enterprise patented invention (i.e., cellular-modem) to Plaintiff's patented CPUs. Ever since the late 1940s, when the Supreme Court stated in *International Salt Co. v. United States* that "it is unreasonable, *per se*, to foreclose competitors from any substantial market," and in *Standard Oil Co. v. United States* that "[t]ying agreements serve hardly any purpose beyond the suppression of competition," U.S. courts have found tying to be *per se* unlawful.

Although the elements of a *per se* tying violation have been articulated differently, courts generally require that: (1) two separate products or services are involved, (2) the sale or

48

agreement to sell one is conditioned on the purchase of the other, (3) the seller has sufficient economic power in the market for the tying product to enable it to restrain trade in the market for the tied product, and (4) a not insubstantial amount of interstate commerce in the tied product is affected. *Antitrust Law Developments* at 179 & n.998 (citing cases).

**Relief:**

1. Remand this case back to the S.C. District Court

2. Order the S.C. District Court to authorize service of process

3. Order the S.C. District Court to authorize a trial by jury

4. Order the S.C. District Court to grant preliminary injunctive relief

5. Any other relief this Circuit Court deems reasonable.

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing "APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION; IN CASE NO. 6:20-cv-02270-JD; JUDGE JOSEPH DAWSON, III presiding, was sent on October 16, 2021 via U.S. Postal Service "Priority Mail", to:

Carroll A. Campbell, Jr. U.S. Courthouse
250 East North Street
Greenville, South Carolina 29601
Telephone: 864-241-2700
Fax: 864-241-2711

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

# EXHIBIT A

AO 450 (SCD 04/2010)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of South Carolina

| | |
|---|---|
| Larry Golden,<br>*Plaintiff*<br>v.<br>Apple Inc, Samsung Electronics USA, LG<br>Electronics USA Inc, Qualcomm Inc, Ford Global<br>Technologies LLC, General Motors Company, FCA<br>US LLC,<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)  Civil Action No.    6:20-cv-02270-JD |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one):*

■ the Court adopts the Report and Recommendation. Plaintiff's Complaint is dismissed without prejudice and without the issuance of service of process.

This action was *(check one)*:

❏ tried by a jury, the Honorable _____ presiding, and the jury has rendered a verdict.

❏ tried by the Honorable _____ presiding, without a jury and the above decision was reached.

■ decided by the Honorable Joseph Dawson, III

Date:   September 21, 2021                    *ROBIN L. BLUME, CLERK OF COURT*

                                              s/Rob Weber
                                    ─────────────────────────────
                                    *Signature of Clerk or Deputy Clerk*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Larry Golden, | ) | Case No.: 6:20-cv-02270-JD-KFM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **OPINION & ORDER** |
| Apple Inc., Samsung Electronics USA, LG | ) | |
| Electronics USA Inc., Qualcomm Inc., Ford | ) | |
| Global Technologies LLC, General Motors | ) | |
| Company, FCA USA LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court with the Report and Recommendation of United States

Magistrate Kevin F. McDonald ("Report and Recommendation" or "Report"), made in accordance

with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1]

Plaintiff Larry Golden ("Golden" or "Plaintiff"), proceeding *pro se* and *in forma pauperis*, filed

this Complaint alleging violations of the Sherman Act, violations of the Clayton Act, and

violations of South Carolina Law by the Defendants. (DE 1.) Plaintiff alleges that he owns certain

intellectual property technology (i.e., Communicating, Monitoring, Detecting, and Controlling

(CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling

Systems; and, Network Connected Vehicles (NCV) which Defendants have conspired to develop

---

[1]    The recommendation has no presumptive weight, and the responsibility for making a final
determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-
71 (1976). The Court is charged with making a de novo determination of those portions of the Report and
Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole
or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28
U.S.C. § 636(b)(1).

as their own without Plaintiff's knowledge.[2] (DE 1, p. 16.) Further, Golden alleges the Defendant corporations and business entities engaged in a "secret conspiracy" to prevent the plaintiff from entering the market with his CMDC device for which he has several patents. (DE 1.) Golden also alleges that the Defendants have deprived him of royalty compensation and/or licensing compensation as a result of their actions. Plaintiff filed this action as a purported class action, alleging that the purported class (defined as each South Carolina tax-paying citizen) has been indirectly harmed by the Defendants' actions based upon lost tax revenue from Golden.[3] (DE 1.)

Since Golden filed this action pursuant to 28 U.S.C. § 1915, the *in forma pauperis* statute, the District Court is authorized to dismiss a case if it is satisfied that the action "fails to state a claim on which relief may be granted," is "frivolous or malicious," or "seeks monetary relief against a Defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Accordingly, on September 11, 2020, the Magistrate Judge issued the Report given his initial review of the pleadings. The Report recommended summary dismissal of the complaint without prejudice, issuance of service of process, or leave to amend his complaint. The Report further recommended that this Court consider the entry of sanctions against Golden in the future should he continue to file frivolous litigation in this Court. (DE 16.) In support of the Magistrate's recommendation, the Report took judicial notice that the instant matter represents Golden's fourth unsuccessful

---

[2]     Plaintiff claims patents for the devices and that Defendants have infringed on patents 10,163,287 ('287 patent); 9,589,439 ('439 patent); 9,096,189 ('189 patent); RE43,990 ('990 patent); RE43,891 ('891 patent); and 7,385,497 ('497 patent) and that he is owed royalties.

[3]     By Order dated July 14, 2020, the Court notified the Plaintiff that this action would be considered as filed solely on the Plaintiff's behalf because the Plaintiff cannot file or maintain a lawsuit on behalf of others. (DE 9.); see also Myers v. Loudon Cty. Pub. Sch., 418 F.3d 395, 400 (4th Cir. 2005) (noting that although an individual has the right to represent himself/herself by statute—28 U.S.C. § 1654—that right does not "create a coordinate right to litigate for others"). The Court also notified the Plaintiff that "although the plaintiff asserts various claims, they all involve infringement of his patents (see generally doc. 1); thus, this case has been opened as a patent infringement matter." (DE 9.)

action regarding his patents (and infringing actions). See Golden v. Apple Inc., et al., C/A No. 6:19-cv-02557-DCC, 2020 WL 415896 (D.S.C. Jan. 27, 2020), aff'd C/A No. 20-1508, --- F. App'x ---, 2020 WL 5240656 (Fed. Cir. Sept. 3, 2020) ("Case Number 3"); Golden v. United States, C/A No. 1:19-cv-00104-EGB (Fed. Cl.), dismissal aff'd 955 F.3d 981 (Fed. Cir. 2020) ("Case Number 2"); Golden v. United States, C/A No 1:13-cv-00307- SGB, stayed pending patent review, at doc. 186 (Fed. Cl.) ("Case Number 1"); In re Patent Number RE 43,990, https://portal.uspto.gov/pair/PublicPair# (choose patent number, enter RE43990, and then click Image File Wrapper) (last visited September 16, 2021), petition denied June 25, 2020.

Accordingly, the Report recommend dismissal of Plaintiff's complaint because *inter alia* Plaintiff's antitrust claims are premised on unsuccessful patent infringements claims that have been adjudicated, and even if they were valid, his complaint still fails because it "offers only vague generalities and block quotes of statutes, cases and treatises, but nowhere points [] to any nonfrivolous allegations of . . . any claim". (DE 16, p. 9.) Moreover, Plaintiff's State law claim under South Carolina Unfair Trade Practices Act (SCUTPA) is deficient because he has not shown that the Defendants' actions adversely affected the public interest. (DE 16, p. 10.)

Golden filed an objection to the Report on September 16, 2020 (DE 19); however, to be actionable, objections to the Report and Recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- *that are at the heart of the parties' dispute.*'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing

Thomas v. Arn, 474 U.S. 140 (1985) (emphasis added)). In the absence of <u>specific</u> objections to the Report and Recommendation of the magistrate judge, this Court is not required to give any explanation for adopting the recommendation. <u>See</u> <u>Camby v. Davis</u>, 718 F.2d 198, 199 (4th Cir. 1983).

Plaintiff makes the following "objections" to the Report, which the Court will discuss *seriatim*. First, Plaintiff objects to the Magistrate Judge changing Plaintiff's cause of action from "violation of antitrust laws" to "patent infringement" and combining/joining the same. (DE 19, pp. 1-2.) Golden contends that the Magistrate's decision to change his cause of action to patent infringement was motivated by a racial animus towards him to make it easier to dismiss his claim under Rule 12(b)(6), Fed. R. Civ. P.[4] This Court categorically rejects the notion that the Magistrate acted with any racial prejudice or bias in the Report, to include his recommendations in this case. However, the Court agrees that this case should not be "opened as a patent infringement matter" when his causes of action are listed under other cognizable legal theories. Therefore, the Court modifies the Report to the extent it changes Plaintiff's causes of action and overrules the Magistrate's previous order finding the same. (DE 9.) However, overruling the Magistrate's order *alone* regarding how this case is classified on the docket (i.e., patent (810) vs. antitrust (410)) is a distinction without a difference because it does not resolve the deficiencies in Golden's complaint.

Nonetheless, Golden objects to the Report's recommendation that this case be dismissed under Rule 12(b)(6), Fed. R. Civ. P., where the Report found that Golden's claims were frivolous.

---

[4]    Plaintiff also objects to the Magistrate Judge racially motivation (sic) recommendation of imposing sanctions on Plaintiff for being a Black inventor who is filing complaints against 'white' defendants. As noted herein, the Court rejects the notion that the Magistrate acted with any racial animus in any respect here. Moreover, Plaintiff misconstrues the Report's recommendation which provides "that the United States District Judge assigned to this case consider the entry of sanctions against the plaintiff *in the future* should the plaintiff continue to file frivolous litigation in this court." (DE 16, 11.) Accordingly, since the event described herein has not occurred (future frivolous filings), the Court overrules this objection.

The Magistrate comprehensively and in detail addressed the issues surrounding this objection in the Report. The Magistrate found that "although the plaintiff's complaint asserts various claims, they all rely upon alleged infringement of the plaintiff's patents". (DE 16, p. 7.) The Report correctly concluded that:

> Indeed, the plaintiff, who unsuccessfully sought damages against many of the defendants in the court for patent infringement in Case Number 6:19-cv–2557-DCC, here, appears to seek relief for the same infringing actions by dressing the case as asserting violations of the Sherman Act, the Clayton Act, and various South Carolina Laws

(DE 16, p. 7-8.) Further, the Report noted that the "plaintiff's patent infringement claims are subject to dismissal because the plaintiff has failed to include factual allegations beyond the identities of the defendants, reference to the CMDC device, and the alleged infringed-upon patents" which was the basis for the dismissal in Plaintiff's previous case alleging patent infringement claims. Therefore, this Court overrules this objection.[5]

Next, Plaintiff objects to the Magistrate Judge's recommendation that this case be dismissed under Rule 12(b)(1) Fed. R. Civ. P., for lack of subject matter jurisdiction. The Court finds that Golden's objection is non-specific, unrelated to the dispositive and/or at the heart of disputed portions of the Report and Recommendation because the Report does not recommend dismissal of this case for lack of subject matter jurisdiction. Therefore, this objection is overruled.

After a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein.

---

[5]    Plaintiff's objection also attempts to seek solace in the fact that he copied another antitrust lawsuit purportedly "submitted by 'whites', accepted by judges, and not challenged . . . whether the plaintiff has stated a claim for which relief can be granted." (DE 19, p. 12.) Without overindulging this hyperbole, Plaintiff's *sample* lawsuit fails to reconcile the fact that he has filed four lawsuits stemming from alleged patent infringement claims, to include the present suit *pro se* and *in forma pauperis,* which is not identical to the facts in his referenced *sample* lawsuit. Also, Plaintiff overlooks the fact that his *sample* reference lawsuit was settled before any responsive pleadings or motions were filed by the parties. Accordingly, this Court is not persuaded by Plaintiff's arguments in this regard.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Complaint is dismissed without prejudice and without the issuance of service of process.

**AND IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

Greenville, South Carolina
September 20, 2021

## NOTICE OF RIGHT TO APPEAL

Plaintiff is hereby notified that he has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.

## APPEAL TRANSMITTAL SHEET (non-death penalty)

| Transmittal to 4CCA of notice of appeal filed: _10/14/21_ | District: <br> South Carolina | District Case No.: <br> 6:20-cv-02270-JD |
|---|---|---|
| ✓ First NOA in Case <br> ___ Subsequent NOA-same party <br> ___ Subsequent NOA-new party <br> ___ Subsequent NOA-cross appeal <br> ___ Paper ROA  ___ Paper Supp. <br> Vols: _____ <br> Other: _____ | Division: <br> Greenville <br><br> Caption: <br> Larry Golden <br> v. <br> Apple Inc., et., al. | 4CCA No(s). for any prior NOA: <br><br><br> 4CCA Case Manager: |

**Exceptional Circumstances:** ___ Bail  ___ Interlocutory  ___ Recalcitrant Witness  ___ Other _____

| Confinement-Criminal Case: <br> ___ Death row-use DP Transmittal <br> ___ Recalcitrant witness <br> ___ In custody <br> ___ On bond <br> ___ On probation <br> Defendant Address-Criminal Case: | Fee Status: <br> ___ No fee required (USA appeal)   ___ Appeal fees paid in full   ✓ Fee not paid <br> **Criminal Cases:** <br> ___ District court granted & did not revoke CJA status (continues on appeal) <br> ___ District court granted CJA & later revoked status (must pay fee or apply to 4CCA) <br> ___ District court never granted CJA status (must pay fee or apply to 4CCA) <br> **Civil, Habeas & 2255 Cases:** <br> ✓ Court granted & did not revoke IFP status (continues on appeal) <br> ___ Court granted IFP & later revoked status (must pay fee or apply to 4CCA) <br> ___ Court never granted IFP status (must pay fee or apply to 4CCA) <br> **PLRA Cases:** <br> ___ Proceeded PLRA in district court, no 3-strike determination (must apply to 4CCA) <br> ___ Proceeded PLRA in district court, determined to be 3-striker (must apply to 4CCA) |

| District Judge: <br> Joseph Dawson, III | |
|---|---|
| Court Reporter (list all): <br><br><br><br> Coordinator: | Sealed Status (check all that apply): <br> ____ Portions of record under seal <br> ____ Entire record under seal <br> ____ Party names under seal <br> ____ Docket under seal |

| Record Status for Pro Se Appeals (check any applicable): <br> ✓ Assembled electronic record transmitted <br> ___ Additional sealed record emailed to 4cca-filing <br> ___ Paper record or supplement shipped to 4CCA <br> ✓ No in-court hearings held <br> ___ In-court hearings held – all transcript on file <br> ___ In-court hearings held – all transcript not on file <br> ___ Other: | Record Status for Counseled Appeals (check any applicable): <br> ___ Assembled electronic record available if requested <br> ___ Additional sealed record available if requested <br> ___ Paper record or supplement available if requested <br> ___ No in-court hearings held <br> ___ In-court hearings held – all transcript on file <br> ___ In-court hearings held – all transcript not on file <br> ___ Other: |

Deputy Clerk: _Rob Weber_     Phone: _864-241-2709_     Date: _10/14/21_

01/2012

RECEIVED
SDC CLERK, GREENVILLE SC

2021 OCT 13 PM 1:49

United States District Court for the _____

District of  South Carolina Greenville Division

File Number  6:20-cv-02270-JD

Larry Golden

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Notice of Appeal</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Apple Inc., Samsung Electronics USA,</td><td>)</td><td></td></tr>
<tr><td>LG Electronics USA Inc., Qualcomm</td><td>)</td><td></td></tr>
<tr><td>Inc., Ford Global Technologies LLC,</td><td></td><td></td></tr>
<tr><td>General Motors Company, FCA USA LLC</td><td></td><td></td></tr>
</table>

Notice is hereby given that  Larry Golden _____(plaintiffs)
(defendants) in the above named case,* hereby appeal to the United States Court of Appeals for
the ___Fourth___ Circuit (from the final judgment) (from the order (describing it)) entered in this
action on the __20__ day of __September__, 20 _21_.

(s) _Larry Golden_____

Attorney for  ProSe Appellant_____

Address: 740 Woodruff Rd., #1102_____

Greenville, SC 29607_____

***[Note to inmate filers:** If you are an inmate confined in an institution and you seek the timing
benefit of Fed. R. App. P. 4(c)(1), complete the Declaration of Inmate Filing and file that
declaration along with this Notice of Appeal]*

* See Rule 3(c) for permissible ways of identifying appellants.

12/01/2016 SCC


## Regular Checking - 5363: Account Activity Transaction Details

| | |
|---|---|
| **Check number:** | 00000005106 |
| **Post date:** | 10/14/2021 |
| **Amount:** | -505.00 |
| **Type:** | Check |
| **Description:** | Check |
| **Merchant name:** | Check |
| **Merchant information:** | |
| **Transaction category:** | Uncategorized: Pending |

LARRY GOLDEN
POD KIARA LATRICE GOLDEN
POD KAYLA GERITA GOLDEN
740 WOODRUFF RD APT 1102
GREENVILLE, SC 29607-4081

5106

10/13/21

Pay To The Order Of  U.S. District Court for the District of SC   $ 505.00

Five hundred, five dollars 00/100   Dollars

BANK OF AMERICA

For Notice of Appeal          Larry Golden

⑈053904483⑈ 000769185363⑈5106

FOR DEPOSIT ONLY
TO THE CREDIT OF
TREASURER OF U.S.
CLERK, U.S.D.C.

# EXHIBIT B

## PATENT CLAIMS 4, 5, & 6, OF THE '287 PATENT

| Patent #: 10,163,287; Independent Claim 4 | LG Electronics LG V30 & LG G6 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| | Plaintiff believes the Defendant and third-party contractor; LG Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s). |
| | **LG Electronics LG V30 & LG G6 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. |
| A communication device comprising: | **IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced... "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| | **The Department of Homeland Security's Cell-All project.** "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones..." "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University |

of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection**: "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection**: Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter. Compatible with Android iOS.



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in

November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**LG V30 Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm)
**LG V30 CPU**: Octa-core (4x2.45 GHz Kryo & 4x1.9 GHz Kryo)

**LG G6 Chipset**: Qualcomm MSM8996 Snapdragon 821 (14 nm)
**LG G6 CPU**: Quad-core (2x2.35 GHz Kryo & 2x1.6 GHz Kryo)

**LG Watch Sport Chipset**: Qualcomm MSM8909W Snapdragon Wear 2100
**LG Watch Sport CPU**: Quad-core 1.1 GHz Cortex-A7

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158.

---

**Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.

All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices.

*at least one central processing unit (CPU);*

| | |
|---|---|
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of an internet connection Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents".** ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854)) The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents".** ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854)) The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |      **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>     The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>     All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| Patent #: 10,163,287; Independent Claim 5 | LG Electronics LG V30 & LG G6 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A monitoring device, comprising: | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**LG Electronics LG V30 & LG G6 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599- |

3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing

| | |
|---|---|
| | the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products. <br><br> **LG V30 Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) <br> **LG V30 CPU**: Octa-core (4x2.45 GHz Kryo & 4x1.9 GHz Kryo) <br><br> **LG G6 Chipset**: Qualcomm MSM8996 Snapdragon 821 (14 nm) <br> **LG G6 CPU**: Quad-core (2x2.35 GHz Kryo & 2x1.6 GHz Kryo) <br><br> **LG Watch Sport Chipset**: Qualcomm MSM8909W Snapdragon Wear 2100 <br> **LG Watch Sport CPU**: Quad-core 1.1 GHz Cortex-A7 <br><br> **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. |
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents".** ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854)) <br><br> The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. <br><br> All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents".** ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents".** ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| <span style="color:blue">one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;</span> | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| <span style="color:blue">at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,</span> | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| |
|---|
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

**Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.

All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices.

| Patent #: 10,163,287; Independent Claim 6 | LG Electronics LG V30 & LG G6 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** |
| | **LG Electronics LG V30 & LG G6 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. |
| A monitoring equipment, comprising: | **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| | **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All |

applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing

| | the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.<br><br>**LG V30 Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm)<br>**LG V30 CPU**: Octa-core (4x2.45 GHz Kryo & 4x1.9 GHz Kryo)<br><br>**LG G6 Chipset**: Qualcomm MSM8996 Snapdragon 821 (14 nm)<br>**LG G6 CPU**: Quad-core (2x2.35 GHz Kryo & 2x1.6 GHz Kryo)<br><br>**LG Watch Sport Chipset**: Qualcomm MSM8909W Snapdragon Wear 2100<br>**LG Watch Sport CPU**: Quad-core 1.1 GHz Cortex-A7<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. |
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one light indicator in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one of an internet connection or Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices.<br><br>**Smart Watches**<br>• Homeland Security's Smartwatch Will Detect Nuclear Bombs. https://www.popularmechanics.com/military/research/a18161/homeland-security-smartwatch-detect-nuclear-bombs/<br>• The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/<br>• Studies reveal smartwatch biometrics can detect COVID-19 before symptoms surface: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; LG Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

## Example of Qualcomm's SoC / CPUs / Chipsets

| Qualcomm's Technological Capability and Industry | Qualcomm's Technological Capability (Description) |
|---|---|
| Qualcomm's DHS Government Contract<br><br>**Government Industry** | HSARPA conducted a national search for ideas that was intended to leverage existing technological expertise in the public and private sectors, which led to the creation of six workable first generation prototypes, including a ''form factor phone'' developed by Qualcomm and a chemical nano-sensor device developed by NASA (U.S. Department of Homeland Security, 2011a). Research contracts were awarded by DHS through HSARPA and the Small Business Innovation Research Portfolio, with some of the primary recipients being Qualcomm, Synkera Technologies, and NASA (U.S. Department of Homeland Security, 2011b). In addition, DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the ''commercialization of technology developed for government purposes'' (U.S. DHS, 2010). |
| Qualcomm® Snapdragon™ (SoC / Central Processing Unit (CPU))<br><br>**Government Industry: Industry for Processors** | Snapdragon is a suite of system on a chip (SoC) semiconductor products designed and marketed by Qualcomm for mobile devices. The Snapdragon system on chip (SoC) was announced in November 2006. The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video. We are helping protect our U.S. government partners' communication with a combination of authentication and identification methods. Our best-in-class commercial sensors help ensure accurate authentication and trusted access for users and devices. From biometrics that reduce or eliminate the need for passcodes, to advanced hardware that shields your data, the Qualcomm® Snapdragon™ mobile security platform is designed to guard and protect precious data with vault-like security. Qualcomm Snapdragon is a product of Qualcomm Technologies, Inc., and/or its subsidiaries. https://www.qualcomm.com/products/government/authentication-identity |
| Qualcomm Government Technologies<br><br>**Government Industry** | Qualcomm Government Technologies leverages Qualcomm's wireless expertise, innovative technologies and vast industry reach to provide capabilities and services that enable our government customers to realize significant technology gains and excellence in mission performance. Qualcomm Incorporated (www.qualcomm.com) is a leader in developing and delivering innovative digital wireless communications products, services, and other advanced technologies. https://www.qualcomm.com/news/releases/2008/05/29/qualcomm-government-technologies-extends-software-security-cryptographic |

| Qualcomm's Technological Capability and Industry | Qualcomm's Technological Capability (Description) |
|---|---|
| Qualcomm's DHS Government Contract<br><br>**Government Industry** | FAIRFAX, Va.--(BUSINESS WIRE)--Kryptowire, the mobile application security and privacy testing platform of choice for U.S. government agencies, is delighted to announce that the Qualcomm Technologies, Inc., has been awarded $1.8M by the Department of Homeland Security Science and Technology Directorate (DHS S&T) to demonstrate Qualcomm Technologies' hardware-anchored Mission-Critical-Grade Security Layer (MCGSL) that leverages the Snapdragon Mobile Security Platform and extends its foundational commercial capabilities to Kryptowire's military-grade mobile application security testing platform to address threats on commercial mobile devices. * |
| NFC<br><br>**Wireless Networking Technology Industry** | NFC chips might also be widely used in the Internet of Things. Qualcomm recently announced that it will include NXP's near-field communication (NFC) solution in the Snapdragon processor platform that powers mobile devices (e.g., smartphones), wearables (e.g., smartwatches), and automobiles. * |
| SmartWatch Qualcomm® Snapdragon Wear™ 4100+ platform<br><br>**Wireless Networking Technology Industry** | The Qualcomm® Snapdragon Wear™ 4100+ platform, comprised of a powerful applications processor and ultralow power co-processor, is designed to deliver super-fast performance, and connectivity. Like other computers, a smartwatch may collect information from internal or external sensors and it may control, or retrieve data from, other instruments or computers. It may support wireless technologies such as Bluetooth, Wi-Fi, and GPS. The Qualcomm® Snapdragon Wear™ platforms are made to deliver low-power, high-impact performance for a wide range of wearables, including smartwatches, kids' watches, smart trackers and more. * |
| Disabling Lock<br><br>**Locking Industry** | Qualcomm Technologies announced SafeSwitch in September of 2014. SafeSwitch is available to customers through its Qualcomm Snapdragon 810 processors. SafeSwitch technology - addresses mobile security threat with a kill switch solution is designed to allow device owners to remotely disable their devices in the event that they're lost or stolen - and then re-enable them in the event they're found. This helps to protect sensitive, valuable personal data and to deter device theft. * |
| Biometrics<br><br>**Biometrics Industry** | Authenticating the user and the device. Beyond secure fingerprint identification, a Snapdragon 835 Mobile Platform provides a user with an extra level of safety using Camera Security—a camera-based biometric solution for iris and facial recognition engineered to help enhance mobile device security. * |

| Qualcomm's Technological Capability and Industry | Qualcomm's Technological Capability (Description) |
|---|---|
| Biometrics<br><br>**Biometrics Industry** | Mobile transactions are safest when they are protected by a combination of user and device authentication methods. This helps data remain secure from the moment a user logs into their device. A Snapdragon 835 Mobile Platform contains the Qualcomm Haven™ security platform—a combination of hardware, software and biometrics technologies that help to make online banking and payments more secure than ever. * |
| Cellular and Wireless Modem: Smartwatches<br><br>**Electronic Device Industry** | Qualcomm supplied the LTE modem in the Apple Watch Series 3. TechInsights found the Qualcomm MDM9635M, a Snapdragon X7 LTE modem in the 42mm sport band model A1861 with GPS + cellular it opened up. The modem was mated in a package-on-package with a Samsung K4P1G324EH DRAM in the watch. Among other wireless chips, TechInsights said the watch contains a Qualcomm PMD9645 PMIC and a WTR3925 RF transceiver. Apple and Qualcomm are embroiled in a handful of patent infringement disputes including investigations at the U.S. ITC, particularly around baseband modems. Apple continues to use the Qualcomm parts in watches despite threats of injunctions. Apple decided to discontinue paying Qualcomm royalties while court cases are in progress. |
| Cellular and Wireless Modem: Smartphone<br><br>**Mobile Device Industry** | The iPhone X A1865 uses the Qualcomm MDM9655 Snapdragon X16 LTE modem. iPhone 8; Qualcomm Modem Model A1663; plus 802.11ac Wi Fi with MIMO; Bluetooth 5.0 wireless technology; NFC with reader mode. iPhone 8 Plus; Qualcomm Modem Model A1664; plus 802.11ac Wi Fi with MIMO; Bluetooth 5.0 wireless technology; NFC with reader mode. iPhone 7; Qualcomm Modem Model A1660; plus 802.11ac Wi Fi with MIMO; Bluetooth 4.2 wireless technology; NFC with reader mode. iPhone 7 Plus; Qualcomm Modem Model A1661; plus 802.11ac Wi Fi with MIMO; Bluetooth 4.2 wireless technology; NFC with reader mode. The Qualcomm MDM9625M is a modem LTE chipset found in the Apple MG9M2CL/A iPhone 6 Plus and iPhone 6. |
| Wi-Fi<br><br>**Wireless Networking Technology Industry** | With all the devices connecting to all the things, we knew we had to help ease overload. So, we were the first to announce end-to-end commercial support for the next-generation of Wi-Fi. What does that mean? It translates into faster delivery and longer battery life for Wi-Fi devices (e.g., phones)—whether you're at home or on the go. * |

| Qualcomm's Technological Capability and Industry | Qualcomm's Technological Capability (Description) |
|---|---|
| Modems<br><br>**Wireless Networking Technology Industry** | Qualcomm quote: "Some say the modem is the most important part of your smartphone. We couldn't agree more. With our wireless modem inside your smartphone, you've got years of engineering keeping you connected to your great big world. And isn't that why you bought that device in the first place?" * |
| LTE<br><br>**Wireless Networking Technology Industry** | Everyone promises smarter/better/faster, but with LTE, we actually delivered. We invented the wireless standards and fundamental technologies that mobile operators rely on to meet the explosive demand in mobile data traffic. And that means you can catch up on the latest sports clips without waiting for the network to keep pace. * |
| Qualcomm Snapdragon Processor: Smartwatches<br><br>**Industry for Processors**<br><br>**Electronic Device Industry** | Samsung Gear S2 3G Watch (Qualcomm Snapdragon 400 Processor); Samsung Gear S Watch (Qualcomm Snapdragon 400 Processor); LG Watch Sport (Qualcomm Snapdragon Wear 2100 Processor); LG Watch Style (Qualcomm Snapdragon Wear 2100 Processor); LG G Watch R (Qualcomm Snapdragon 400 Processor); LG Watch Urban (Qualcomm Snapdragon 400 Processor). |
| Qualcomm Snapdragon Processor: Smartphone<br><br>**Industry for Processors**<br><br>**Mobile Device Industry** | Samsung Galaxy S8 (Qualcomm Snapdragon 835 Processor); Samsung Galaxy Note 8 (Qualcomm Snapdragon 835 Processor); Samsung Galaxy S7 (Qualcomm Snapdragon 820 Processor); Samsung Galaxy S5 (Qualcomm Snapdragon 801 Processor); Samsung Galaxy S4 (Qualcomm Snapdragon 600 Processor); LG V30 (Qualcomm Snapdragon 835 Processor); LG G5 (Qualcomm Snapdragon 820 Processor); LG G4 (Qualcomm Snapdragon 808 Processor); LG G3 (Qualcomm Snapdragon 801 Processor); LG Pro 2 (Qualcomm Snapdragon 800 Processor). |
| GPS / Navigation<br><br>**Automobile Industry** | Every time you navigate you've got the power of Qualcomm technology to thank. All the advancements coming to your phone, car, home and community are made possible by the mobile hardware, software and standards we pioneered. Qualcomm invented many of the technologies that the world's leading networks and devices run on. * |

- Reference: Qualcomm's Website

# EXHIBIT C

RECEIVED
USDC CLERK. GREENVILLE. SC

2020 JUN 16 PM 12: 03

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF SOUTH CAROLINA - GREENVILLE

| | |
|---|---|
| LARRY GOLDEN, on behalf of himself and all others similarly situated, | CASE NO: _____ |
| Plaintiff, | **(JURY TRIAL DEMANDED)** |
| V. | **(The Sherman Act §1: Motive to Form a Conspiracy; Conspiracy; and Unreasonable Restraint on Trade).** |
| (1) APPLE INC. | **(Violation of South Carolina Consumer** |
| (2) SAMSUNG ELECTRONICS, USA | **Protection and Unfair Competition Laws;** |
| (3) LG ELECTRONICS, USA, INC. | **Unjust Enrichment and Disgorgement of** |
| (4) QUALCOMM INC. | **Profits)** |
| (5) FORD GLOBAL TECHNOLOGIES, LLC | |
| (6) GENERAL MOTORS COMPANY | June 15, 2020 |
| (7) FCA US LLC | |
| Defendants. | |

## COMPLAINT FOR ANTITRUST LAW VIOLATIONS

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations and teaming agreements that likely resulted in a secret conspiracy. This action is for damages and injunctive relief on behalf of the Plaintiff and all others similarly situated, against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA"); demanding a trial by jury, complains and alleges as follows:

## JURISDICTION AND VENUE

1.    This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages, injunctive relief, and costs of suit; recover damages under South Carolina state antitrust and common laws, for violation of Section 1 of the Sherman Act (15 U.S.C. § 1; conspiracy in the restraint of trade illegal).

2.    This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). This Court has jurisdiction under South Carolina law that are cognizable under this Court's supplemental jurisdiction, 28 U.S.C. § 1367(a). This Court also has jurisdiction over the South Carolina state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the defendants.

3.    Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

4.    The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States:

   a.    Defendants and their co-conspirators participated in a continuous and uninterrupted flow in interstate commerce to customers located in South Carolina; and/or

2

     b.  Defendants and their co-conspirators sold and shipped substantial quantities of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) to customers located in South Carolina.

5.    The Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority, including each other as co-conspirators) have:

     a.  Transacted business in South Carolina;

     b.  Contracted to supply or obtain services or goods in South Carolina;

     c.  Intentionally availed themselves of the benefits of doing business in South Carolina;

     d.  Produced, promoted, sold, marketed or distributed their products or services in South Carolina and, thereby, profiting from their access to the markets in South Carolina;

     e.  Caused tortious damage by act or omission in South Carolina;

     f.  Caused tortious damage in South Carolina by acts or omissions committed outside of South Carolina while (i) regularly doing or soliciting business in South Carolina, and/or (ii) engaging in other persistent courses of conduct within South Carolina, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in South Carolina; and,

     g.  Committed acts and omissions that the Defendants knew or should have known would cause damage (and, in fact, did cause damage) in South

<div align="center">3</div>

Carolina to Plaintiff and members of the Class while (i) regularly doing or soliciting business in South Carolina, and/or (ii) engaging in other persistent courses of conduct within South Carolina and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in South Carolina.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

6.      Plaintiff had neither actual nor constructive knowledge of the facts of collusion constituting its claim for relief and did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least March 29, 2018, when the Court of Federal Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the Government's Motion to Dismiss". After five (5) years of discovery to determine jurisdiction, the Trial Court dismissed 64 of the Plaintiff's allegations of infringing his claimed invention of a CMDC device (Case 1:13-cv-00307-SGB Document 130 Filed 03/29/18), for the following reasons:

"Regarding the "first requirement," private conduct incidentally benefitting the Government does not constitute use "for the benefit of the Government" ... "The court does not have jurisdiction under 28 U.S.C. § 1498(a) to adjudicate patent infringement allegations concerning NSF and NIH grants and cooperative agreements, because any benefit to the Government, at best, would be incidental"... "determining that the alleged benefit to the Government of economic "stimulus, jobs, and revenue" was "merely an incidental effect of private conduct"... "Complaint contains no factual allegations establishing anything more than "incidental benefit" to the NSF"... *"Incidental benefit to the [G]overnment is insufficient" to satisfy the requirements of 28 U.S.C. § 1498(a)"*...

4

"The Government also argues that the Fifth Amended Complaint's "allegations relating generally to smartphones and other consumer devices should be dismissed" under RCFC 12(b )(1) and 12(b)(6), because they fail to allege "actual 'use' by the [G]overnment of the various combinations of consumer devices, nor would the [G]overnment's use be plausible."... "In addition, the Fifth Amended Complaint "fails to allege that any of these various consumer devices were made for the benefit of the [G]overnment."

7.     Defendants engaged in a secret conspiracy that did not reveal facts to the public that would put Plaintiff on inquiry notice that a conspiracy to conceal and/or hide the fact that the Defendants, Apple, Samsung, LG, and Qualcomm, as private parties, were manufacturing Communicating, Monitoring, Detecting, and Controlling (CMDC) devices. In an announcement found on the Department of Homeland Security's (DHS) website: "S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes" https://www.dhs.gov/science-and-technology/cell-all-super-smartphones-sniff-out-suspicious-substances. (2007- DHS/S&T; *Cell-All* solicitation for a new cell phone, i.e. smartphone). Defendants' agreement and conspiracy was kept secret.

8.     Plaintiff and Class was unaware of Defendants' unlawful conduct alleged herein and did not know the Defendants were manufacturing Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones) as their own private property during the Relevant Period.

5

9.      Defendants engaged in a secret conspiracy that did not reveal facts to the public

that would put Plaintiff on inquiry notice that a conspiracy to conceal and/or hide the fact that the

Defendants, Ford, General Motors, and, FCA, as parties owned by the Government, were

manufacturing Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems;

and, Network Connected Vehicles (NCV). Discovery revealed the following: "The U.S.

government's $80.7 billion bailout of the auto industry lasted between December 2008 and

December 2014. The U.S. Department of the Treasury used funds from the Troubled Asset

Relief Program (TARP). In the end, taxpayers lost $10.2 billion" https://www.thebalance.com

/auto-industry-bailout-gm-ford-chrysler-3305670.

10.     Plaintiff and Class was unaware of Defendants' unlawful conduct alleged herein

and did not know the Defendants were manufacturing Stall, Stop, and Vehicle Slow-Down

Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) as their

own private property during the Relevant Period.

11.     Thus, Plaintiff, nor the Class, could have had either actual or constructive

knowledge of the "fraudulent concealment" until March 29, 2018 when the Court of Federal

Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the

Government's Motion to Dismiss". It was on this date that the Plaintiff realized he could not

bring an action of patent infringement, or patent "takings" under the Fifth Amendment Clause,

against the "Government Third Party Contractors" and the "Government Owned Companies"

because their use of the inventions asserted in this complaint was "purely  incidental".

Defendants actively mislead the public about the government contracts to manufacture

Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, and what the

"Bailout" funds was actually used for (i.e. manufacture of Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV)).

12.    Defendants' "fraudulent concealment" means the Defendants Apple, Samsung, LG, Qualcomm, Ford, General Motors, and, FCA deliberately hide and/or suppress, with an intention to deceive or defraud, Plaintiff, and the Class, of material facts and/or circumstances by which the Defendants are legally bound to disclose. "Fraudulent concealment" is a common law doctrine and it can be invoked to toll a statute of limitations. The most liberal test for "fraudulent concealment" only requires a showing that the Defendants' conspiracy was carried out in a manner intended to deceive the Plaintiff, and the Class.

13.    The stature of limitation was tolled because the Plaintiff and Class was under a legal disability—the lack of legal capacity to do an act—at the time the cause of action accrues. The time limit was tolled until March 29, 2018, when the Court of Federal Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the Government's Motion to Dismiss" stating: "allegations relating generally to smartphones and other consumer devices should be dismissed" under RCFC 12(b )(1) and 12(b)(6), because they fail to allege actual 'use' by the [G]overnment of the various combinations of consumer devices… "incidental benefit to the [G]overnment is insufficient to satisfy the requirements of 28 U.S.C. § 1498(a)", at which time the disability was removed.

## THE PARTIES

14.    Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government

beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e. Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV). The Defendants conspired to develop the intellectual property technology as their own private property without Plaintiff's knowledge. The Plaintiff was deprived of royalty compensation as a result of the Defendants' illegal conduct. Every South Carolina tax paying citizen (the "Class") indirectly suffered as a result of Defendants' illegal conduct. For year 2019, the S.C. taxpayer burden equated to $14,500 for every state taxpayer.

15.     On information and belief, Apple is a California corporation with a principal place of business at 1 Infinite Loop, Cupertino, CA 95014 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Apple's total revenue between the years 2013 and 2019 = $1,130.8B. 25% royalty compensation for Plaintiff = $282.7B. 7.5% S.C. tax rate = $21.20B toward S.C. taxpayer debt. Apple may be served at its principal place of business at 1 Infinite Loop, Cupertino, CA 95014.

16.     On information and belief, Samsung is a New Jersey corporation with a principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Samsung's total revenue between the years 2013 and 2019 = $664.1B.

8

25% royalty compensation for Plaintiff = $166.03B. 7.5% S.C. tax rate = $12.45B toward S.C. taxpayer debt. Samsung may be served at its principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660.

17.    On information and belief, LG is a New Jersey corporation with a principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. LG's total revenue between the years 2009 and 2019 = $585.87B. 25% royalty compensation for Plaintiff = $146.47B. 7.5% S.C. tax rate = $10.99B toward S.C. taxpayer debt. LG may be served at its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

18.    On information and belief, Qualcomm is a California corporation with a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Qualcomm's total revenue between the years 2013 and 2019 = $169.48B. 25% royalty compensation for Plaintiff = $142.37B. 7.5% S.C. tax rate = $3.18B toward S.C. taxpayer debt. Qualcomm may be served at its principal place of business at 5775 Morehouse Drive, San Diego, CA 92121.

19.    On information and belief, Ford is a Michigan corporation with a principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan

9

48126 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Ford's total revenue between the years 2013 and 2019 = $1,065.4B. 25% royalty compensation for Plaintiff = $266.35B. 7.5% S.C. tax rate = $19.98B toward S.C. taxpayer debt. Ford may be served at its principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126.

20.    On information and belief, GM is a Michigan corporation with a principal place of business at 300 Renaissance Center, Detroit, MI 48243 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. GM's total revenue between the years 2013 and 2019 = $991.5B. 25% royalty compensation for Plaintiff = $247.88B. 7.5% S.C. tax rate = $18.59B toward S.C. taxpayer debt. GM may be served at its principal place of business at 300 Renaissance Center, Detroit, MI 48243.

21.    On information and belief, FCA is a Michigan corporation with a principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. FCA's total revenue between the years 2013 and 2019 = $701.15B. 25% royalty compensation for Plaintiff = $175.29B. 7.5% S.C. tax rate = $13.15B toward S.C. taxpayer debt.

10

FCA may be served at its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326.

22.    Defendants' total damages between the years 2013 and 2019, and Qualcomm years 2009 thru 2019 at 25% royalty compensation for Plaintiff = $1,327.09B. 7.5% S.C. tax rate = $99.54B toward S.C. taxpayer debt (the "Class").

## Co-Conspirators

23.    The Defendants conspired with various others "known" who participated as co-conspirators with the Defendants in the violations of law alleged in this complaint and have engaged in conduct and made statements in furtherance thereof.

24.    The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in management of each Defendant's business or affairs.

25.    Each of the Defendants named herein acted as the agent or representative of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Plaintiff Class (the "Class") composed of and defined as follows:

>   All persons and entities residing in the United States who, during the Class period, purchased Communicating, Monitoring, Detecting, and Controlling (CMDC) devices,

11

Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) for their own use and not for resale. Specifically excluded from this class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

27.    This action has been brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

      a.    The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

      b.    Based on the nature of the trade and commerce involved and the number of purchasers of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV), Plaintiff believe that the members of the Class number in the thousands, and therefore is sufficiently numerous that joinder of all Class members is not practicable;

      c.    Plaintiff claims are typical of the claims of the members of the Class because Plaintiff indirectly purchased Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise

12

to the claims of the members of the Class and the relief sought is common to the Class;

d.  The following common questions of law or fact, among others, exist as to the members of the Class:

 i. whether Defendants formed and operated a combination or conspiracy;

 ii. whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

 iii. the appropriate measure of the amount of damages suffered by the Class;

 iv. the operative time period of Defendants' combination or conspiracy;

 v. whether Defendants' conduct violates Section 1 of the Sherman Act;

 vi. whether Defendants conduct violates SC Code § 16-17-410 (2012)

 vii. whether Defendants conduct violates SC Section 39-5-20

 viii. whether Defendants' conduct violates South Carolina Consumer Protection and Unfair Competition Laws; Unjust Enrichment; and,

 ix. the appropriate nature of class-wide equitable relief.

e.  These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

f.  After determination of the predominate common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

g.  Plaintiff will fairly and adequately protect the interest of the Class in that
Plaintiff has no interest that are antagonistic to other members of the Class;

h.  A class action is superior to other available methods for the fair and efficient
adjudication of this litigation since individual joinder of all damaged Class
members is impractical. The damages suffered by individual Class members
are relatively small, given the expense and burden of individual prosecution of
the claims asserted in this litigation. Thus, absent the availability of class
action procedures, it would not be feasible for Class members to redress the
wrongs done to them. Even if the Class members could afford individual
litigation, the court system could not. Further, individual litigation presents
the potential for inconsistent or contradictory judgements and would greatly
magnify the delay and expense to all parties and to the court system.
Therefore, the class action device presents far fewer case management
difficulties and will provide the benefits of unitary adjudication, economy of
scale and comprehensive supervision by a single court;

i.  Defendants have acted, and refused to act, on grounds generally applicable to
the Class, thereby making appropriate final injunctive relief with respect to the
Class as a whole; and,

j.  In the absence of a class action, Defendants would be unjustly enriched
because they would be able to retain the benefits and fruits of their wrongful
conduct.

k.  Throughout the period of time covered by this Complaint, Defendants and
their Co-conspirators engaged in the business of marketing and selling

14

(CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

Lock Disabling Systems; and, Network Connected Vehicles (NCV)

## NATURE OF TRADE AND COMMERCE

### Communicating, Monitoring, Detecting, and Controlling (CMDC) Devices

28.    The Patent Owner's communicating, monitoring, detecting, and controlling

(CMDC) device is commercialized in the form of an improved cell phone, smartwatch, laptop, or

tablet. The specifications and capabilities of the CMDC device(s) developed, manufactured, and

commercialized by Apple, Samsung, LG, Qualcomm, Panasonic, and Motorola, are significantly

the same as the Patent Owner's CMDC device(s) as illustrated below:

- Communication: at least one of a satellite connection, Bluetooth connection, WiFi
  connection, internet connection, cellular connection, long and/or short-range radio
  frequency (RF) connection, or GPS connection was "taken" for the benefit of the
  Government and for Government "use".
- Monitoring: at least one of a viewing screen for monitoring in real time, viewing screen
  monitoring for CBRNE-H signal alerts, viewing screen monitoring for CBRNE-H color
  coded indicator lights, or viewing screen monitoring for tracking, alerts, and heart rate.
- Detecting: at least one of a chemical sensor, a biological sensor, an explosive sensor, a
  human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless,
  capable of being disposed within, on, upon or adjacent the CMDC device.
- Controlling: at least a fixed, portable or mobile communication device interconnected to
  a fixed, portable or mobile product, capable of wired or wireless communication
  therebetween, for sending signals to at least lock or unlock doors, stall, stop, or slowdown
  vehicles, activate or deactivate security systems, activate or deactivate multi-sensor
  detection systems, or to activate or deactivate cell phone detection systems.
- Central Processing Unit (CPU): is the programmable device capable of general-purpose
  computation. It is the engine of logic, as with the brain, and the core piece of hardware in

the Patent Owner's CMDC device (i.e. communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that executes instructions that make up a computer program.

- Biometrics: that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and or signature or a face recognition to at least gain access to the CMDC device or to prevent unauthorized use of the CMDC device.

- Lock, Unlock, Disabling Lock: the CMDC device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks after a certain number of failed attempts to unlock.

- Near-Field Communication: Near Field Communication or NFC is a short-range communication channel. The purposes for this technology is to simplify first-time connections to other wireless technologies, like Wi-Fi and Bluetooth. Near Field Communication in a CMDC device can be used as part of a two-factor access control system for unlocking a door. Biometric Fingerprint recognition is used for authentication and NFC is used to transmit authentication information to a computer controlling the door. NFC is preferred over RFID because RFID has a frequency vulnerable for detonating bombs.

- Location and Tracking: The CMDC tracking is a process for identifying the location of the device, whether stationary or moving. Localization may be affected by a number of technologies, such as using multi literation of radio signals between (several) cell towers of the network and the device, or simply using GPS. Some GPS CMDC devices use wireless-assisted GPS to determine the user's location. In wireless-assisted systems, the device uses the orbiting GPS satellites in conjunction with information about the device's signal. Sometimes called enhanced GPS, wireless-assisted GPS can often get a fix on the user's location faster than a GPS-only receiver. Some wireless-assisted systems can work inside buildings, under dense foliage and in city areas where traditional receivers cannot receive signals. GPS-enabled CMDC devices with view screens can often display turn-by-turn directions as well as announce them through the device's

speaker. A database of maps is used to provide the directions. The CMDC device locator provides GPS coordinates and can dial emergency CMDC device numbers. The Government, parents and caregivers can track the device's location by device or online and can receive notification if it leaves a designated "safe area."

- Example of Patent Owner's claimed invention CMDC device (i.e. smartphone). Below is claim 4 of the issued patent 10,163,287:

    4. A communication device comprising:

    at least one central processing unit (CPU);

    at least one motion sensor in communication with the at least one CPU;

    at least one viewing screen for monitoring in communication with the at least one CPU;

    at least one global positioning system (GPS) connection in communication with the at least one CPU;

    at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

    at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

    at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

    at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

    at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

    at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

    at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

    at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least

one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

### Similar Claims Covering the CMDC Device (i.e. Smartphone)

| Pat. # RE43,990* | Pat. # 9,096,189 | Pat. # 9,589,439 | Pat. # 10,163,287 | App. # 16/350,683 | Reissue App. # 16/350,874* |
|---|---|---|---|---|---|
| Claim 11 of the RE43,990 Patent | Claims 1, 2, & 3 of the '189 Patent | Claims 13, 14, 15, 22, & 23 of the '439 Patent | Claims 1, 2, 3, 4, 5, & 6 of the '287 Patent | Claims 1 & 11 of the [683] Patent Application | Claims 13, 14, 15, 22, 23, 64, 74, 75, & 76 of the [874] Reissue Patent Application |

## STALL, STOP, and VEHICLE SLOW-DOWN SYSTEM (SSVSS)

29.     The Patent Owner's stop, stall, or vehicle slowdown mean; and, the CMDC device being interconnected to the vehicle to control certain operating systems, is illustrated below:

- Stall, Stop, Slowdown: the CMDC device being equipped to send signals to vehicles (i.e. driver, driverless, autonomous, unmanned aerial, unmanned land, unmanned sea, boats, trucks, etc.) that engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

- Preprogrammed Stall, Stop, Slowdown: interconnected to the vehicle operating systems of at least one of, ignition start/stop, door lock/unlock, temperature settings and temperature on/off, vehicle brakes, foot peddle, lights, speed controls, and steering.

18



| GM/OnStar Stolen Vehicle Slow-down System | PO's SSVSS Pat. #: RE43,891; Independent Claim 11 | PO's SSVSS Patent #: 8,334,761; Independent Claim 1 |
|---|---|---|
| A vehicle adapted with Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media /us/en/gm/news.detail.html/content /Pages/news/us/en/2019/ apr/0404-onstar.html | A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: | A vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Using satellite and cellular technology, OnStar remotely slow the vehicle. OnStar activates a flashing message front of steering wheel, "engine power is reduced." The process affects the accelerator pedal. OnStar's Stolen Vehicle Slowdown System: by Jennifer Geiger; Copyright © 2012; HowStuffWorks.com, Inc. | at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; | at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |

| | | |
|---|---|---|
| An OnStar Advisor can send a signal to disable the stolen vehicle's engine and gradually slow the vehicle to an idle speed to assist police in recovering the vehicle. https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/apr/ 0404-onstar.html | an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story/10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/apr/0404-onstar.html | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story/10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; and |

| | | |
|---|---|---|
| OnStar, will work with the cops to locate the vehicle using GPS. When the police identify the vehicle by sight, the police identify the vehicle by sight, the lights flash to confirm its identity. When conditions are safe to stop the vehicle, OnStar remotely slows it to a crawl. https://www.wired.com/2008/04/onstars-stolen/ | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| After a member has filed a police report and once authorities have confirmed conditions are appropriate, an OnStar Advisor can send a signal to disable the stolen vehicle's engine and gradually slow the vehicle to an idle speed to assist police in recovering the vehicle. https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/apr/ 0404-onstar.html | wherein the at least one control signal is sent due to unauthorized use of the vehicle, and wherein an originating first signal that eventually causes the at least one control signal to be sent is generated upon initial verification of the unauthorized use of the vehicle; | X |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story /10/01/22/2339204/ electromagnetic-pulse-gun-to-help-in-police-chases | at least one mobile, portable, or fixed device capable of sending the at least one control signal from the remote location that is of electromagnet pulse, electrostatic discharge, microwave beam or radio frequency, to disable the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and horsepower of the motor. | X |

21

| | | |
|---|---|---|
| Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media /us/en/gm/news.detail.html/content /Pages/news/us/en/2019/ apr/0404-onstar.html | X | wherein a user determines that the vehicle has been stolen and in response initiates a distress signal communication over a communication network that causes communication between the vehicle and the remote location and that then causes the at least one control signal to be sent from the remote location via the communication network that includes at least one of a cell phone tower and a satellite. |

30.    **GM:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control.

| GM Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |

| | |
|---|---|
| Preprogrammmed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammmed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammmed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device**<br>**Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53** |
| Enhanced Smart Pedal Technology: Known as brake override, reduces power to the engine in cases where the brake and accelerator pedal are being simultaneously depressed. | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Front Automatic Braking: Helps a driver avoid a forward crash or reduce the severity of crashing into a vehicle in front of it, whether it is moving or has come to a stop. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Rear Automatic Braking: Helps the driver avoid a crash or to mitigate the impact into objects directly behind their vehicle by bringing the vehicle to a stop. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |

23

| Electronic Stability Control (ESC): Detects loss of steering control, it automatically applies the brakes to help "steer" the vehicle. Braking is automatically applied. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Lane Keep Assist: Represents an upgrade of Lane Departure Warning. The feature is listed as "Lane Keep Assist with Lane Departure Warning". | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control: The technology automatically accelerates and brakes the vehicle up to moderate levels to maintain a driver-selected following gap (distance). | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

31.    **FORD:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least, Ford's Evasive Steering Assist; Ford's Pre-Collision Assist; Ford's Reverse Brake Assist; Ford's AdvanceTrac Electronic Stability Control (ESC); Ford's Lane-Keeping system; or, Ford's Adaptive Cruise Control.

| Ford Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| Ford's Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Explorer, Expedition, F-150, and Mustang vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |

24

| | |
|---|---|
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **Ford Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 48, 48, 49, 50, 51, & 53** |

| | |
|---|---|
| Ford's Evasive Steering Assist comes into play, employing the camera and radar sensor technology of the available Pre-Collision Assist with Automatic Emergency Braking to detect the vehicle ahead and apply active brake | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Ford's Pre-Collision Assist feature uses camera technology to detect a potential collision with a vehicle or pedestrian directly in front of your vehicle. If you don't take corrective action and a collision is imminent, brakes can apply automatically. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Ford's reverse brake assist with automatic emergency brake (AEB) will help prevent drivers from hitting an object while backing up. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |
| Ford's AdvanceTrac Electronic Stability Control automatically detects wheel-slippage, while adjusting torque & braking to gain control & traction. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Ford's Lane-Keeping system has three modes: Lane-Keeping Aid applies steering torque to direct you back to the center of the lane. Lane-Keeping Alert warns you through steering wheel vibrations. You can set the system to activate either the Alert or Aid mode, or both. And Driver Alert sends out warnings in the message center. | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Ford's Adaptive Cruise Control lets you set a cruising speed and distance from the vehicle in front of you, an especially helpful feature in slow traffic conditions. When traffic ahead slows down, you automatically do too | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

32.    **FCA US LLC:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus.

| FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |

| | |
|---|---|
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53** |
| Brake-throttle override: Allows driver to stop the vehicle when throttle and brake inputs occur simultaneously; electronic throttle control reduces engine-power output until vehicle stops or pedal inputs cease | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Forward Collision Warning-Plus: Radar and camera technology combine to determine if frontal impact with another vehicle appears imminent; if so, system pre-fills brakes; no driver response triggers brief brake application; if driver remains unresponsive, brakes are applied to slow vehicle before impact | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| ParkSense rear park assist system: The system utilizes ultrasonic sensors at low speeds in reverse to detect stationary objects. If it is determined that a collision is imminent the system will provide a momentary, autonomous brake apply/brake jerk then release. At speeds below 7 km/h the system will bring the vehicle to a stop before releasing | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |

| Electronic stability control (ESC): Enhances driver control and helps maintain directional stability under all conditions. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
|---|---|
| LaneSense Departure Warning-Plus: Leverages electronic power steering (EPS) to deliver a torque input to alert and assist the driver with corrective action | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control-Plus: Helps to maintain distance from the vehicle ahead and under certain conditions, can bring the vehicle to a full stop without driver intervention | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

## Lock Disabling Systems

33.    *Claim 1 of Patent No. 10/163,287.* Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising… the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

34.    *Claim 2 of Patent No. 10/163,287.* Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising... the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

35.    *Claim 3 of Patent No. 10/163,287.* Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising... the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

**Network Connected Vehicles (NCV): CMDC Device (i.e. Smartphone) & Vehicle's Operating Systems**

36.    The Ford Sync Connect Apps are the "gateways", "integrators", or "interfaces" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Explorer, Expedition, F-150, and Mustang vehicles. The Ford Sync Connect Apps allows the CMDC device user to command the forenamed vehicles to lock and unlock; remote start, including scheduling a future start; vehicle status, including fuel, oil and battery levels, along with tire pressure readings; and, vehicle location.

37.    Ford Sync Connect system Android Compatibility: You can utilize Google's Android Auto to connect your smartphone to the Ford Sync Connect system. Ford Motor Company's Explorer, Expedition, F-150, and Mustang mobile apps are downloaded from Google Play for managing Ford's vehicles remotely.

| Ford: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The Ford Sync Connect Apps are the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Explorer, Expedition, F-150 and Mustang vehicles. | A monitoring device, comprising: |
| The performance of LG's CMDC devices: CPU that's at the core of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| LG's CMDC devices has an internal temperature sensor which monitors the CPU and battery temperature of device | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| LG's CMDC devices, starting with LG G2, you can calibrate the motion sensor by going to Settings > General tab > Motion. | at least one motion sensor in communication with the at least one CPU; |
| LG's CMDC devices: Thin Q has "the brightest" screen of any smartphone, thanks to its Super Bright Display technology. | at least one viewing screen for monitoring in communication with the at least one CPU; |

| | |
|---|---|
| LG's CMDC devices: GPS with A-GPS, GLONASS, and BDS | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| LG's CMDC devices: Wi-Fi, Wi-Fi Direct<br><br>Ford Sync Connect system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| LG's CMDC devices: cellular connection; Bluetooth<br><br>Ford Sync Connect system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| After multiple unsuccessful attempts, LG's CMDC devices will automatically perform a factory data reset and all of the personal files will be erased. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Battery Charging Specification, is power drawn from a USB port for charging. Three different sources of power: Standard downstream port (SDP), charging downstream port (CDP), and dedicated charging port (DCP). Wireless charging | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| LG's CMDC devices: features include sensors for face/smile detection, iris scanner, and fingerprint recognition | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| LG's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air and sends detection data to another phone or a computer<br><br>LG Watch Sport Smartwatch wireless, wearable, mobile, electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| LG's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. LG Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |

| LG's CMDC device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| --- | --- |
| Voice Mate (i.e. Quick Voice; Q Voice) built-in application for various LG CMDC devices (i.e. smartphone); lock and unlock doors, activate and deactivate security systems.<br><br>The Ford Sync Connect Apps allows the LG CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

38.    Fiat Chrysler Automobiles—FCA US LLC, Uconnect Access App is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chrysler, Dodge, Jeep, and Ram vehicles. The Uconnect Access App allows the CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles doors; remotely start and cancel start the vehicles; sound the horn of the vehicles; or, flash the lights of the vehicles.

39.    Uconnect® system Android Compatibility: You can utilize Google's Android Auto to connect your smartphone to the Uconnect® system. Android Auto by Google will help you seamlessly integrate your Android smartphone with your vehicle. Seller: FCA US LLC (FIAT CHRYSLER AUTOMOBILES)

| Samsung: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
| --- | --- |
| The FCA US LLC Uconnect Access App is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chrysler, Dodge, Jeep, and Ram vehicles. | A monitoring device, comprising: |

| | |
|---|---|
| The performance of Samsung's CMDC devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| Samsung's CMDC devices has various sensors like the temperature sensor for the battery and the CPU or processor. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Samsung's CMDC devices accelerometers handle axis-based motion sensing—reason why the smartphone can track steps without a separate wearable. | at least one motion sensor in communication with the at least one CPU; |
| Samsung's CMDC device has set the bar with the highest-rated smartphone displays. With a panel produced by Samsung, and optimized by Apple | at least one viewing screen for monitoring in communication with the at least one CPU; |
| Samsung's CMDC device: GPS with A-GPS, GLONASS, BDS, GALILEO | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| Samsung's CMDC device: Wi-Fi, dual-band, Wi-Fi Direct, hotspot<br><br>Uconnect® system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| Samsung's CMDC device: cellular connection; Bluetooth<br><br>Uconnect® system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Samsung's CMDC device: After several unsuccessful log-in attempts using a passcode or fingerprint, the Samsung CMDC device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Samsung's CMDC devices Fast Charge power bank has a capacity of 5,100mAh and can provide up to 1.5 charges for the majority of smartphones. The power bank has an LED power indicator; comes with a micro USB cable and a micro USB to USB Type-C adapter. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |

| | |
|---|---|
| Samsung's CMDC devices allows fingerprints to set-up the fingerprint scanner for easy log-in and lock-out. Face unlock uses the front-facing camera to identify the user and unlock the device. Iris scanning uses special sensors on front of phone to identify and unlock the device. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| Samsung's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung's S3 Classic electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Samsung's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. Samsung Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Samsung's CMDC device, near-field communication (NFC) Ring can unlock the device. The NFC Ring has two NFC tag inlays inside the ring and can be used to unlock & control mobile devices | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... |
| Samsung's SmartThings contains: Connects to appliances, lights, locks, cameras, thermostats, sensors. BMW Digital Key to lock/unlock; and start it up with Samsung phones only.<br><br>The FCA US LLC Uconnect Access App allows the Samsung CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

40.    General Motors Company (GM) myChevrolet, myBuick, myGMC and myCadillac mobile apps are the "gateways", "integrators", or "interfaces" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, and LG CMDC smartphones) to the Chevrolet, Buick, GMC and Cadillac vehicles. The GM Remote Access Apps allows the CMDC

35

device user to command the forenamed vehicles to at least lock and unlock the vehicles doors;

remotely start and cancel start the vehicles; sound the horn of the vehicles; or, flash the lights of

the vehicles.

41.    GM Remote Access system Android Compatibility: You can utilize Google's

Android Auto to connect your smartphone to the GM Remote Access system. General Motors

Company (GM) myChevrolet, myBuick, myGMC and myCadillac mobile apps are downloaded

from Google Play for managing GM's vehicles remotely.

| Apple: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The GM Remote Access Apps is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chevrolet, Buick, GMC and Cadillac vehicles. | A monitoring device, comprising: |
| The performance of Apple's CMDC devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| Apple Files Patent for a new Temperature Sensor tied to a new Interactive Battery Indicator | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Apple's CMDC devices: Apple M-series coprocessors are motion coprocessors used by Apple Inc. in their mobile devices. | at least one motion sensor in communication with the at least one CPU; |
| Apple's CMDC devices: Highest absolute color accuracy; full screen brightness; full screen contrast; contrast ratio; lowest screen reflectance; smallest brightness variation | at least one viewing screen for monitoring in communication with the at least one CPU; |
| Apple's CMDC device: GPS with A-GPS, GLONASS | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| Apple's CMDC device: Wi-Fi, dual-band, hotspot  GM Remote Access system iPhone Compatibility: CMDC device requires iOS 10.0 or later | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |

| | |
|---|---|
| Apple's CMDC device: cellular connection; Bluetooth<br><br>GM Remote Access system iPhone Compatibility: CMDC device requires iOS 10.0 or later | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Apple's CMDC device includes a feature on that disables and erases all of the devices data after 10 failed passcode attempts. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Apple's CMDC device batteries and wall chargers which employ USB PD have the ability to charge devices up to 100W output using a USB-C connector | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| Apple's CMDC device features include sensors for face/smile detection, and fingerprint recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| Apple's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Apple Watch Series 3 electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Apple's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. Apple Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Apple's CMDC device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... |

| Apple's Viper SmartStart: Start, locate and control your car with your iPhone, or Apple Watch. Viper system in your car so you can start, lock and unlock your car

The GM Remote Access Apps allows the Apple CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |
|---|---|

42.    Qualcomm's claim on inventing the smartphone (i.e. CMDC Device)

| **Qualcomm: CMDC Device** | **Patent #: 10,163,287; Independent Claim 5** |
|---|---|
| DHS; S&T "Cell-All" initiative. Develop detection device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million electronic devices (i.e. cell phones) | A monitoring device, comprising: |
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video. The Snapdragon system on chip (SoC) was announced in Nov. 2006. | at least one central processing unit (CPU); |
| Qualcomm® Bluetooth® Low Energy Solutions Environmental Sensor Board Sensors: Accelerometer sensor, Temperature sensor, Pressure sensor, Magnetometer sensor, Humidity sensor, Gyro/angular sensor | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Snapdragon sensor engine supports course motion classification, which determines standing, resting, walking, running, driving, or parking. | at least one motion sensor in communication with the at least one CPU; |
| Qualcomm TruPalette display tech is supported by Qualcomm Snapdragon processors | at least one viewing screen for monitoring in communication with the at least one CPU; |
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video | at least one global positioning system (GPS) connection in communication with the at least one CPU; |

| | |
|---|---|
| Apple iPhone 8; Qualcomm Modem Model A1663; 802.11ac Wi Fi with MIMO; Bluetooth 5.0 wireless technology; NFC with reader mode. | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| Apple iPhone 7; Qualcomm Modem Model A1660; 802.11ac Wi Fi with MIMO; Bluetooth 4.2 wireless cellular technology; NFC with reader mode. | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Qualcomm Technologies SafeSwitch is available through its Qualcomm Snapdragon processors. SafeSwitch technology - addresses mobile security threat with a kill switch solution designed to remotely disable the devices in the event they're lost or stolen - then re-enable when found. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Qualcomm Quick Charge: Qualcomm's Snapdragon SoCs is used in a number of popular smartphones and tablets, has its own fast-charging standard. Quick Charge is a technology found in Qualcomm SoCs, used in devices such as mobile phones, for managing power delivered over USB. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| Authenticating beyond secure fingerprint identification, a Snapdragon 835 Mobile Platform provides safety using Camera Security—a camera-based biometric solution for iris and facial recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| *Cell-All*: wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung Gear S2 3G Watch & Samsung Gear S Watch (Qualcomm Snapdragon 400 Processor); LG Watch Sport & LG G Watch R & LG Watch Urban (Qualcomm Snapdragon 400 Processor) for chem / bio / human heart rate detection and monitoring | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| *Cell-All*: The device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Apple, Samsung, LG, Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |

| Qualcomm include NXP's near-field communication (NFC) solution in the Snapdragon processor platform that powers mobile devices (e.g. smartphones), wearables (e.g. smartwatches), and automobiles. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... |
|---|---|
| Qualcomm Technologies developed the QCA4020 tri-mode connectivity system-on-chip (SoC), the IoT industry's first commercially sampling connectivity solution that integrates three major radios in one low-power, cost-optimized chip. Connecting IoT devices like Refrigerators, TVs, security systems, thermostats, door locks. The Snapdragon 820A enables the driver attention-sensing cameras and autonomous controls to fingerprint-based door locks. *Cell-All:* The device detects and identify chemicals in the air using a "sample jet" sends detection data to another phone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

43.    All CMDC Devices: DHS; S&T "Cell-All" initiative. Develop CMDC device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million CMDC devices (i.e. smartphones)

| **CMDC** Devices | Patent #: 10,163,287; Independent Claim 4, 5 & 6 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,589,439; Independent Claim 22 | Patent #: 9,096,189; Independent Claim 1 | Patent #: RE43,990; Independent Claim 11 | Patent #: 7,385,497; Independent Claim 1 |
|---|---|---|---|---|---|---|
| DHS; S&T "Cell-All" initiative. Develop CMDC device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million CMDC devices (i.e. smartphones) | Claim 4: A communication device, comprising:<br><br>Claim 5: A monitoring device, comprising:<br><br>Claim 6: Monitoring equipment, comprising: | Claim 23: A cell phone comprising:<br><br>*Note: This claim 23 of the '439 patent directly covers the 'new and improved' cell phone that the DHS requested in its Cell-All solicitation* | Claim 22: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | Claim 1: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | Claim 11: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products, interconnected to a product for communication therebetween, comprising: | Claim 1: A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: |

40

44.    "Network Connected Vehicles" Patent Claims

**Patent No.: 10,163,287**

3. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or *__smart phone interconnected to a vehicle lock for communication therebetween__*; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular

41

connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and,

the *monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock*, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

**Patent No.: 8,334,761**

1. A *vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means*, comprising:

at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

42

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

wherein a user determines that the vehicle has been stolen and in response initiates a distress signal communication over a communication network that causes communication between the vehicle and the remote location and that then causes the at least _**one control signal to be sent from the remote location via the communication network that includes at least one of a cell phone tower and a satellite.**_

**Patent No.: 8,106,752**

1. A stall-to-stop disabling and slowdown system for slowing and stopping a vehicle wherein the vehicle includes a transceiver and a stall-to-stop system that is interconnected to the electromotive system and of the vehicle, comprising:

43

a stall-to-stop disabling and slowdown means that includes:

***monitoring equipment located at a determinate monitoring site;***

at least one Cellular tower and at least one satellite capable of sending and receiving signals to and from the monitoring equipment and the transceiver of the vehicle;

the Cellular tower and the satellite capable of two-way signal communication with the transceiver of the vehicle; and

whereupon a distress signal sent from a portable or fixed telecommunication device to the satellite causes a signal to be sent to the monitoring equipment followed by ***communicating with the transceiver of the vehicle for exchanging information on at least one of a, mechanical problem, electrical problem, computer problem, location, and speed of the vehicle*** resulting in the monitoring equipment transmitting a signal to the Cellular tower and/or satellite and the Cellular tower and/or satellite communicating with the transceiver of the vehicle for executing commands that actuate the stall-to-stop system for slowing and stopping the vehicle.



## RELATED CASES

45.    Plaintiff Larry Golden has filed an action of patent infringement on September 11, 2019, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:19-cv-2557) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O"). The case is on appeal at the Court of Appeals for the Federal Circuit (CAFC); case no. 20-1508.

## DEFENDANT'S ILLEGAL CONDUCT

**Sherman Act § 1: "Motive to Form a Conspiracy": (Apple, Samsung, LG, Qualcomm)**

46.    Evidence of the Defendants' (Apple, Samsung, LG, Qualcomm), motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion. The Defendants' (Apple, Samsung, LG, Qualcomm), as government own or ran companies, and/or third-party government contractors—under contract to perform work for the Government—was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the

development, manufacture, commercialization, and pricing of product(s), there would not be any reasonable substitute for their product or service.

47.    The Defendants' "motive to form a conspiracy" accelerated after the decision in *ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

"We conclude that under § 1498, the United States is liable for the use of a method patent only when it practices every step of the claimed method in the United States. The court therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims... The United States contracted with Lockheed Martin Corporation ("Lockheed") to design and build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material made from Nicalon silicon carbide fibers. These fibers are partially carbonized and manufactured into sheets in Japan, which are then imported into the United States. The second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are manufactured exclusively in Japan, but they are processed into mats in the United States. *Zoltek*, 58 Fed. Cl. at 690... Zoltek brought suit in the Court of Federal Claims under § 1498(a), alleging that the United States and Lockheed used the methods claimed in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber products used in the F-22. Zoltek alleges that the mats and sheets were made, for the United States, using the claimed methods...The government moved for partial summary judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred Zoltek's claims under § 1498(a)... The federal government is immune from any legal action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61

46

S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that " [t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498.[2] Section 1498(a) provides, in pertinent part: Whenever an invention described in and covered by a patent of the United States *is used. . . by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture... This court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims."

**The Conspiracy: (Apple, Samsung, LG, Qualcomm)**

48.    After the events of 9/11 the Plaintiff introduced to the United States ("government") three economic stimulus and terrorism prevention packages: The packages were titled: the "ATPG" project; the "SafeRack" project; and the "V-Tection" project. The Plaintiff submitted the packages to President Bush and his administration, the U.S. Senators and U.S. Congressmen that was in office during the Bush administration beginning in the year 2003. Beginning in year 2004, the Government began enforcing and administering the Plaintiff's intellectual property subject matter strategies. The packages outlined how the Government could stimulate the economy following the 9/11 attacks and provide protection against future terrorist activities. Because the Plaintiff's residence is in South Carolina, and the Plaintiff's business is in South Carolina, the stimulus packages would have benefited the Plaintiff and the Plaintiff's Class through royalty compensation for the Plaintiff, new jobs growth, low unemployment, increase S.C. tax revenue, and a decrease, if not totally eliminate, South Carolina's debt. The Defendants' (Apple, Samsung, LG, and Qualcomm) collusion, and conspiracy to hinder trade, destroyed all possibilities for the Plaintiff to receive royalty compensation and for the Class to eliminate its South Carolina taxpayer debt.

49.    The Plaintiff's CMDC device is, designed for integration with any of the products grouped under the "ATPG" project, the "SafeRack" project, and the "V-Tection" project. The CMDC device was designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across all industries, agencies, groups, demographics, race, ages, and gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment. The Defendants (Apple, Samsung, LG, and Qualcomm) colluded and conspired under the protection of a Government contract to develop a "new and improved cell phone" (i.e. smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and

48

mass commercialized across all industries, agencies, groups, demographics, race, ages, and gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

50.    The US Department of Homeland Security (DHS), NASA's Ames Research Center, (the United States), entered into cooperative agreements (contracts) with Qualcomm Inc., LG Electronics, Apple Inc., and the Samsung Group for the development of a new and improved cell phone (i.e. smartphone) that is capable of detection for chemical and biological agents. The agreements were entered into after Defendants' receive notices of the Plaintiff's intent to develop his own CMDC device for commercialization. The Defendants (Apple, Samsung, LG, and Qualcomm) colluded and conspired under the protection of a Government contract to develop a "new and improved cell phone" (i.e. smartphone). The motive to form a conspiracy for the Defendants, was to avoid being sued for infringement because the Defendants (Apple, Samsung, LG, and Qualcomm) was performing the work under a Government contract. The Defendants (Apple, Samsung, LG, and Qualcomm) also conspired not to perform all of the Plaintiff's patented process within the United States. By not performing all of the Plaintiff's patented process in the United States, "government liability does not exist pursuant to section 1498(a) for patent infringement", See *Zoltek,* 2006.

51.    It is the belief of the Plaintiff, that the Defendants (Apple, Samsung, LG, and Qualcomm) have been unjustly enriched through the non-payment of royalty compensation to the Plaintiff that should have been paid as a percentage of the Defendants gross annual revenue for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices. "Verto Analytics looked at the numbers of Apple, Samsung, and LG (CMDC devices) smartphones currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung

49

claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market."

52.    It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants' (Apple, Samsung, LG, and Qualcomm) unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

53.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

54.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) act together in ways that limit competition by hindering Plaintiff's businesses from entering the market, while exercising an unreasonable horizontal restraint of trade. The Defendants' (Apple, Samsung, LG, and Qualcomm) agreements are considered unreasonable because the Defendants interact to such a degree that they were no longer acting independently, and the collaboration gave the Defendants the ability to wield market power together.

55.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation.

56.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm), through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators.

**Sherman Act § 1: "Motive to Form a Conspiracy": (GM, FCA, and Ford)**

57.    Evidence of the Defendants' (GM, FCA, and Ford), motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion. The Defendants' (GM, FCA, and Ford), as government own or ran companies, and/or third-party government contractors—under contract to perform work for the Government—was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the development, manufacture, commercialization, and pricing of product(s), there would not be any reasonable substitute for their product or service.

58.    The Defendants' "motive to form a conspiracy" accelerated after the decision in *ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

"We conclude that under § 1498, the United States is liable for the use of a method patent only when it practices every step of the claimed method in the United States. The court therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims... The United States contracted with Lockheed Martin Corporation ("Lockheed") to design and build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material made from Nicalon silicon carbide fibers. These fibers are partially carbonized and manufactured into sheets in Japan, which are then imported into the United States. The

51

second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are

manufactured exclusively in Japan, but they are processed into mats in the United

States. *Zoltek*, 58 Fed. Cl. at 690... Zoltek brought suit in the Court of Federal Claims

under § 1498(a), alleging that the United States and Lockheed used the methods claimed

in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber

products used in the F-22. Zoltek alleges that the mats and sheets were made, for the

United States, using the claimed methods...The government moved for partial summary

judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in

Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred

Zoltek's claims under § 1498(a)... The federal government is immune from any legal

action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61

S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that " [t]he United States, as sovereign, is

immune from suit save as it consents to be sued"). The waiver of immunity can be limited

and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30,

34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be

sued must be strictly construed in favor of the sovereign and not enlarged beyond what

the language requires). A patentee's judicial recourse against the federal government, or

its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C.

§ 1498.[2] Section 1498(a) provides, in pertinent part: Whenever an invention described in

and covered by a patent of the United States *is used. . . by or for the United*

*States* without license of the owner thereof or lawful right to use or manufacture the

same, the owner's remedy shall be by action against the United States in the United States

Court of Federal Claims for the recovery of his reasonable and entire compensation for

52

such use and manufacture… This court has held that "direct infringement under section

271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v.*

*Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v.*

*United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a

process cannot be used 'within' the United States as required by section 271(a) unless

each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as

here, not all steps of a patented process have been performed in the United States,

government liability does not exist pursuant to section 1498(a). We affirm the trial court's

conclusion that § 1498(a) bars Zoltek's claims."

**The Conspiracy: (GM, FCA, and Ford)**

59.    Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if

they would like to participate with Plaintiff in responding to a Department of Homeland Security

(DHS) solicitation: (Broad Agency Announcement; BAA 07-02A). The Plaintiff's primary

contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if

GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown. Mr.

Culbertson's response to me was, "I need time to find out if we have those capabilities and if

there is interest from upper management". After several conversations and several failed

attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed

while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new,

"Stolen vehicle slow down system" that was being offered by GM/OnStar beginning the

following year on their 2009 models. GM/OnStar's "Stolen vehicle slow down system" is

substantially the same as the Plaintiff's "stall, stop, and vehicle slowdown systems (SSVSS)"

that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months

of 2007. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791.

Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms.

Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not

leave a message. On April 14, 2008, Plaintiff faxed a letter of interest to the General Motors

Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several

members of the General Motors leadership team, to include, Mr. Frederick A. Henderson,

President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief

Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

      60.    "The federal government took over GM... in March 2009. The Government fired

GM CEO Rick Wagoner. GM entered bankruptcy on June 1, 2009. By the end of July, GM

emerged from bankruptcy reorganization, became two separate companies and spun off GMAC

into Allied Financial. The Treasury Department began selling off its ownership of GM in 2010.

The Obama administration used the take-over to set new auto efficiency standards design to

improved air quality and forced U.S. automakers to be more competitive against Japanese and

German firms. On December 18, 2014, the Treasury Department ended the bailout. That's when

it sold its last remaining shares of Ally Financial, formerly known as General Motors Acceptance

Corporation. It had bought them for $17.2 billion to infuse cash into the failing GM subsidiary.

The Treasury Department sold the shares for $19.6 billion, making a $2.4 billion profit for

taxpayers. On June 1, 2009, GM entered bankruptcy. It had $82 billion in assets and $172.8

billion in liabilities. That month, sales hit their low point of 9.545 million cars and trucks.

The government lent GM $30.1 billion to fund operations through June and July while it went

through bankruptcy reorganization. It also guaranteed GM's extended warranties. In return, it

bought 60 percent of the company in warrants for common stock and preferred stock.

The Canadian government bought 12 percent. A union health trust received 17.5 percent stock ownership. That was in lieu of the $20 billion needed to cover benefits for 650,000 retirees. Bondholders received 10 percent stock ownership in lieu of $27 billion in bonds. Stockholders lost all their investment. GM promised to repay the $30 billion loan by 2012 when it planned to break even. The company pledged to cut its debt by $30 billion by converting debt ownership for equity. It agreed to pay union health care benefits to retirees by 2010. It promised to sell its Saab, Saturn, and Hummer divisions, reducing the number of models for sale to 40. It shut down 11 factories, closed 40 percent of its 6,000 dealerships, and cut more than 20,000 jobs. Government funding also provided the following incentives for new car buyers: The government backed all new car warranties; the economic stimulus bill allowed new car buyers to deduct all car sales and excise taxes; Congress approved TARP-funded subsidies of zero percent financing for some Chrysler vehicles. The government intended to make GM more efficient. That would allow it to become profitable when sales returned to 10 million vehicles a year. That happened in July 2009, when sales hit 10.758 million. GM emerged from bankruptcy on July 10, 2009, as two separate companies. Old GM held most of the debt. New GM held the assets, $17 billion in debt, the contract with unions, and its underfunded pension funds. This allowed it to move forward as a profitable company. The new company only has four brands: Chevrolet, Cadillac, GMC, and Buick. The company sold Saab and discontinued Saturn and Hummer. In April 2010, New GM repaid its $6.7 billion TARP loan. In November 2010, Treasury revealed it would sell half its ownership of GM. That sale allowed an initial public offering on the stock market of $33 a share. It had already gotten back $37.2 billion by selling its ownership in GM. In November 2013, the Treasury Department announced it would sell its remaining 31.1 million shares in GM. In

55

December 2014, Treasury sold its remaining shares in Ally Financial."

https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

61.    "The federal government took over Chrysler in March 2009. The Government required Chrysler to merge with Italy's Fiat S.p.A. Chrysler entered bankruptcy on April 3, 2009. By the end of July, Chrysler emerged from bankruptcy reorganization and became a brand owned mostly by Fiat. Chrysler paid off the last of its loans by 2011. On January 16, 2009, the Treasury Department approved a $1.5 billion loan for Chrysler Financial. The interest rate for the loans was one point above Libor. In return, Chrysler Financial promised to pay the government $75 million in notes and reduce executive bonuses by 40 percent. As a result, car buyers got zero percent financing for five years on some models. Chrysler received $4 billion of the $7 billion bridge loan it originally requested. In return, its owner Cerberus vowed to convert its debt to equity. Chrysler had also asked for $6 billion from the Energy Department to retool for more energy efficient vehicles. Chrysler wanted the Big Three to partner with the federal government in a joint venture to develop alternative energy vehicles. That didn't happen, and Chrysler didn't get the loan from the Energy Department. Instead, it pledged to debut an electric vehicle in 2010 and ramp up its production to 500,000 by 2013. On April 30, 2009, Chrysler filed for bankruptcy. Treasury Secretary Tim Geithner agreed to lend it $6 billion to fund operations while in bankruptcy. It emerged as a new company; 58.5 percent of which automaker Fiat S.p.A. of Italy now partly owned. This Fiat-Chrysler merger created the world's sixth largest automaker. The rest was owned by the United Auto Workers Retiree Medical Benefits Trust. Chrysler closed underperforming dealerships as part of its bankruptcy proceedings. In May 2011, Chrysler repaid $11.2 billion of its outstanding $12.5 billion in TARP loans six years ahead of schedule. Total cost to taxpayers was $1.3 billion. In 2013, Fiat CEO Sergio

Marchionne announced plans to take Chrysler public on the New York Stock Exchange. This allowed Fiat to purchase the rest of the company and merge the two into a more competitive global automaker. In October 2014, it was listed under the ticker symbol "FCAU." The new company was called Fiat Chrysler Auto Company N.V. Its 2017 market capitalization was $17 billion." https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

62.    "Ford Credit received its bailout from the Term Asset-Backed Securities Loan Facility, not TARP. That was a government program for auto, student, and other consumer loans. Although Ford did not receive TARP funds, it did receive government loans. These were critical because banks were not lending during the financial crisis. It requested a $9 billion line-of-credit from the government. In return, it pledged to spend $14 billion on new technologies. On June 23, 2009, Ford received a $5.9 billion loan from the Energy Department's Advanced Technology Vehicles Manufacturing program. In return, it pledged to accelerate development of both hybrid and battery-powered vehicles, close dealerships, and sell Volvo. It upgraded factories in Illinois, Kentucky, Michigan, Missouri, and Ohio to produce hybrid vehicles. Ford used the funds to switch its focus to commercial electric vehicles. In 2016, CEO Mark Fields said, "We want to become a top player in electrified solutions. The company wants to lead…we can win such as with our commercial vehicles." Eighty-one percent of the funds went to create new efficiency technologies for gas-powered vehicles. For example, they helped fund Ford's aluminum bodies in the F-series pickups. The Congressional Research Service estimated the loans saved 33,000 jobs. Ford will repay this loan by 2022. Many argue that Ford needed the funds to sustain its cash flow during the recession. Ford says it was in better shape than the other two (e.g. GM and FCA) because it had mortgaged its assets in 2006 to raise $23.6 billion. It used the loans to retool its product lineup to focus on smaller, energy efficient vehicles. It got the United Automobile

Workers to agree it could finance half of a new retiree health care trust with company stock. By April 2009, it retired $9.9 billion of the debt it had taken out in 2006."

https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

63.    It is the belief of the Plaintiff, that the Defendants (GM, FCA and Ford) have been unjustly enriched through the non-payment of royalty compensation to the Plaintiff that should have been paid as a percentage of the Defendants gross annual revenue for Plaintiff's Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV). GM's total revenue between the years 2013 and 2019; FCA's total revenue between the years 2013 and 2019 = $701.15B; and, Ford's total revenue between the years 2013 and 2019 = $1,065.4B.

64.    It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants' (GM, FCA and Ford) unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

65.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

66.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) act together in ways that limit competition by hindering Plaintiff's businesses from entering the market, while exercising an unreasonable horizontal restraint of trade. The Defendants' (GM, FCA and Ford) agreements are considered unreasonable because the Defendants interact to such

58

a degree that they were no longer acting independently, and the collaboration gave the

Defendants the ability to wield market power together.

67.     It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) and their

co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which

was to develop, manufacture, and commercialize Plaintiff's Stall, Stop, and Vehicle Slow-Down

Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

68.     It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford), through

their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or

conspiracy between themselves and their co-conspirators.

## ACTIVE CONCEALMENT

69.     Throughout and beyond the conspiracy, Defendants and their co-conspirators

affirmatively and actively concealed their unlawful conduct from Plaintiffs. Defendants and their

co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of

their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual

and false justifications regarding the intellectual property rights of the Communicating,

Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and

Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected

Vehicles (NCV). Defendants and their co-conspirators conducted their conspiracy in secret,

concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively

concealed their activities through various other means and methods to avoid detection. Plaintiffs

did not discover, and could not have discovered through the exercise of reasonable diligence, that

Defendants and their co-conspirators were violating the antitrust laws as alleged herein until the

Court of Federal Claims filed on March 29, 2018 its opinion in *Larry Golden v. United States*, case no. 13-307C. In the opinion, the Judge found that the Government could not be held liability under §1498(a) for the "use" of private parties' private property, when the "use" was incidental.

70.    As a result of the active concealment of the conspiracy by the Defendants and their co-conspirators to hide the fact that they were acting independently, apart from the performing work under contract for the Government, any and all applicable statures of limitations otherwise applicable to the allegations herein have been tolled.

## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

71.    Plaintiffs incorporate and reallege, as through fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

72.    Beginning at a time presently unknown to Plaintiffs, but at least as early as the year 2008 and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into continuing agreements, and conspiracy in restraint of trade for the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV), in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

73.    In formulating and carrying out the alleged agreements, understandings, and conspiracies, the Defendants and their co-conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

     a.   To allocate markets for Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV);

     b.   To submit rigged bids for the award and performance of certain Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV); and,

     c.   To allocate among themselves the production of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

74.    Plaintiff and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

## (Violation of the South Carolina Consumer Protection and Unfair Competition Laws)

75.    Plaintiffs incorporate and reallege, as through fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

76.    By reason of the foregoing, Defendants have engaged in unfair competition or unfair and deceptive acts or practices in violation of South Carolina Code Laws §§ 39-5-10 and 39-5-20.

77.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property by Defendants' conspiracies, and restraint of trade for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

### Third Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

78.     Plaintiffs incorporate and reallege, as through fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

79.     Defendants have been unjustly enriched through non-payment of royalty compensation for Plaintiff and Class members for: Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

80.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain benefits conferred via non-payment of royalty compensation for Plaintiff and Class members for: Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

81.     Plaintiff seek disgorgement of all profits resulting from such non-payment and establishment of a constructive trust from which Plaintiff and Class members may seek restitution. South Carolina should be experiencing a $95B dollar surplus in tax revenue instead of a $21.8B dollar deficit (shortfall to paying off the State's debt), and a "D" grade rating. The State should also be experiencing a 0% unemployment rate.

# SOUTH CAROLINA FINANCIALS

82.    September 2019 (truthinaccounting.org). South Carolina ranks no. 36 for its fiscal health. South Carolina has a debt burden of $21.8B. That burden equates to $14,500 for every state taxpayer. South Carolina's financial problems stem mostly from unfunded retirement obligations that have accumulated over the years. Of the $43B in retirement benefits promised, the state has not funded $14B in pension and $11.1B in retiree health care benefits.



## THE FINANCIAL STATE OF SOUTH CAROLINA

A new analysis of the latest available audited financial reports found South Carolina has a Taxpayer Burden™ of $14,500, earning it a "D" grade from Truth in Accounting. South Carolina's overall financial condition improved by 17 percent from the previous fiscal year.

South Carolina's elected officials have made repeated financial decisions that have left the state with a debt burden of $21.8 billion. That burden equates to $14,500 for every state taxpayer. South Carolina's financial problems stem mostly from unfunded retirement obligations that have accumulated over the years. Of the $43 billion in retirement benefits promised, the state has not funded $14 billion in pension and $11.1 billion in retiree health care benefits.

South Carolina and other states have become more transparent over the last few years, thanks to the Generally Accepted Accounting Principles (GAAP) set by the Governmental Accounting Standards Board (GASB), which now require governments to disclose pension (GASB 68) and other post-employment (GASB 75) benefits on their balance sheets.

## THE TRUTH:

**36** Rank    **-$21.8 billion** Money needed to pay bills    **-$14,500** Taxpayer Burden    **D** Financial grade

**98**    Data included in this report is derived from the state of South Carolina's 2018 audited Comprehensive Annual Financial Report and retirement plans' reports.

## SOUTH CAROLINA FINANCIAL BREAKDOWN

### FAST FACTS

- South Carolina has $20.4 billion available to pay $42.1 billion worth of bills.
- The outcome is a $21.8 billion shortfall, which breaks down to a burden of $14,500 per taxpayer.
- South Carolina's reported net position is inflated by $1.4 billion, largely because the state defers recognizing losses incurred when the net pension liability increases.

| THE STATE'S BILLS EXCEED ITS ASSETS | |
|---|---|
| Total assets | $61,023,562,000 |
| *Minus:* Capital assets | -$30,095,590,000 |
| Restricted assets | -$10,554,155,000 |
| Assets available to pay bills | $20,373,817,000 |
| *Minus:* Total bills | -$42,134,522,000 |
| Money available (needed) to pay future bills | -$21,760,705,000 |
| Each taxpayer's share of this debt | -$14,500 |

| BILLS THE STATE HAS ACCUMULATED | |
|---|---|
| Bonds | $13,392,509,000 |
| Other liabilities | $12,566,431,000 |
| *Minus:* Debt related to capital assets | -$8,969,765,000 |
| Unfunded pension benefits | $14,011,861,000 |
| Unfunded retiree health care benefits | $11,133,486,000 |
| Total bills | $42,134,522,000 |

### GRADE: D

Bottom line: South Carolina would need $14,500 from each of its taxpayers to pay all of its bills, so it has received a "D" for its finances. According to Truth in Accounting's grading scale, any government with a Taxpayer Burden between $5,000 and $20,000 receives a "D."



Truth in Accounting is a 501(c)(3) committed to educating and empowering citizens with understandable, reliable and transparent government financial information. To be knowledgeable participants in their government and its budget process, citizens need truthful and transparent financial information.    **99**

**Damage to Class: "Every South Carolina State Taxpayer and Unemployed**

**Integrated Technology: Rational for Stimulating the Economy (i.e. new technology; small business creation; reduced unemployment**

**Designed for Government and Military use**

**Designed to be commercialized to all consumers**

**Stall, Stop, and Vehicle Slow-Down Systems (SSVSS) i.e. Pre-programmed and Remote cellular / satellite**

**Lock Disabling Systems (i.e. automatic; mechanical; electrical; and remote)**

**Designed to be commercialized to all consumers**

**Designed for Government and Military use**

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e. smartphone)**

Collusion and conspiracy (chart above illustrate the integration of technology) in violation of the Sherman Act; Section 1. Agreements made in restraint of trade between the defendants: Apple, Samsung, Lg, Qualcomm, Gm, Ford, and FCA US LLC. The conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)

64

## DAMAGE ESTIMATES: CMDC DEVICE

Apple sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $125.9B

Year 2014 - $148.5B

Year 2015 - $176.8B

Year 2016 - $158.5B

Year 2017 - $167.5B

Year 2018 - $176.8B

Year 2019 - $176.8B (est.)

TOTAL -- $1,130.8B X 25% = **$282.7B** X 7.5% = **$21.20B**


Samsung's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $128.2B

Year 2014 - $98.4B

Year 2015 - $85.4B

Year 2016 - $80.9B

Year 2017 - $97.4B

Year 2018 - $86.9B

Year 2019 - $86.9B (est.)

TOTAL -- $664.1B X 25% = **$166.03B** X 7.5% = **$12.45B**


LG Electronics total worldwide revenue 2009 to 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2009 - $52.16B

Year 2010 - $52.41B

Year 2011 - $51B

Year 2012 - $47.9B

Year 2013 - $53.37B

Year 2014 - $55.5B

Year 2015 - $53.12B

Year 2016 - $52.04B

Year 2017 - $57.71B

Year 2018 - $54.9B

Year 2019 - $55.76B

TOTAL -- $585.87B X 25% = **$146.47B** X 7.5% = **$10.99B**

Qualcomm's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $24.866B

Year 2014 - $26.487B

Year 2015 - $25.281B

Year 2016 - $23.554B

Year 2017 - $22.291B

Year 2018 - $22.732B

Year 2019 - $24.273B

TOTAL -- $169.484B X 25% = **$42.37B** X 7.5% = **$3.18B**

*Total sales/revenue for the above Companies was retrieved from STATISTA.COM*

Apple, Samsung, LG, and Qualcomm conspired and colluded under a cooperative agreement to develop and commercialize a new and improve cell phone (i.e. CMDC device, smartphone). The laws of South Carolina prohibit contracts or agreements in restraint of trade (S.C. Code Ann. §§ 39-3-10, et seq.) and unfair trade practices (S.C. Code Ann. §§ 39-5-10, et seq.).

*Verto Analytics* looked at the numbers of Apple, Samsung, and LG smartphones currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market.



# DAMAGE ESTIMATES: CMDC DEVICE/STALL, STOP, VEHICLE
# SLOWDOWN SYSTEM

General Motors Company sales and revenue streams between FY 2013 and FY 2019 (in billion
U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $138.79B

Year 2014 - $137.96B

Year 2015 - $135.73B

Year 2016 - $149.18B

Year 2017 - $145.59B

Year 2018 - $147.05B

67



## DAMAGE ESTIMATES: CMDC DEVICE/STALL, STOP, VEHICLE SLOWDOWN SYSTEM

General Motors Company sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $138.79B

Year 2014 - $137.96B

Year 2015 - $135.73B

Year 2016 - $149.18B

Year 2017 - $145.59B

Year 2018 - $147.05B

Year 2019 - $137.2B

TOTAL -- $991.5B X 25% = **$247.88B** X 7.5% = **$18.59B**


Ford's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $146.9B

Year 2014 - $144.1B

Year 2015 - $149.6B

Year 2016 - $151.8B

Year 2017 - $156.8B

Year 2018 - $160.3B

Year 2019 - $155.9B

TOTAL -- $1,065.4B X 25% = **$266.35B** X 7.5% = **$19.98B**


Fiat Chrysler Automobiles (FCA)'s sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $72.14B

Year 2014 - $83.06B

Year 2015 - $110.60B

Year 2016 - $111.02B

Year 2017 - $105.73B

Year 2018 - $110.41B

Year 2019 - $108.19B

TOTAL -- $701.15B X 25% = **$175.29B** X 7.5% = **$13.15B**

*Total sales/revenue for the above Companies was retrieved from STATISTA.COM*


***Estimated South Carolina Tax Revenue (Class Damage)***

Apple ($21.20B) + Samsung ($12.45B) + LG ($10.99B) + Qualcomm ($3.18B) + GM ($18.59B) + Ford ($19.98B) + FCA ($13.15B) = **$99.54B**

68

*Estimated Damage to Private Litigant*

Apple ($282.7B) + Samsung ($166.03B) + LG ($146.47B) + Qualcomm ($42.37B) + GM ($247.88B) + Ford ($266.35B) + FCA ($175.29B) = **$1,327.09B**

In *Apani Southwest, Inc. v. Coca-Cola Enterprises*, the Fifth Circuit explained the Supreme Court's analysis in *Tampa*:

> "When assessing whether an exclusive-dealing arrangement has the probable effect of substantially lessening competition, the Supreme Court has identified a three-part inquiry. *Tampa Elec.* First, the relevant product market must be identified by considering interchangeability and cross-elasticity of demand. Second, the relevant geographic market must be identified, "by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies." Id. Finally, a plaintiff must show that the "competition foreclosed by the arrangement constitutes a 'substantial share of the relevant market.'" Id. That is, 'the opportunities for other traders to enter into or remain in that market must be significantly limited'."

It is the belief of the Plaintiff, that the exclusive-dealing agreement occurred when the seller (Qualcomm) agreed to sell all or substantially all of its output of a particular product (CPUs, modems, chipsets) to a particular buyer (Apple, Samsung, LG); or, when the buyer (Apple, Samsung, LG) agreed to buy all or substantially all of its needs (CPUs, modems, chipsets) for a particular product (CMDC device, smartphone) from a particular seller (Qualcomm).

Competitor collaborations facilitates explicit or tacit collusion through facilitating practices such as the exchange or disclosure of competitively sensitive information (the consumer device manufactures of Apple, Samsung, Qualcomm and LG, and the automobile manufactures of GM, Ford and FCA US, was at least informed by the Government and/or the Plaintiff of the competitively sensitive information that is the subject matter of Plaintiff's claimed inventions), or through increased market concentration. Such collusion may involve the relevant market in which the collaboration operates or another market in which the participants in the collaboration are actual or potential competitors.

69

## DAMAGE ESTIMATES: LOSS OF S.C. MANUFACTURING and DISTRIBUTION FACILITIES; LOSS OF WAGES; and, LOSS OF TAXABLE REVENUE FOR EVERY S.C. TAXPAYER (the "CLASS")

*Horizontal Conduct:* "It is illegal for businesses to act together in ways that can limit competition, lead to higher prices, or hinder other businesses from entering the market. The FTC challenges unreasonable horizontal restraints of trade. Such agreements may be considered unreasonable when competitors interact to such a degree that they are no longer acting independently, or when collaborating gives competitors, the ability to wield market power together. Certain acts are considered so harmful to competition that they are almost always illegal. These include arrangements to fix prices, divide markets, or rig bids."

It is the belief of the Plaintiff that Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US agreements with the Government and among themselves are considered unreasonable because their interaction has risen to such a degree that they are no longer acting independently, and has given rise to Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US's ability to manipulate market power together.

It is further the belief of the Plaintiff that because Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US refused to license the Plaintiff's CMDC Device/Stall, Stop, Vehicle Slowdown System patents; the results are dramatic to the "Class" (i.e. recognized here to include South Carolina's unemployed), in loss job opportunities and wages. S. C. statistics for 2010 – 2020:



70







***Estimated Labor Force Damages to the "Class": South Carolina***

Apple: 2019 (Worldwide) total number of employees – 137,000 rounded

Samsung: 2019 (Worldwide) total number of employees – 310,000 rounded

LG: 2019 (Worldwide) total number of employees – 72,000 rounded

Qualcomm: 2019 (Worldwide) total number of employees – 37,000 rounded

GM: 2019 (Worldwide) total number of employees – 164,000 rounded

71

Ford: 2019 (Worldwide) total number of employees – 190,000 rounded

FCA US: 2019 (Worldwide) total number of employees – 199,000 rounded

Total Number of worldwide employees combined – 1,109,000 rounded


9.02% of 1,109,000 employees = 100,000 unemployed in the state of South Carolina

100,000 unemployed @ $40,000/yr = $4B in taxable revenue, (gross, not net)

7.5% is South Carolina income tax rate

7.5% of $4B = $300M; cumulative over a 10-year period = $3B dollars

Estimated South Carolina Tax Revenue (Class Damage) = **$3B dollars\***


***Estimated Damage to Private Litigant***

Example: (Revenue vs. Income). Apple Inc. posted a top-line revenue number of $260,174 billion for 2019. Apple posted $55.26 billion in net income for the same period. Calculated: $55.26 is what percent of $260,174 = 21.24%

Therefore, 21.24% of what number = $4B dollars, (employee's salaries)

         21.24% of $18.8B = $4B dollars

7.5% of $18.8B = $1.4B; cumulative over a 10-year period = $14B dollars

Estimated South Carolina Tax Revenue = **$14B dollars\***


\* South Carolina should be experiencing a $95B dollar surplus in tax revenue instead of a $21.8B dollar deficit (shortfall to paying off the State's debt), and a "D" grade rating. The State should also be experiencing a 0% unemployment rate.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.      That the Court determine that the Sherman Act, state antitrust law, and common law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

        a.  A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief);

        b.  A violation of the South Carolina state consumer protection law identified in the Second Claim for Relief herein; and,

        c.  Acts of unjust enrichment as set forth in the Third Claim for Relief herein.

C.     That Plaintiffs and the Class recover damages, as provided by federal and state Antitrust laws, and that a joint and severe judgement in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

D.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or devices having a similar purpose or effect; and ; (2) communicating or causing to be communicated to any other person engaged in the sale of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV), information concerning bids of competitors;

E.     That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

F.    That Plaintiffs and members of the Class be awarded pre- and post-judgement interest, and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) and 38(b) of the Federal Rules of Civil Procedure; Plaintiff's right of trial by jury as declared by the Seventh Amendment to the Constitution and Plaintiff's demand a trial by jury for issues so triable.

Respectfully submitted,

S/ *Larry Golden*          Date: 06 /15 /2020

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

74

# EXHIBIT D

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

        Plaintiff,

        V.

UNITED STATES,

        Defendant.

1:13-cv-307-EGB

Senior Judge Eric G. Bruggink

September 29, 2021

## PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

A summary chart of this document is attached as **Exhibit A.** Defendant's objection is against claim 1 limitations of the '497 patent. One (1) of twenty-five (25) patent claims asserted in the PIC means 96% (24) of the claims asserted provided defendant with notice and was left unchallenged. Because Plaintiff only needs one (1) of twenty-five (25) patent claims asserted, Plaintiff is seeking summary judgement of infringement in Plaintiff's favor.

Defendant in this case has spent 8-1/2 years challenging the same patent specifications and same claimed inventions of Plaintiff's '497, '752, '990, '189, '439, & '287 patents, but fail to invalidate Plaintiff's patents, and fail to intervene at the USPTO to prevent Plaintiff's patents from being issued with the presumption of validity. The DOJ & DHS, unauthorized persons to petition for IPR, asserted 3 unqualified patents; 18 publications; and, one expert declaration in the IPR, but fail to invalidate Plaintiff's patent specifications and claimed inventions. Defendant has presented 6 unqualified references in their PIC, most are references the Defendant asserted in the IPR. Plaintiff is seeking summary judgement of infringement in Plaintiff's favor because all of Plaintiff's patent claims asserted in this case are presumed valid.

It is a burden on Plaintiff to continue litigating the same defenses. Discovery will only reveal more Gov't agencies, more alleged infringing products, and more third-party contractors with potential liability of infringement. Summary judgement is appropriate and timely.

# CELL PHONES TRANSFORMED TO FUNCTION AS "HANDHELD, PERVASIVE ENVIRONMENTAL SENSORS."

According to Monahan and Mokos, 2013; cell phones, when modified to sense or detect for CBRN&Es, are considered "handheld weapon of mass destruction detector(s)". The new cell phones, i.e., sensors and detectors, are developed to form a "dynamic sensor system". [1]

"Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as *handheld, pervasive environmental sensors*."

"The Homeland Security Advanced Research Projects Agency (HSARPA) of the DHS Science and Technology (S&T) Directorate refers to the sensors as "a new class of chemical detectors" ...

"By drawing upon mobile phone saturation, the Cell-All program aims to establish a flexible and dynamic sensor system, with citizens functioning as roving information nodes."

"So, whereas in 2010 media articles and a DHS press release focused on the homeland security potential of the sensors to detect biological and chemical terrorist agents, for example by calling it a *"handheld weapon of mass destruction detector"* (U.S. Department of Homeland Security, 2010)

"[I]n 2011 the technology was instead described as a "personal environmental threat detector system" (U.S. Department of Homeland Security, 2011c: 37)

"[A] range of sensors *(the sensors are the same as the phones: emphasis added)* are available to detect chemicals, such as chlorine, carbon monoxide sensors were the ones first linked to the Cell-All platform and made available for purchase" (Li, 2011).

"[T]he aggregation of sensors *(the sensors are the same as the phones: emphasis added)* in crowded public places will minimize false positives."

---

[1] Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks Torin Monahan, Jennifer T. Mokos, Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

"[W]hat is it that their phone has seen to an operations center that can then understand what it is that that sensor and the collection of sensors *(the sensors are the same as the phones: emphasis added)* around them actually means in terms of response." (Dennis, 2011)

"Still, the example hints at scenarios where an automated Cell-All system might save lives, such as if multiple sensor readings *(the sensors are the same as the phones: emphasis added)* prompted a rapid evacuation and quarantine of contaminated areas"

"In order for the Cell-All public safety sensing and alerting system to be complete, four links must be forged and joined together: the sensor *(the sensor is the same as the phone: emphasis added)* and computing hardware, the sensing application for mobile phones, a centralized server and network operations center, and the end consumer, whether individuals, emergency operations centers, first responders, government agencies, or private companies"

"According to Chris Needs, product and content manager at NC4, the risk centers perform a ''human-in-the-loop'' function of looking at raw data from the sensors" *(the sensors are the same as the phones: emphasis added)*

"The service provided by NC4's risk centers are marketed as generating ''value-added'' alerts that can include maps of locations with spikes in sensor *(the sensor is the same as the phone: emphasis added)* readings"



A silicon-based sensing chip, which consists of 64 nanosensors and is less than one square centimeter, can turn a cell phone into a ***portable poison detector***. (Dominic Hart/NASA)

"New technology can turn your cellphone into a ***portable "silent killer" detector***. And in the near future, this technology has the potential to convert the average cell phone into a ***handheld detector*** capable of warning you of chemical warfare attacks"

https://www.foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors

Plaintiff has aided the Defendant in specifically pointing out the sensor(s) inside the cell phone that enables the phone to operate as a sensor or detector. In view of the DHS *Cell-All* request, Plaintiff has specifically directed Defendant to the sensors inside the cell phone that were specifically developed by the third-party contractors Qualcomm, NASA, and Synkera for the *Cell-All* project.

The Defendant continues to try and divert the attention of the Court away from the schematics of the design of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices by isolating and separating a sensor from the host device.

Plaintiff has repeatedly described and explained to the Defendant that Plaintiff's specification's describing his CMDC devices, covers sensors and detectors the are placed in, on, upon, or adjacent the host device. That simply means the sensor(s) or director(s) can be inside the new and improved cell phone, or away from the new and improved cell phone (e.g., inside a cargo container, a mail box, a locker, a UPS truck, a FedEx truck, a warehouse, a storage building, a vehicle, a cargo plane, a cargo ship, etc.); interconnected by at least that of Bluetooth, radio frequency, cellular, satellite, etc., and still cover the essentials of Plaintiff's claimed inventions.

According to the specifications of Plaintiff's patents, and the Patent Trials and Appeals Board (PTAB), in a final decision, a sensor for detecting that is "embedded" in the phone, is likewise the same as a sensor for detecting that is away from the phone because the integration of phone plus sensor/detector, describes Plaintiff's CMDC device(s).

## THE GOVERNMENT'S CALL FOR A "PERSONAL ENVIRONMENTAL THREAT DETECTOR SYSTEM"

Plaintiff believes the Defendant (Government), in its request for ubiquitous biological and chemical sensing, has revolutionized the way we communicate with one another locally and globally. In so doing, it is Plaintiff's belief the Defendant (Government) cause the manufacture and mass commercialization of Plaintiff's CMDC devices. The *DHS BROAD AGENCY ANNOUCEMENT (BAA); BAA07-10 CELL-ALL Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007 Solicitation*, aim was to transform a cell phone into a sensor: "[I]f biological and chemical sensors could be effectively integrated into common cell phone devices

and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing... with integration into common device(s) and a communication systems concept for large scale multi-sensor networks" *DHS S&T CELL-ALL BAA07-10.*

"DHS S&T has designated this program as a High Impact Technology Solution (HITS), which is designed to ... result in high-payoff technology (revolutionary) breakthrough... [t]his proof of concept should be *capable of* detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials (in future collaborations with other organizations)." *DHS S&T CELL-ALL BAA07-10.*

As DHS's Stephen Dennis explained, "We didn't just do the science work here; we actually did look at the market". According to Dennis, 2011, "the acceleration of integrated environmental sensing and the utilization of mobile computing platforms for homeland security establishes a leading-edge capability" ... "[w]e believe that technology transfer directly to the commercial [sector] is an efficient way to go."

With a target market of roughly 300 million consumers, private and public participants continue to develop and manufacture (in view of the Government's request) the "personal environmental threat detectors". "[M]oreover, 'authorization or consent of the Government,' does not need to be expressly stated. *See TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) ('[a]uthorizarion or consent by the Government can be express [or] [i]n proper circumstances, Government authorization can be implied.'). Indeed, 'authorization or consent . . . may be given in many ways other than by . . . direct form of communication--e.g., by contracting officer instructions, [or] by specifications . . . which impliedly sanction and necessitate infringement[.]" *Hughes Aircraft co, 534 F.2d at 901.*

Below are examples of how the "sensors", stemming from the Cell-All project has evolved over the years. The Plaintiff has repeatedly demonstrated to the Defendant that, when the sensing and detection means is placed in, on, upon, or adjacent the cell phone, the integration forms a "sensor". A sensor is described by Merriam-Webster as: "[a] device that responds to a physical stimulus (such as heat, light, sound, pressure, magnetism, or a particular motion) and transmits a resulting impulse (as for measurement or operating a control)". Plaintiff will compel discovery of the "sensors" before submitting the Final Infringement Contentions.


































HSARPA accelerates this process of developing sensors[2] through direct commercial partnerships, where it funds researchers from both the public and the private sector to develop sensors that can then be brought to market, even if the only buyers are government agencies.

---

[2] List of "Sensors / Detectors": Apple Watch Series 3, 4, 5, & 6; Samsung Gear S3 Classic; Samsung Galaxy Watch Active 2; Samsung Galaxy Watch 3; LG Watch Sport; LG Watch Style; LG Watch 7; Qualcomm's FFA sensor; NASA's ARC nanosensor module for iPhone integration; Smartphone-based detection for biomedical applications; Smartphone virus scanner; Integrated Biochemiluminescence Detection on Smartphones; Wireless gas detection with a smartphone via rf communication; Cradle that turns smartphone into handheld biosensor; Smartphone-Based Image Capture of Rapid Diagnostic Tests; Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App; Smartphone radiation detector; Thermal infrared camera attachment for smart phone; The NODE+ platform; Low-Cost Smartphone-Based Electrochemical Biosensor; Biosensor attached to the phone to sniff bacteria; Cell phone radiation detection for Android; Sharp Pantone 5 107SH Smartphone comes with a built-in radiation sensor: Android 4.0 preinstalled

# AUTHORIZATION OR CONSENT OF THE GOVERNMENT DOES NOT NEED TO BE EXPRESSLY STATED

Infringing activity is "for the Government" under section 1498(a) if it is "for the benefit of the Government." *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir. 2009); *see also Madey v. Duke University*, 413 F. Supp. 2d, 601, 607 (M.D.N.C. 2006) ("A use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" (quoting *Riles v. Amerada Hess, Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998)). In *Hughes Aircraft Co. v. United States*, 534 F.2d 889 (1976), for example, the court held that a satellite program to advance the military defense and security of the United States was "for the Government."

Based on the alleged facts, the court should be able to reasonably infer that Apple, Samsung, LG, and Qualcomm are government contractors and that their "manufacture and use" of the asserted alleged infringing products[3] was "for the benefit of [DHS]." See *Advanced Software Design Corp.*, 583 F.3d at 1378. In light of the allegations that the inventions disclosed in patents '497, '752, '189, '439, and '287 were designed to prevent terrorist activity, it is plausible that Apple, Samsung, LG, and Qualcomm manufactured the alleged infringing devices for the benefit of DHS, to promote national security. *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's participation in a satellite program was "for the

---

[3] Additional List of "Sensors / Detectors": The relevant devices are: Smartphone Biosensor cradle M-Lock; High-power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; iPhone Biodetector Smartphone; Pathtracker; the Center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded Sensors; Smartphone-Based Rapid Diagnostic Tests; SIN-VAPOR I Smartphone System; Samsung Galaxy Microscope Smartphone; VOCket System; Nett Warrior Smartphone System; GammaPix; NFC Samsung Galaxy Smartphone Sensor; Cell-All Synkera MikroKera Ultra: Biotouch System; FLIR identiFINDER R300; AOptix Stratus MX Peripheral; MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX;1"x2" Detection Device Samsung Galaxy Smartphone; 2"x2" Detection Device Samsung Galaxy Smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy Smartphone; Portable Smartphone attachment to detect viruses and bacteria," [a device] that derives biological signals from your smartphone's accelerometer . . . smartphone medical diagnoses to help track chronic health conditions; cradle and app for iPhone to make a handheld biosensor that uses the phone's own camera to detect any kind of biological molecules or cells; handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaria; portable device for real-time detection of explosives, toxicants; and, highly sensitive rapid medical diagnostic tests.

Government," because the program was vital to the military defense and security of the United States). Moreover, under section 1498(a), "Government authorization or consent" can be implied by circumstances". *See TVI Energy Corp*, 806 F.2d at 1060.

Authorization or consent can be implied from the circumstances, (e.g., "by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement") *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.*, 806 F.2d at 1060.

Therefore, Plaintiff believes the Government impliedly sanctioned the use of Plaintiff's patented inventions when the Government issued the DHS S&T *CELL-ALL* Solicitation. *See the Department of Homeland Security; Broad Agency Announcement (BAA); BAA07-10 CELL-ALL Ubiquitous Biological and Chemical Sensing; Published: 10/30/2007.*

# PLAINTIFF'S CENTRAL PROCESSING UNITS (CPUs) ARE "SUITABLE FOR USE" AS AN "EMBEDDED SYSTEM"

In Plaintiff's CMDC (i.e., new and improved cell phones; smartphones) devices, the CPU / Chipsets[4] of the alleged infringers are responsible for the execution of most of the functions of the mobile devices. These functions include running apps and the operating system, as well as relaying input instructions from the user to the rest of the device.

---

[4] Apple iPhone 7 Chipset: Apple A10 Fusion (16 nm). Apple iPhone 7 CPU: Quad-core 2.34 GHz (2x Hurricane + 2x Zephyr). Apple iPhone 8 Chipset: Apple A11 Bionic (10 nm). Apple iPhone 8 CPU: Hexa-core (2x Monsoon + 4x Mistral). Apple Watch Series 3 Chipset: Apple S3. Apple Watch Series 3 CPU: Dual-core. Apple iPhone SE Chipset: Apple A9 (14 nm). Apple iPhone SE CPU: Dual-core 1.84 GHz Twister. Apple iPhone XS Chipset: Apple A12 Bionic (7 nm). Apple iPhone XS CPU: Hexa-core (2x2.5 GHz Vortex + 4x1.6 GHz Tempest). Apple Watch Series 4 Chipset: Apple S4. Apple Watch Series 4 CPU: Dual-core. Apple iPhone 11 Chipset: Apple A13 Bionic (7 nm+). Apple iPhone 11 CPU: Hexa-core (2x2.65 GHz Lightning + 4x1.8 GHz Thunder). Apple iPhone 12 Chipset: Apple A14 Bionic (5 nm). Apple iPhone 12 CPU: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). Apple Watch Series 5 Chipset: Apple S5. Apple Watch Series 5 CPU: Dual-core. Apple Watch Series 6 Chipset: Apple S6. Apple Watch Series 6 CPU: Dual-core.

Your smartphone processor, also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor. https://www.coolblue.nl/en/advice/smartphone-processors.html

"Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

A CPU, at its most basic level, consists of five parts:

- *Arithmetic and logic unit (ALU)*: The ALU is responsible for performing calculations on data. An uncomplicated CPU might contain just one ALU that can perform only addition, subtraction, and basic logic. The more sophisticated CPUs may contain several ALUs that are capable of advanced floating-point operations (McGrath, 2014).

- *Control unit (CU)*: The CU controls the movement of instructions in and out of the processor, as well as the operation of the ALU (McGrath, 2014).

- *Register array*: A register array consists of small units of internal memory used for quick storage and retrieval of data and instructions. All processors contain at least one program counter, an instruction register, an accumulator, a memory address register, and a stack pointer register (McGrath, 2014).

- *System bus*: The system bus comprises a data bus, an address bus, and a control bus and is used to transfer data between the processor, memory, and peripherals. The address bus carries the address of a specified location. The data bus carries information between the CPU

---

LG V30 Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm). LG V30 CPU: Octa-core (4x2.45 GHz Kryo & 4x1.9 GHz Kryo). LG G6 Chipset: Qualcomm MSM8996 Snapdragon 821 (14 nm). LG G6 CPU: Quad-core (2x2.35 GHz Kryo & 2x1.6 GHz Kryo). LG Watch Sport Chipset: Qualcomm MSM8909W Snapdragon Wear 2100. LG Watch Sport CPU: Quad-core 1.1 GHz Cortex-A7. LG G7 Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm). LG G7 CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver). LG G8 Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm). LG G8 CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485). LG Watch Style Chipset: Qualcomm MSM8909W Snapdragon Wear 2100. LG Watch Style CPU: Quad-core 1.1 GHz Cortex-A7. LG V50 Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm). LG V50 CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485). LG V60 Chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+). LG V60 CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585). LG Watch W7 Chipset: Qualcomm MSM8909W Snapdragon Wear 2100. LG Watch W7 CPU: Quad-core 1.3 GHz Cortex-A7.

and memory, or between the CPU and I/O devices. The control bus carries commands from the CPU and returns status signals from the devices (McGrath, 2014).

- *Memory*: Although not actually part of the CPU, memory is an essential part of CPU operation as it stores data and the program being executed (McGrath, 2014).

While, a sensor and a lock are important stand-alone components of Plaintiff's CMDC devices, so too is the GPS tracking, internet (Wi-Fi), biometric authentication, near-field communication (NFC), and other wireless protocols (i.e., Bluetooth, cellular, satellite, RF). But, the one component of the Plaintiff's CMDC devices that interconnects with all of the aforementioned components, is Plaintiff's central processing units (CPUs).

The central processing unit or CPU is the "brains" of a smartphone, and is central to its functionality. It governs how quickly a device can perform various functions, and determines how well a device can perform multiple different functions simultaneously.

> "The district court construed "integrated circuit card" to mean "a card containing a single semiconductor substrate [i.e., a chip] having a central processing unit and all program memory." J.A. 31. The court construed "programmable device" as "a single semiconductor substrate integrating electronic circuit components that includes a central processing unit and all program memory making it suitable for use as an embedded system. J.A. 33… [w]e thus agree with the district court that the programmable device of claim 3 of the '727 patent should be construed as "a single semiconductor substrate integrating electronic circuit components that includes a central processing unit and all program memory making it *suitable for use as an embedded system*. J.A. 33."
> *GEMALTO S.A. v. HTC CORPORATION, HTC AMERICA, INC., et. al.* CAFC Case No. 13-1397; Decided June 19, 2014.

---

Samsung Galaxy Note 8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China. Samsung Galaxy Note 8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China. Samsung Galaxy S8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China. Samsung Galaxy S8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China. Samsung Gear S3 Classic Series Chipset: Exynos 7 Dual 7270 (14 nm). Samsung Gear S3 Classic Series CPU: Dual-core 1.0 GHz Cortex-A53. Samsung Galaxy S9 Series Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China. Samsung Galaxy S9 Series CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver) USA/China. Samsung Galaxy S10 Series Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China. Samsung Galaxy S10 Series CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China. Samsung Galaxy Watch Active 2 Series Chipset: Exynos 9110 (10 nm). Samsung Galaxy Watch Active 2 Series CPU: Dual-core 1.15 GHz Cortex-A53. Samsung Galaxy S20 Series chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA. Samsung Galaxy S20 Series CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA. Samsung Galaxy S21 Series chipset: Qualcomm SM8350 Snapdragon 888 5G (5 nm). Samsung Galaxy S21 Series CPU: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA. Samsung Galaxy Watch 3 Series Chipset: Exynos 9110 (10 nm). Samsung Galaxy Watch 3 Series CPU: Dual-core 1.15 GHz Cortex-A53.

Qualcomm was strongly positioned to benefit from the growth of smartphone sales, and from high demand for increasingly fast data and processing capabilities into thinner smartphones and other mobile devices. Since 2007, Qualcomm has released four different series of Snapdragon mobile processors—the 200 series, 400 series, 600 series, and the 800 series—each of which included the capability of accessing both 3G and 4G/LTE wireless networks, something that Qualcomm's competitors were not able to do until at least the second half of 2014. This was significant because by the end of 2013, some of the largest smartphone markets in the world—the United States, Europe, and China (with nearly 1 billion subscribers alone) had launched lightning fast 4G/LTE wireless networks and Qualcomm had the only 4G/LTE SoC for premium-tier smartphones. *JAMES HAYS, Derivatively on Behalf of QUALCOMM INCORPORATED v. PAUL E. JACOBS, et. al, UNITED STATES DISTRICT COURT DISTRICT OF DELAWARE*, Case 1:17-cv-00603-UNA, https://www.courthousenews.com/wp-content/uploads/2017/05/qualcomm.pdf

## Joint Direct Infringement

Patent Claims 4, 5, & 6 of the '287 patent in the PIC Charts demonstrates how Apple and Samsung; Apple and TSMC; Qualcomm and LG; and, Qualcomm and Samsung are potentially liable under the provisions of *joint direct infringement*. *Akamai Techs.*, 629 F.3d at 1319-21 (holding there must be a contractual or agency relationship between the parties for a finding of joint infringement).

Although joint infringement is similar to contributory infringement (which is a form of indirect infringement), joint infringement is considered a form of direct infringement. *BMC Resources Inc. v. Paymentech L.P.*, 498 F.3d 1373, 1381, 84 USPQ2d 1545 (Fed. Cir. 2007) (74 PTCJ 644, 9/28/07). Joint infringement does not change the traditional standard of direct infringement that requires a single party to perform all the steps of a claimed method. *BMC at 1380*. Rather, joint infringement can be viewed a special case where application of the law of agency treats two parties as a single party for purposes of determining infringement.[5]

---

[5] Apple and Samsung's Contract: Apple first used SoCs in early versions of the iPhone and iPod touch. They combine in one package a single ARM-based processing core (CPU), a graphics processing unit (GPU), and other electronics necessary for mobile computing. The APL0098 (also 8900B or S5L8900) is a package on package (PoP) system on a chip (SoC) that was introduced on June 29, 2007, at the launch of the original iPhone. It includes a 412 MHz single-core ARM11 CPU

In *Travel Sentry, Inc. v. David A. Tropp (Travel Sentry III)*, a panel of the Court of Appeals for the Federal Circuit (CAFC) broadened the scope of potential liability for joint patent infringement by expanding the definition of direct infringement. Direct infringement requires that all steps of a patented method to be performed by or attributable to a single actor.

Traditionally, attribution was based on traditional agency principles or contracts. *In Akamai V*, the CAFC established a two-prong test stating "an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." The CAFC, in *Akamai V*, established that "[w]hether a single actor directed or controlled the acts of one or more third parties are a question of fact."

The CAFC panel reiterated the importance of correctly identifying the relevant "activity" or "benefit" that is being conditioned upon performance of one or more claim steps. The panel also emphasized that the context of the claims and conduct in a particular case will inform whether attribution is proper under *Akamai V's* two-prong test.

When facts presented in a case are sufficient to establish that an accused infringer "has the right and ability to stop or limit" infringing activity performed by one or more third parties, regardless of whether such right or ability has basis in traditional agency principles or a

---

The Apple A4 is a PoP SoC manufactured by Samsung, the first SoC Apple designed in-house. It combines an ARM Cortex-A8 CPU – also used in Samsung's S5PC110A01 SoC – and a PowerVR SGX 535 graphics processor (GPU), all built on Samsung's 45-nanometer silicon chip fabrication process. The design emphasizes power efficiency. The A4 commercially debuted in 2010, in Apple's iPad tablet, and was later used in the iPhone 4 smartphone.

The Apple A5 is an SoC manufactured by Samsung that replaced the A4. The chip commercially debuted with the release of Apple's iPad 2 tablet in March 2011, followed by its release in the iPhone 4S smartphone later that year. Compared to the A4, the A5 CPU "can do twice the work" and the GPU has "up to nine times the graphics performance", according to Apple.

The Apple A6 is a PoP SoC introduced on September 12, 2012, at the launch of the iPhone 5. The A6 is manufactured by Samsung on a high-κ metal gate (HKMG) 32 nm process. The A6 is said to use a 1.3 GHz custom Apple-designed ARMv7 based dual-core CPU…

The Apple A9 is a 64-bit ARM-based SoC that first appeared in the iPhone 6S and 6S Plus, which were introduced on September 9, 2015. Apple states that it has 70% more CPU performance and 90% more graphics performance compared to its predecessor, the Apple A8. It is dual sourced, a first for an Apple SoC; it is manufactured by Samsung on their 14 nm FinFET LPE process and by TSMC on their 16 nm FinFET process. It was subsequently included in the first-generation iPhone SE, and the iPad (5th generation). The Apple A9 was the last CPU that Apple manufactured through a contract with Samsung, as all A-series chips after are manufactured by TSMC.

Qualcomm, Inc.'s Contracts with Samsung & LG for Snapdragon Processors: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by

contract(s), such facts should be presented to a [Judge(s)] or jury to determine whether or not the third-party activity is attributable to the accused infringer.

In *BMC Resources Inc. v. Paymentech L.P.,* BMC relied upon dicta from *On Demand Machine Corp. v. Ingram Industries Inc.*, 424 F.3d 1293, 1322-24, 76 USPQ2d 1662 (Fed. Cir. 2005) (70 PTCJ 631, 10/7/05), that the law on joint infringement had been changed by the Federal Circuit such that a single party was no longer required to perform all the steps to infringe a method claim.

The Federal Circuit disagreed, and stated that *"On Demand* did not change this Court's precedent with regard to joint infringement." The precedent appears limited, but includes *Cross Medical Products v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1322-24, 76 USPQ2d 1662 (Fed. Cir. 2005) (70 PTCJ 631, 10/7/05), discussed infra. *Id. at 1380.* The court stated:

> "A party cannot avoid infringement, however, simply by contracting out steps of a patented process to another entity. In those cases, the party in control would be liable for direct infringement. It would be unfair indeed for the mastermind in such situations to escape liability." *Id. at 1381.*

Qualcomm Electronics was also issued a notice to appear (2019) in this case to protect any interest they may have in the allegations set forth by the Plaintiff, but fail to respond.

---

Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

Qualcomm, Inc.'s Contracts with Apple, Samsung & LG for Qualcomm's patented wireless cellular technology: The case of *Fed Trade Comm'n v. Qualcomm Inc.*, (N.D. Cal. 2017, Case No. 17-CV-00220-LH) ("Qualcomm"). Qualcomm specifically concerns standard-essential patents and their misuse to restrain and monopolize commerce. "Qualcomm has long been a leading provider of highly specialized modem chips and related technologies for use in smartphones and other smart devices. After emerging as an industry leader, it applied for and obtained standard-essential patents ("SEPs") for various chips and technologies that must be used to make the most popular and sophisticated smartphones and other smart devices." The alleged infringement occurs when Qualcomm uses, offers for sale, and sells, as a third-party contractor for the Government, Plaintiff's covered CPUs for use with Plaintiff's CMDC (i.e., cell phones, smartphones; smartwatches) devices in a single unit (chipset).

# APPLE'S FIRST iPHONE DESIGN PATENT CHART

## PLAINTIFF BELIEVES HE OWNS THE RIGHTS TO THE DESIGN

| Apple's 1st Patent for the electronic device (i.e., smartphone) ornamental design: First application filing date is January 5, 2007 (App. # D/270,887) | Plaintiff's Patent for the Detector Case (i.e., CMDC device) ornamental design: USPTO Disclosure Document filed Nov. 26, 2004; (*Doc. No. 565732*) First application filing date is April 5, 2006 (App. # 11/397,118) |
|---|---|
| Electronic Device: "The device (i.e., electronic device) which controls the flow of electrons is called electronic device. These devices are the main building blocks of electronic circuits. The various electronic devices are computers, mobile phones, etc." *https://www.physics-and-radio-electronics.com/electronic-devices-and-circuits.html* | The communicating, monitoring, detecting, and controlling (CMDC) device: The detector case [CMDC device] includes a power source (battery or electrical) ... A cpu 40 is mounted within the detector case [CMDC device] 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates |
| FIG. 1 is a front perspective view of an electronic device in accordance with the present design. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 2 is a rear perspective view for the electronic device. | The detector case [CMDC device] includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 3 is a front view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 4 is a rear view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 5 is a top view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 6 is a bottom view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |

| | |
|---|---|
| FIG. 7 is a left side view for the electronic device; and, | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 8 is a right-side view for the electronic device | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| The broken lines depicted in FIGS. 1, 2, and 6 of the inner rectangle, at the center bottom of the electronic device, represent the bounds of the claimed design, while the broken lines inside the rectangle, shown only in FIG. 6, are directed to environment and are for illustrative purposes only; the broken lines from no part of the claimed design. | Fig. 1 is an illustrative drawing of the rectangle design of the detector case [CMDC device]; and, Fig. 17 are illustrative drawings of the rectangle design of the cell phone (i.e., smartphone) and the cell phone detector case |
| The article is not limited to the scale shown herein. As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device. **Examples of an electronic device are a computer, a portable or hand-held device, a personal digital assistant, a communication device (e.g., cellular phone), a** novelty item, toy, and/or the like. | FIG. 15 is a representative schematic view of... a monitoring PC or computer terminal. It is another objective of the present invention to provide... products grouped together by common features in several product groupings such as design similarity... product grouping strategy has been developed wherein products... having the same or similar design... [i]n addition to grouping products together by features, designs and materials... **FIG. 17 is a perspective view... of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case** |
| The first iPhone featured a two-tone back that was mostly made of aluminum — a design element that the company would return to this year with the release of the iPhone 5 with a predominantly metal back. Apple's interim devices opted for different materials: The iPhone 3G and 3GS had plastic backs, while the iPhone 4 and 4S backs were made of glass. *Retrieved from: https://appleinsider.com/articles/12/12/18/apple-wins-patent-for-first-iphone-designed-by-jobs-ive* | ... [P]roduct grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design... [i]n addition to grouping products together by features, designs and materials... the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include... mobile communication devices... personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs)... handhelds |

## Claim 1 of the '497 Patent

   *"[a] plurality of interchangeable detectors… capable of being disposed within the detector case"*. In the chart above Plaintiff illustrates a "detector case" as having the same design as Defendant's [s'] "electronic devices".

   *"[a] plurality of interchangeable detectors for detecting the chemical, biological and radiological agents"* [suggest that all of the detectors are present within the Defendant's alleged infringing device; but because the limitation calls for a 'plurality of interchangeable detectors', does not suggest a single (one) detector for detecting 'chemical, biological and radiological agents']. The images below illustrate how Plaintiff's detector case (i.e., CMDC device; Defendant's alleged infringing products) are capable of having chemical, biological and radiological detectors disposed within.



Pin-sized sensor for chemical ID on smartphone devices

Smartphone virus scanner: Device lets smartphones count biological viruses



18



Sharp Pantone 5 107SH Smartphone comes with a built-in radiation sensor

Therefore, the three sensors in the above images that are specifically designed to work with Defendants alleged infringing products; satisfies, Rule 4(c) requirement of identifying the interchangeable chemical, biological and radiological detectors, of Claim 1 of the '497 patent, that are disposed within the detector case (i.e., Defendants alleged infringing products). Plaintiff believes the Defendants has literally infringed each and every element of Claim 1 of the '497 patent.

Rule 4(d): If this Court finds that the Defendants alleged infringing products i.e., smartphones or smartwatches, when integrated with C/B/R interchangeable detectors, does not literally or precisely infringe every limitation of Claim 1 of the '497 patent; the Court may find infringement under the "doctrine of equivalents".

The "function/way/result" test: "[t]he Court held that infringement under the *doctrine of equivalents* may be found, where there is no literal infringement, when the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the patented device. This test is often referred to as the "function/way/result" equivalence test.

"[t]he case law often uses the word 'way' interchangeably with the word 'means.' Thus, for purposes of this note, the 'function/way/result' test is the same as the 'function/means/result' test", *Adelman and Francione*, supra note 16, at 687. The doctrine of equivalents was first used in *Winans v. Denmead*, 56 U.S. 330 (1853), where the Supreme Court stated that "[t]he exclusive right to the thing patented is not secured, if the public are at liberty to make substantial copies of it, varying its form or proportions."

**THE CAMERA SENSORS OF THE DEFENDANTS ALLEGED INFRINGING PRODUCTS ARE "BUILT-IN, EMBEDDED" SENSORS FOR C/B/R DETECTION**

Accelerometer
Gyroscope
Magnetometer
Barometer
Proximity
Light sensor
Touch screen
GPS
WiFi
Bluetooth
GSM/CDMA Cell
NFC: Near Field
Camera (front)
Camera (back)
Source: Internet
14 sensors!

*Smartphone: Front and Back Camera Sensors*

AUDIO
Active Noise Cancellation
Microphone
PAYMENT
NFC
Magnetic
USER INTERFACE
Touchscreen
Gesture Recognition
BIOMETRICS
Fingerprint
Iris Scan
DISPLAY
Ambient Light
Proximity
RGB - Color Balance
ENVIRONMENT
Humidity
Air Quality
UV
HEALTH & FITNESS
Heart Rate Measurement
SpO2
Heart Rate Variability
MOTION TRACKING
GPS
Accelerometer
Gyroscope
Magnometer
CAMERA
HD Image Capture
Laser Auto Focus
RGB - Lighting

*Smartphone Sensors Include Camera Sensors*

**Defendants Devices Camera Sensor for *Chemical* Detection:** The sensor that Rhevision and the University of California at San Diego have worked on responds to different chemicals by changing color. It's possible to pack a single chip with many different tiny pores, each of which respond to a different chemical. The human eye may not be able to see the tiny changes, but a standard cell-phone camera can resolve a picture finely enough to detect them. So, their system relies on a digital camera to watch the chip for color changes.



**Defendants Devices Camera Sensor for *Biological* Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**Defendants Devices Camera Sensor for *Radiological* Detection:** How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of

light. An app may not be as sensitive as a dedicated radiation detector, but it works well enough to alert users to dangerous levels of radiation.



**Defendants Alleged Infringing Devices Camera Sensors for C/B/R Detection**

Apple:

- Apple iPhone 7 Camera: 12 MP, f/1.8, 28mm (wide), 1/3", PDAF, OIS; Quad-LED dual-tone flash, HDR; 4K@30fps, 1080p@30/60/120fps, 720p@240fps video.
- Apple iPhone 8 Camera: 12 MP, f/1.8, 28mm (wide), PDAF, OIS; Quad-LED dual-tone flash, HDR; 4K@24/30/60fps, 1080p@30/60/120/240fps video.
- Apple iPhone SE Camera: 12 MP, f/2.2, 29mm (standard), 1/3", 1.22μm, PDAF; Dual-LED dual-tone flash, HDR; 4K@30fps, 1080p@30/60fps, 1080p@120fps, 720p@240fps video.
- Apple iPhone XS Camera: (Dual)12 MP, f/1.8, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 52mm (telephoto), 1/3.4", 1.0μm, PDAF, OIS, 2x optical zoom; Quad-LED dual-tone flash, HDR (photo/panorama); 4K@24/30/60fps, 1080p@30/60/120/240fps, HDR, stereo sound rec. video.
- Apple iPhone 11 Camera: (Dual) 12 MP, f/1.8, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 120˚, 13mm (ultrawide), 1/3.6"; Dual-LED dual-tone flash, HDR (photo/panorama); 4K@24/30/60fps, 1080p@30/60/120/240fps, HDR, stereo sound rec. video.
- Apple iPhone 12 Camera: (Dual) 12 MP, f/1.6, 26mm (wide), 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 13mm, 120˚ (ultrawide), 1/3.6"; Dual-LED dual-tone flash, HDR

(photo/panorama); 4K@24/30/60fps, 1080p@30/60/120/240fps, HDR, Dolby Vision HDR (up to 30fps), stereo sound rec. video

Samsung:

- Samsung Galaxy Note 8 Series Camera: (Dual) 12 MP, f/1.7, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 52mm (telephoto), 1/3.6", 1.0μm, AF, OIS, 2x optical zoom; LED flash, auto-HDR, panorama; 4K@30fps, 1080p@30/60fps, 720p@240fps, stereo sound rec., HDR, gyro-EIS video.

- Samsung Galaxy S8 Series Camera: 12 MP, f/1.7, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; LED flash, auto-HDR, panorama; 4K@30fps, 1080p@30/60fps, 720p@240fps, HDR, stereo sound rec., gyro-EIS, OIS video.

- Samsung Galaxy S9 Series Camera: 12 MP, f/1.5-2.4, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; LED flash, auto-HDR, panorama; 4K@30/60fps, 1080p@30/60/240fps, 720p@960fps, HDR, stereo sound rec., gyro-EIS & OIS (30fps) video.

- Samsung Galaxy S10 Series Camera: (Triple) 12 MP, f/1.5-2.4, 26mm (wide), 1/2.55", 1.4μm, Dual Pixel PDAF, OIS; 12 MP, f/2.4, 52mm (telephoto), 1/3.6", 1.0μm, AF, OIS, 2x optical zoom; 16 MP, f/2.2, 12mm (ultrawide), 1/3.1", 1.0μm, Super Steady video; LED flash, auto-HDR, panorama; 4K@60fps (no EIS), 4K@30fps, 1080p@30/60/240fps, 720p@960fps, HDR10+, stereo sound rec., gyro-EIS & OIS video.

- Samsung Galaxy S20 Series Camera: (Triple) 12 MP, f/1.8, 26mm (wide), 1/1.76", 1.8μm, Dual Pixel PDAF, OIS; 64 MP, f/2.0, 29mm (telephoto), 1/1.72", 0.8μm, PDAF, OIS, 1.1x optical zoom, 3x hybrid zoom; 12 MP, f/2.2, 13mm, 120° (ultrawide), 1/2.55" 1.4μm, Super Steady video; LED flash, auto-HDR, panorama; 8K@24fps, 4K@30/60fps, 1080p@30/60/240fps, 720p@960fps, HDR10+ stereo sound rec., gyro-EIS & OIS video.

- Samsung Galaxy S21 Series Camera: (Triple) 12 MP, f/1.8, 26mm (wide), 1/1.76", 1.8μm, Dual Pixel PDAF, OIS; 64 MP, f/2.0, 29mm (telephoto), 1/1.72", 0.8μm, PDAF, OIS, 1.1x optical zoom, 3x hybrid zoom; 12 MP, f/2.2, 13mm, 120° (ultrawide), 1/2.55" 1.4μm, Super Steady video; LED flash, auto-HDR, panorama; 8K@24fps, 4K@30/60fps, 1080p@30/60/240fps, 720p@960fps, HDR10+, stereo sound rec., gyro-EIS video.

LG:

- LG V30 Camera: (Dual) 16 MP, f/1.6, 30mm (standard), 1/3.1", 1.0μm, PDAF, Laser AF, 3-axis OIS; 13 MP, f/1.9, 12mm (ultrawide), no AF; LED flash, HDR, panorama; 4K@30fps, 1080p@30/60fps, 720p@120fps, 24-bit/192kHz stereo sound rec., HDR video.
- LG G6 Camera: (Dual) 13 MP, f/1.8, 30mm (standard), 1/3.1", 1.12μm, PDAF, 3-axis OIS; 13 MP, f/2.4, 12mm (ultrawide), no AF; Dual-LED flash, HDR, panorama; 4K@30fps, 1080p@30/60fps, HDR, 24-bit/192kHz stereo sound rec. video.
- LG G7 Camera: (Dual) 16 MP, f/1.6, 30mm (standard), 1/3.1", 1.0μm, PDAF, Laser AF, OIS; 16 MP, f/1.9, 16mm (ultrawide), 1/3.1", no AF; LED flash, HDR, panorama; 4K@30/60fps, 1080p@30/60fps, 720p@240fps, HDR, 24-bit/192kHz stereo sound rec. video.
- LG G8 Camera: (Dual or Triple) 12 MP, f/1.5, 27mm (standard), 1/2.55", 1.4μm, Dual pixel PDAF, OIS; 16 MP, f/1.9, 16mm (ultrawide), 1/3.1", 1.0μm, no AF; or, 12 MP, f/1.5, 27mm (standard), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 16 MP, f/1.9, 16mm (ultrawide), 1/3.1", 1.0μm, no AF; 12 MP, 52mm (telephoto), f/2.4, 1.0μm, 2x optical zoom, dual pixel PDAF, OIS; LED flash, HDR, panorama; 4K@30/60fps, 1080p@30/60fps, 720p@240fps, HDR10, 24-bit/192kHz stereo sound rec. video.
- LG V50 Camera: (Triple) 12 MP, 27mm (wide), f/1.5, 1/2.55", 1.4μm, dual pixel PDAF, 3-axis OIS; 12 MP, 52mm (telephoto), f/2.4, 1/3.4", 1.0μm, 2x optical zoom, PDAF, OIS; 16 MP, 16mm (ultrawide), f/1.9, 1/3.1", 1.0μm, no AF; LED flash, HDR, panorama; 4K@30/60fps, 1080p@30/60/240fps, 24-bit/192kHz stereo sound rec., HDR10 video, gyro-EIS video.
- LG V60 Camera: (Triple) 64 MP, f/1.8, 27mm (standard), 1/1.72", 0.8μm, Dual pixel PDAF, OIS; 13 MP, f/1.9, 12mm (ultrawide), 1/3.4", 1.0μm; 0.3 MP, TOF 3D, f/1.4, (depth); Dual-LED dual-tone flash, HDR, panorama; 8K@30fps, 4K@30/60fps, 1080p, HDR10+, 24-bit/192kHz stereo sound rec., gyro-EIS video.

Therefore, the camera sensors listed above that are specifically designed to work with Defendants alleged infringing products; satisfies, Rule 4(c) requirement of identifying the "built-in, embedded" sensors (per Defendant's request), of Claim 1 of the '497 patent, that are disposed within the detector case (i.e., Defendants alleged infringing products). Plaintiff believes the

Defendants has literally infringed each and every element of Claim 1 of the '497 patent. (the "built-in, embedded" requirement also appears in the Claims 4, 5, & 6 of the '189 patent; and Claims 16, 17, & 18 of the '439 patent).

Rule 4(d): If this Court finds that the Defendants alleged infringing products i.e., smartphones, when integrated with "built-in, embedded" sensors, does not literally or precisely infringe every limitation of claim 1 of the '497 patent; claims 4, 5, & 6 of the '189 patent; or claims 16, 17, & 18 of the '439 patent, the Court may find infringement under the "doctrine of equivalents".

The "function/way/result" test: "[t]he Court held that infringement under the *doctrine of equivalents* may be found, where there is no literal infringement, when the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the patented device. This test is often referred to as the "function/way/result" equivalence test.

"The doctrine of equivalents was first used in *Winans v. Denmead*, 56 U.S. 330 (1853), where the Supreme Court stated that "[t]he exclusive right to the thing patented is not secured, if the public are at liberty to make substantial copies of it, varying its form…"

Plaintiff believes the Defendants alleged infringing devices camera sensors are "suitable for use", as a "multi-sensor detection device" when integrated with at least that of a new and improved cell phone or smartphone.

"In *FastShip LLC v. United States*, a unanimous panel of the Federal Circuit addressed an issue of first impression, construing "manufactured" in § 1498 to mean "suitable for use," thereby affirming Court of Federal Claims Judge Charles Lettow, who rejected FastShip's argument that "manufactured" means "substantially manufactured."

## DEFENDANT'S INVALIDITY CONTENTIONS

Defendant submitted its Notice to the Court in Case 1:13-cv-00307-EGB; Document 238; Filed 07/08/21: "Defendant the United States (the Government) hereby provides notice that on Friday, June 25, 2021, the Government served its Preliminary Disclosure of Invalidity Contentions on Plaintiff, pursuant to the Court's March 29, 2021 Scheduling Order (Dkt. 221)

and PRCFC 6." The Defendant asserted the patent references of Breed, Benson, Webb, Garabedian, Astrin, and Mostov.

The Breed reference is the only reference that antedates the conception date established under Patent Local Rule 4(e) by Plaintiff of December 16, 2002. The Breed reference nullifies and renders redundant the other refences of Benson, Webb, Garabedian, Astrin, and Mostov because the Breed reference, under 102-anticipation, has the earlier priority date. See the following chart.

> "[a]nticipation under 35 U.S.C. § 102 requires the presence in a **single prior art** disclosure of each and every element of a claimed invention.... [t]hat which would literally infringe if later in time anticipates if earlier than the date of invention."

**Breed does not qualify as a valid prior art reference to Plaintiff's asserted patents-in-suit ('497, '752, '189, '439, & '287) for the following reasons:**

➤ The Breed reference, alone with the Mostov and Astrin references, was asserted against the Plaintiff in an IPR trial. "IPR estoppel applies to "any ground that the petitioner raised or reasonably could have raised during that *inter partes review*." 35 U.S.C. § 315(e). As recently as 2018, there was uncertainty about the scope of *inter partes review* (IPR) estoppel under 35 U.S.C. § 315(e)(2). Under a broad interpretation, IPR estoppel precludes petitioners from asserting in a district court any grounds raised or that could have been raised in their IPR petitions."

➤ During the 18 months of the IPR trial, the Plaintiff sent the Breed, Mostov and Astrin references over to the USPTO for prosecution of the nine (9) patent claims asserted in this case, of the now issued '189 patent. The USPTO stated the Breed, Mostov and Astrin references do not cover the Plaintiff's patent claims as a hold. Plaintiff submitted as "information disclosure statements", the Breed, Mostov and Astrin references to the USPTO for prosecution of the eleven (11) patent claims asserted in this case of the now issued '439 patent, and the prosecution of the three (3) patent claims asserted in this case of the now issued '287 patent. All 23 claims asserted in this case were allowed and issued as patents with the "presumption of validity".

➤ Submitting the Breed, Mostov and Astrin references violates Patent Local Rule 7(b). "PATENT RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS: Rule 7. Document Production Accompanying Preliminary Disclosure of Invalidity

Contentions. "Together with the Preliminary Disclosure of Invalidity Contentions, the defendant and any defendant-intervenors must produce to each opposing party, or make available for inspection or copying: (b) <u>a copy of any additional items of prior art identified that do not appear in the file history of each patent at issue</u>."

➤ Plaintiff's patents are presumed valid. "[w]ith *Microsoft v. i4i*, the Supreme Court confirmed the status quo, that the clear-and-convincing standard is the single standard for proving patent invalidity. The Court acknowledged, however, that the burden of proof may be easier to meet when evidence touching the validity of the patent was not considered by the PTO... Much of the uncertainty leading up to the i4i decision derived from language in the Supreme Court's recent decision in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ("KSR"). KSR stated that, when evidence before the fact finder was not before the PTO during procurement, "the rationale underlying the presumption-that the PTO, in its expertise, has approved the claim-seems much diminished." "*In i4i*, the Supreme Court harmonized KSR with its conclusion that the statute requires a clear-and-convincing standard of proof of invalidity. New evidence supporting an invalidity defense may 'carry more weight' before the fact finder than evidence previously considered by the PTO." As articulated by Judge Rich in *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984):

> When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to disagree with the PTO or with deferring to its judgment or with taking its expertise into account. The evidence may, therefore, carry more weight and go further toward sustaining the attacker's unchanging burden.

| Order of Priority | Asserted References |
|---|---|
| 1ST | Breed, Appl. No.: 11/946,928, filed on Nov. 29, 2007, Pub. No.: US 2008/0094212 A1, Pub. Date.: April 24, 2008, Provisional application No. 60/387,792, filed on *Jun. 11, 2002.* |
| 2ND | Webb, Appl. No.: 10/464,523, filed on *June 17, 2003*, Pub. No.: US 2004/025722 A1, Pub. Date.: Dec. 23, 2004, No Provisional application filed. |
| 3RD | Mostov, Appl. No.: 11/343,560, filed on Jan. 30, 2006, Pub. No.: US 2006/0181413 A1, Pub. Date.: Aug. 17, 2006, Provisional application No. 60/648,260, filed on *Jan. 28, 2005.* |

| | |
|---|---|
| **4TH** | Garabedian, Appl. No.: 11/065,865, filed on *Feb. 25, 2005*, Pub. No.: US 2006/0191324 A1, Pub. Date.: Aug. 31, 2006, No Provisional application filed. |
| **5TH** | Benson, Appl. No.: 11/418,380, filed on May 3, 2006, Pub. No.: US 2007/0030143 A1, Pub. Date.: Feb. 8, 2007, Provisional application No. 60/677,164, filed on *May 3, 2005*. |
| **6TH** | Astrin, Appl. No.: 11/414,479, filed on April 28, 2006, Pub. No.: US 2006/0250235 A1, Pub. Date.: Nov. 9, 2006, Provisional application No. 60/678,454, filed on *May 4, 2005*. |

The Defendant is trying to convince this Court that Plaintiff's central processing units (CPUs) are insignificant to these proceedings, but has introduced Benson's, (Patent No. 7,656,286 B2), "TRUSTED MONITORING SYSTEM AND METHOD", microprocessors as prior art to challenge Plaintiff's asserted patents' central processing units (CPUs).

Benson's '286 filing date does not antedate Plaintiff's '497 application filing date of 04/05/06; does not antedate Plaintiff's Disclosure Document No. 565732 filed with the USPTO on 11/26/04; or, Plaintiff's date of conception—correspondence letters made to several members of Congress—of 12/16/02.

Benson does not disclose a microprocessor connection for radio-frequency near-field communication; a disabling locking mechanism; chemical or biological detection; a fingerprint biometric lock disabler after multiple failed attempts to open; a communication device of at least a cell phone or smartphone; or, an internet or wi-fi connection.

## <u>JOINT (DIVIDED) DIRECT INFRINGEMENT</u>

Plaintiff believes the Defendant (Government) and third-party contractors; Apple, Samsung, Qualcomm, and LG are infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "WiFi connection, internet connection, cellular connection, GPS connection, or NFC", that are interconnected to, or integrated with, Plaintiff's CMDC device(s), ("substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)

The particular facts of Qualcomm, Apple, Samsung, and LG raise the question of how the Federal Circuit's broader view of divided infringement may impact cases in which "use or manufacture of a patented invention by or for the United States" is alleged to infringe a patent under 28 U.S.C. § 1498. Section 1498 explicitly states that: "the use or manufacture of an

invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."

The Federal Circuit's holding that a reasonable Judge presiding in the CFC could find divided direct infringement in Qualcomm, Apple, Samsung, and LG hinges on the view that third-party defendants Qualcomm, Apple, Samsung, and LG's actions arguably conferred a benefit upon at least that of the DHS, TSA, CBP, FEMA, or the DoD. If this Court found that a benefit was conferred, it arguably follows that Qualcomm, Apple, Samsung, and LG's alleged acts of infringement (and the DHS's acts imputed to Qualcomm, Apple, Samsung, and LG) were performed "by or for the United States" and would fall within the purview of Section 1498.

According to Lee (2019), Apple contacted Qualcomm as a potential supplier for modem chips in the first iPhone that was released in 2007. Qualcomm also responded to a request for proposals in the 2007 DHS S&T "CELL-ALL" solicitation as a supplier of the cellular—modem chips for the new and improved cell phones, capable of detecting for at least that of hazardous chemical, biological, and radiological agents. In order for the new and improved cell phones (i.e., smartphones) to provide users with instant access to the internet, anytime, anywhere, and without wires; the "CELL-ALL" devices must have cellular and Wi-Fi to achieve this wireless data flow.

Cellular-modem chips, also known as thin modems, are paired with application processors in high-end smartphones such as Apple's iPhone, Samsung's Galaxy series, and LG's series of mobile devices (Lee, 2019). Wi-Fi technology is delivered in a combo chip that include Bluetooth, GPS, and even NFC. Qualcomm is the first vendor to integrate Wi-Fi into its application processors, an option that is expected to increase in popularity. More than one billion mobile Wi-Fi chips shipped in 2012, a number that grew to more than 1.6 billion in 2016 (Lee, 2019).

"Qualcomm has monopoly power over certain cell phone chips, and they use that monopoly power to charge people too much money," says Charles Duan, a patent expert at the free-market R Street Institute. "Instead of just charging more for the chips themselves, they required people to buy a patent license and overcharged for the patent license."

According to Lee (2019), "Qualcomm's patent licensing fees were calculated based on the value of the entire phone, not just the value of chips that embodied Qualcomm's patented technology. This effectively meant that Qualcomm got a cut of every component of a smartphone—most of which had nothing to do with Qualcomm's cellular patents." [6]

Lee, T. B., (2019, May,30). NO LICENSE, NO CHIPS? —How Qualcomm shook down the cell
phone industry for almost 20 years. https://arstechnica.com/tech-policy/2019/05/how-qualcomm-
shook-down-the-cell-phone-industry-for-almost-20-years/

Respectfully submitted,

s/ Larry Golden

Larry Golden, Plaintiff, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

---

[6] More about the WiFi connection, internet connection, cellular connection, GPS connection, and
NFC will be revealed during discovery. More on the wireless carriers of AT&T, Verizon, & T-Mobile as
possible third-party subcontractors for mobile devices and wireless services will be reveal during
discovery: "The Navy has awarded three wireless carriers' positions on a potential five-year, $993 million
contract for mobile devices and services to defense and other federal agencies. AT&T, T-Mobile and
Verizon are the winners for this "Spiral 3" edition of the Navy's Wireless and Telecommunications
Services contract. The new contract iteration is for one base year and four option years, the Defense
Department said Monday." https://washingtontechnology.com/articles/2017/10/30/navy-wireless-1b-
contract.aspx

"In *FastShip LLC v. United States*, a unanimous panel of the Federal Circuit addressed an issue of
first impression, construing "manufactured" in § 1498 to mean "suitable for use," thereby affirming Court
of Federal Claims Judge Charles Lettow, who rejected FastShip's argument that "manufactured" means
"substantially manufactured."

Based on the alleged facts, the court should be able to reasonably infer that AT&T, T-Mobile and
Verizon are government subcontractors and that their "manufacture and use" [suitability for use] of the
asserted alleged infringing products was "for the benefit of [DHS]." See *Advanced Software Design
Corp.*, 583 F.3d at 1378.

In light of the allegations that the inventions disclosed in patents '497, '752, '189, '439, and '287
were designed to prevent terrorist activity, it is plausible that AT&T, T-Mobile and Verizon made
"*suitable for use*" [manufactured] the alleged infringing devices for the benefit of DHS, to promote
national security. *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's
participation in a cell phone for detection [satellite] program was "for the Government," because the
program was vital to the military defense and security of the United States). Moreover, under section
1498(a), "Government authorization or consent" can be implied by circumstances". *See TVI Energy Corp*,
806 F.2d at 1060.

Authorization or consent can be implied from the circumstances, (e.g., "by contracting officer
instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement")
*Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the United States Court of
Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented
invention when it issued a solicitation that required bidders to submit for inspection, and perform live
demonstrations of, the accused device. *See TVI Energy Corp.*, 806 F.2d at 1060.

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of September, 2021, a true and correct copy of the foregoing "Plaintiff's Reply to Plaintiff's Motion for Summary Judgement", was served upon the following Defendant via e-mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

202-305-2513

s/ Larry Golden

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# EXHIBIT E

# Do smartphones have Qualcomm CPUs?

Today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function. There are, in fact, quite a few popular companies that make processors for smartphones. Qualcomm is probably the most widely known company because its Snapdragon smartphone processor can be found in quite a number of today's smartphones. Other companies include Apple (A-series), Samsung (Exynos), and MediaTek (Helio).



The first Snapdragon of the QSD8250 was released in December 2007. Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. The Snapdragon's central processing unit (CPU) uses the ARM architecture. As such, Qualcomm often refers to the Snapdragon as a "mobile platform". By late 2009, smartphone manufacturers announced they would be using Snapdragon SoCs. By June 2010, Snapdragon chips were embedded in 20 available consumer devices and incorporated into 120 product designs in development. Freeman, Mike (17 June 2010). "Qualcomm hoping to feast on Snapdragon". *Union Tribune San Diego*. Retrieved 2 October 2014. By 2011 Snapdragon had a 50% market share of a $7.9 billion dollar smartphone processor market. By July 2014, the market share of Android phones had grown to 84.6 percent, and Qualcomm's Snapdragon chips were embedded in 41% of smartphones. The Snapdragon (i.e., CPU) system on chip products typically include a graphics processing unit (GPU), a global positioning system (GPS), and a cellular modem integrated into a single package.

**Inside a Qualcomm Snapdragon system-on-a-chip (SoC), is an 8-core CPU.**



A Qualcomm Snapdragon (i.e., CPU) with more than one CPU is said to have a multi-core processor. A core is basically a processor inside the CPU. On its own, a core works exactly like a standalone CPU. There is only so much a single CPU can do without slowing down the phone.



With smartphones, when you talk of the Snapdragon (i.e., CPU), you're not necessarily talking about the phone's processor but a component that's on the processor. The term 'processor' in mobile phones most commonly refers to what is known as the SoC or system-on-a-chip, which houses, amongst other things, the actual smartphone CPU.

In smartphones, the Snapdragon (i.e., CPU) is responsible for the execution of most of the functions of the phone. These functions include running apps and the operating system, as well as relaying input instructions from the user to the rest of the device.

In February 2015, Qualcomm re-branded its stand-alone modem products under the Snapdragon name; they were distinguished from SoCs using the "x" designation, such as the X7 or X12 modem. Hruska, Joel (18 February 2015). "Qualcomm rides to war: Multiple new CPUs, modems announced ahead of Mobile World Congress". *ExtremeTech*. Retrieved 17 April 2018. The first Snapdragon modem for 5G networks, the X50, was announced in October 2016.

Qualcomm's decision to remove the integrated modem from the recently released Snapdragon 865 SoC is evidence Qualcomm's Snapdragon SoCs (i.e., CPUs), as a stand-alone CPU, continues to duplicate Golden's patented CPU invention. It also demonstrates that Qualcomm did not need to integrate it's patented cellular technology with Golden's patented CPU. (See the image below).





Antitrust law, like patent law, is "aimed at encouraging innovation, industry and competition." *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) (citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 876–77 (Fed. Cir. 1985)). "Despite the opportunities for conflict . . . a central goal of both patent and antitrust law is the promotion of the public benefit through a competitive economy." *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 427 (4th Cir. 1986); see also *Am. Express*, 138 S. Ct. at 2290 ("[I]t is '[t]he promotion of interbrand competition,' after all, that 'is . . . the primary purpose of the antitrust laws.'" (some alterations in original) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007))).

Indeed, the Federal Circuit, which frequently examines cases at the intersection of patent and antitrust law, has commented that "[t]he patent and antitrust laws are complementary, the patent system serving to encourage invention and the bringing of new products to market by adjusting investment-based risk, and the antitrust laws serving to foster industrial competition." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999) (citing *Loctite Corp.*, 781 F.2d at 866–67).

Qualcomm's patents include cellular standard essential patents ("SEPs"), non-cellular SEPs, and non-SEPs. Cellular SEPs are patents on technologies that international standard-setting organizations ("SSOs") choose to include in technical standards practiced by each new generation of cellular technology.

Qualcomm's SEPs and other patents relate to CDMA and premium LTE technologies— that is, the way cellular devices communicate with the 3G and 4G cellular networks. Qualcomm also manufactures and sells cellular modem chips, the hardware that enables cellular devices to

practice CDMA and premium LTE technologies and thereby communicate with each other across cellular networks.

Qualcomm's modem chip business has been very successful. From 2006 to 2016, Qualcomm possessed monopoly power in the CDMA modem chip market, including over 90% of market share. From 2011 to 2016, Qualcomm possessed monopoly power in the premium LTE modem chip market, including at least 70% of market share. During these timeframes, Qualcomm leveraged its monopoly power to "charge monopoly prices on [its] modem chips." *Qualcomm*, 411 F. Supp. 3d at 800. Based on projections from 2017 to 2018, Qualcomm maintains approximately a 79% share of the CDMA modem chip market and a 64% share of the premium LTE modem chip market.

Although Qualcomm's licensing and modem chip businesses have made it a major player in the broader cellular technology market, the company is not an OEM. That is, Qualcomm does not manufacture and sell cellphones and other end-use products (like smart cars) that consumers purchase and use. Thus, it does not "compete"—in the antitrust sense—against OEMs like Apple and Samsung in these product markets. Instead, these OEMs are Qualcomm's customers.

# EXHIBIT F



Contents lists available at SciVerse ScienceDirect

# Geoforum

journal homepage: www.elsevier.com/locate/geoforum




# Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks

CrossMark

Torin Monahan [a,*], Jennifer T. Mokos [b]

[a] Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA
[b] Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

## ARTICLE INFO

Article history:
Available online 7 March 2013

Keywords:
Surveillance
Crowdsourcing
Mobile phones
Pollution
Outsourcing

## ABSTRACT

Mobile systems for detecting environmental threats may radically restructure spatial imaginaries as people learn to see and engage with heretofore largely hidden dimensions of urban spaces. While the design of such technological systems is contingent and currently open to varied outcomes, powerful security and industry players are asserting their influence to set overriding protocols that will ensure widespread ambient data collection, especially for security and commercial applications. This paper critically explores the emergent power geographies of surveillance revealed by one such system: the Department of Homeland Security's Cell-All project. This project, which has been under development at the U.S. Department of Homeland Security (DHS) since 2007, equips mobile phones with chemical-agent detectors and links them to security networks so that threats to urban populations can be automatically detected and rapidly mitigated. In order to assess the politics of crowdsourced sensing systems, first we map the core characteristics of the Cell-All development model: creating a participatory system, building public–private partnerships, and outsourcing responsibility for privacy protections. Second, we describe some alternative designs for mobile, participatory environmental sensing and reflect on their potentials for correcting power inequalities or achieving environmental justice. Finally, we conclude by discussing the implications of these various systems and the conditions that could alter their outcomes.

© 2013 Elsevier Ltd. All rights reserved.

## 1. Introduction

The securitization of urban spaces is a dynamic political process that mutates according to constructions of threat, need, and possibility. In some instances fear of terrorist attacks has motivated the hardening of potential targets, such as monuments or buildings, with video surveillance networks or concrete sacrificial facades intended to block would-be bombers (Boddy, 2007; Coaffee, 2004; Fussey et al., 2011). In other cases, unmanned aerial vehicles are deployed over cities and borders to watch for illegal or suspicious activities and direct authorities to investigate (Finn and Wright, 2012; Graham, 2010; Wall and Monahan, 2011; Weber, 2011). Other articulations come in the form of informatized passage points, such as building entrances, community guard stations, or airports, where biometric identifiers and identity documents can be checked to ascertain whether one should be granted access (Adey, 2006; Klauser, 2010; Lianos and Douglas, 2000; Magnet, 2011; Thrift and French, 2002). Such systems often act in overlapping and reinforcing ways, connecting with larger assemblages of

regulation and control. As geographers and surveillance studies scholars have argued, the modalities of security systems are inflected by an anticipatory rationality that seeks to identify and control risks in advance (Coaffee et al., 2009; Graham and Wood, 2003; Haggerty and Ericson, 2006; Klauser et al., 2008; Lyon, 2003). Rather than being objective or deterministic, however, every step in the process—from risk construction to system implementation to altered practice—betrays a complex politics whereby resources are allocated, populations sorted, and institutions reconfigured.

An important dimension of the securitization process is the creation of compelling narratives to justify the surveillance systems under consideration. This mythical dimension relies on what Mike Crang and Stephen Graham (2007) have called "technological fantasies" that position emergent technological systems as necessary—and effective—responses to dire threats. Some of the genres at work are entertainment media and news reporting; police or government educational campaigns; and industry- and government-produced videos, presentations, and reports that typically describe scenarios of mass destruction, followed by proposed technological fixes to prevent or manage such crises (Altheide, 2006; Barnard-Wills, 2012; Graham, 2010). As has been argued elsewhere, technological fantasies are not simply instrumental narrative devices to achieve desired ends; in addition to this, they actively shape larger security cultures and afford them influence,

* Corresponding author.
E-mail addresses: torin.monahan@unc.edu (T. Monahan), jennifer.mokos@vanderbilt.edu (J.T. Mokos).

0016-7185/$ - see front matter © 2013 Elsevier Ltd. All rights reserved.
http://dx.doi.org/10.1016/j.geoforum.2013.02.001

such that alternative motivations for personal or institutional action become filtered through a security lens (Monahan, 2010b).

The technological fantasy that is the backdrop for this paper is one where mobile phones are equipped with chemical-agent detectors and linked to security networks so that threats to urban populations can be automatically detected and rapidly dealt with. This project, which has been under development at the U.S. Department of Homeland Security (DHS) since 2007, operates under the name "Cell-All." It draws upon an existing ecology of related sensor networks woven throughout the built environment in many cities, such as Chicago's "Operation Virtual Shield," which includes smart CCTV cameras and hidden chemical and biological agent sensors (Bulkeley, 2009; Murakami Wood, 2009a). The name Cell-All references the ubiquity of mobile phones and perhaps unintentionally signals the data exchange made possible by the public–private partnerships that are at the heart of this enterprise. The DHS Cell-All project is also designed to exploit mobile-phone saturation to enroll everyday users as passive data collectors whose devices communicate silently to the DHS system and its private industry partners. As with U.S. border-control and military efforts to enlist citizens as participants in crowdsourced surveillance (Koskela, 2010; Murakami Wood, 2009b), the success of Cell-All depends upon a mass of participating individuals scanning public spaces.

The ideological underpinning for the Cell-All project is one of neoliberal public–private partnerships, by which industry profits from privileged government contracts and access to data without accepting many financial or symbolic risks. A core component of this arrangement, as will be shown, is in the persuasion of everyday mobile phone users to act as data collectors and distributors. In this sense, to achieve initial success a certain type of participatory surveillance must be cultivated through discursive appeals to individuals—whether patriotic duty to avert mass-casualty disasters, personal interest to save oneself or one's loved ones from carbon monoxide poisoning, or individual desire to be a part of an innovative technological research project. Regardless of the nature of the appeal, the intended outcome is for the responsibilization of individuals to undertake what Mark Andrejevic has referred to as the "work of being watched," an eager involvement in data collection and restricted forms of interactivity that may give one pleasure while simultaneously serving the interests of institutions (Andrejevic, 2002, 2007).

While the Cell-All project may rely upon a technological fantasy, it is certainly not fictional. Prototypes have already been developed, major telecommunications companies have become partners, and mass-marketing strategies are being fine-tuned. Drawing upon insights from the field of science and technology studies, one could say that the "black box" of this technology is rapidly closing and its politics are solidifying; as a result, alternative, perhaps more democratic and empowering possibilities are being foreclosed (Akrich, 1992; Winner, 1986; Woodhouse et al., 2002). Once mobile phone manufacturers routinely include chemical and other sensors in their devices, users can be compelled or coerced to communicate environmental data as such sharing becomes normalized in technical protocol. There is precedent in place to require geolocational data sharing as an "always on" feature of mobile phones for purposes of public safety under the E911 initiative in the U.S. and similar requirements in other countries (Curry et al., 2004), so one can easily envision similar policies mandating the constant relay of environmental readings. This predictable development makes sense in part because of the widespread normalization of surveillance through commonplace media and organizational encounters. As David Murakami Wood and William Webster explain: "Interactions become structured around surveillance relationships and the new forms of social negotiation that emerge are no longer about what information one chooses to give

but how that information is to be given (or taken)" (Murakami Wood and Webster, 2011: 157).

In keeping with the goals of this special issue, this paper will critically explore the emergent power geographies of surveillance revealed by DHS's Cell-All project. Environmental sensing with mobile devices represents, on one hand, the possibility for crafting new spatial imaginaries and modes of public engagement that bring about collective empowerment. On the other hand, technological systems must be situated within their current political and ideological contexts, which in the case of Cell-All signifies a tightly constrained trajectory for technology development that promises coerced participation and asymmetrical relationships of visibility. First, we will provide an overview of our methods and sources. Second, we will draw upon DHS documents and presentations to analyze the Cell-All project, paying particular attention to the core characteristics of its development model: creating a participatory system, building public–private partnerships, and outsourcing responsibility for privacy protections. Third, we will describe some alternative designs for mobile, participatory environmental sensing and reflect on their potentials for correcting power inequalities or achieving environmental justice. Finally, we will conclude by discussing the implications of these various systems and the conditions that could alter their outcomes.

## 2. Methods and sources

The primary case study analyzed here—that of the Cell-All system—is based on a review of official and public documents, including press releases, media reports, DHS documents and training materials, and commercial partner marketing products and websites. We conducted a LexisNexis news search to identify news, media, and publicly available materials referencing Cell-All. All articles returned by the search were examined for relevance, and those not directly discussing the Cell-All program were discarded, with 31 documents remaining. These relevant documents were read and coded to identify initial thematic concepts in accordance with grounded theory approaches to data analysis (Charmaz, 2006).

In response to initial thematic coding, additional targeted data collection was focused on DHS and commercial partner documents and websites in order to identify the current development status, the operation and functionality of the system, and marketing strategies. This secondary investigation included a thorough search for pertinent documents on DHS's website, as well as searches on commercial partner websites, to locate original agency and company texts. A 2-hour video webcast of the DHS's live demonstration and training of the Cell-All project held at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center on September 28, 2011 (U.S. Department of Homeland Security, 2011a) was also transcribed and coded. Analysis of primary DHS and commercial partner documents yielded key information on the design of the Cell-All system, from the environmental sensors to the broader support and data communication infrastructures developed to store, analyze, and send alerts.

Many of the media and news articles identified were printed in security trade publications, such as Aviation Today's *Air Safety Week* and the *Terror Response Technology Report* (*TR2*), and they were often published in response to press releases from DHS or other Cell-All partners, such as NASA's Ames Research Center. This dynamic tended to produce clusters of articles with similar headlines and content that often closely reproduced the phrasing and content of the agency press releases. Similarly, the few articles that did appear in the mainstream media seemed to echo statements made in press releases with little or no analysis. This relationship between press releases and media reports suggests that there

may be a disproportionate ability afforded to DHS and commercial entities to shape public understanding and uptake of these technological systems.

## 3. Exploring the DHS Cell-All project

### 3.1. Project background and development

Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones.

The Homeland Security Advanced Research Projects Agency (HSARPA) of the DHS Science and Technology (S&T) Directorate refers to the sensors as "a new class of chemical detectors" that are smaller, less expensive, and *in situ* compared to the fairly large, static, and relatively expensive sensors used at existing monitoring stations (U.S. Department of Homeland Security, 2011a). By drawing upon mobile phone saturation, the Cell-All program aims to establish a flexible and dynamic sensor system, with citizens functioning as roving information nodes. As Stephen Dennis, the technical director of HSARPA, states, "Generally people have their smartphone with them. It's representing [through sensor readings] the space that they reside in" (Dennis, 2011).

For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "Cell-All Ubiquitous Biological and Chemical Sensing" project (U.S. Department of Homeland Security, 2007). The goals at this point were to design a range of chemical sensors and refine the GPS functionality of phones to achieve accurate transmission of location data. According to DHS, the first year and a half focused on the question "Could we miniaturize chemical sensors and make them actually fit a cell phone profile?" (Dennis, 2011). Thus, researchers focused on understanding the needs of the equipment, in terms of power and physical profiles, and determining whether the sensors could work within the "ecosystem of the phone." HSARPA conducted a national search for ideas that was intended to leverage existing technological expertise in the public and private sectors, which led to the creation of six workable first-generation prototypes, including a "form factor phone" developed by Qualcomm and a chemical nanosensor device developed by NASA (U.S. Department of Homeland Security, 2011a).

The second phase of Cell-All began in 2010 with the goals of creating dozens of competing viable devices and refining the network capabilities of the system (U.S. Department of Homeland Security, 2011a). At this stage, DHS also sought to standardize the data-reporting protocols so that data from different devices could be received and processed by a centralized network operations center. Research contracts were awarded by DHS through HSARPA and the Small Business Innovation Research Portfolio, with some of the primary recipients being Qualcomm, Synkera Technologies, and NASA (U.S. Department of Homeland Security, 2011b). In addition, DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010).

During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available. At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release. DHS presentations at this event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a).

### 3.2. Cultivating participation through a personal alerting system

A 2011 report by Fox News begins with the following scenario: "A silent killer threatens a family with a baby in a hotel room. Fortunately, their smartphone wises up, senses the threat and notifies the authorities—and the local fire department charges in to the rescue, saving the day" (Barrie, 2011). The silent killer in this story is that of carbon monoxide, which causes thousands of poisonings and hundreds of deaths each year (King and Bailey, 2007), and the smartphone is equipped with gas sensors and linked directly to DHS's Cell-All system, allowing for automatic communication with first responders. The fictional story continues by escalating the life-saving potential of the systems to mass casualty terrorist attacks:

> Ultimately, Cell-All could be American's secret weapon against public threats at football stadiums or sarin gas-style attacks like the one that killed 13 people in Tokyo's subway system in 1995. Experts are always working hard to find ways to reduce the risk to Americans at large events that could be attractive targets to terrorists. (Barrie, 2011)

As with other surveillance systems deployed under the rubric of counterterrorism, the accompanying narrative implies technological infallibility and nurtures public support through a process of simplification that strips away politics and social difference (Monahan, 2010b). What is especially interesting about this media thread, though, is that it emphasizes personal, commonplace threats (carbon monoxide poisoning of families) over large-scale terrorist attacks. This may indicate a larger shift in security discourses, but it also suggests an intentional crafting of message, on the part of DHS and its partners, to encourage participation of and support by the growing population of smartphone users in the U.S.

Therefore, during the second phase of development outlined above, DHS shifted its marketing strategy to stress the personal protection aspect of the project as an approach intended to persuade consumers to buy the associated products (U.S. Department of Homeland Security, 2011a). So, whereas in 2010 media articles and a DHS press release focused on the homeland security potential of the sensors to detect biological and chemical terrorist agents, for example by calling it a "handheld weapon of mass destruction detector" (U.S. Department of Homeland Security, 2010), in 2011 the technology was instead described as a "personal environmental threat detector system" (U.S. Department of Homeland Security, 2011c: 37) and an "environmental surveillance system" (U.S. Department of Homeland Security, 2011b: 2). By the time of the 2011 Cell-All product demonstration, presenters

concentrated almost exclusively on threats posed by commonplace gas or chemical exposure, such as carbon monoxide in the home or toluene in nail salons. Furthermore, while a range of sensors are available to detect chemicals, such as chlorine, carbon monoxide sensors were the ones first linked to the Cell-All platform and made available for purchase (Li, 2011).

Unlike most state-sponsored security programs, which are implemented without full public knowledge or direct approval, the public–private partnership model adopted by Cell-All requires public buy-in, at least initially. This necessitates the adoption of a market lens to evaluate the need for and potential success of this public safety program. As DHS's Stephen Dennis explained, "We didn't just do the science work here; we actually did look at the market" (Dennis, 2011). With Qualcomm's help, DHS assessed commercial viability through market research, asking what conditions would need to be met for the public to both accept and pay for the system. Based on this market research, DHS concluded:

> What we learned is that the personal protection application will sell the device. People will actually turn in their [current] phone, get a new phone, if it provides them with a magnitude of personal protection, especially for families, people with aging parents, people with young children. (Dennis, 2011)

In order to convince people that the system would assist with personal protection, DHS settled on carbon monoxide poisoning as a much more likely and avoidable threat than terrorism. Mainstream media outlets like Fox News could provide sensationalistic sales-pitch stories about the "silent killer" of families with babies, while DHS could craft an argument drawing upon sober statistics and the expertise of first responders:

> When we asked our nation's first responders to name the deadliest gas for us, in terms of what the American population faces as a threat, carbon monoxide was it... it actually establishes a basis for commercial manifestation of what we've done here. (Dennis, 2011)

Thus, by the time of DHS's live demonstration of their system in 2011, the entire framing had shifted to "infiltrations" of carbon monoxide as an invisible and unpredictable danger to Americans:

> Today's test is going to focus on a common poisonous gas that is responsible for more than 2,000 deaths in the United States every year. As a matter of fact, just yesterday there were 43 people injured in an incident in Washington D.C. where carbon monoxide gas infiltrated into a building. (Verrico, 2011)

The marketing efforts that follow these threat constructions focus almost exclusively on the individual, positioning the product as a personal alerting system.

As a personal sensing and alerting system, Cell-All promises to protect a diverse and inclusive range of individuals, from "a grandmother taking a siesta [to] a teenager hiking through the woods..." (U.S. Department of Homeland Security, 2010). When set to personal safety mode, an auditory alarm will sound directly on the phone when the sensor detects an abnormal chemical level, and the app can also be configured to send a text message to specific emergency contacts designated by the user. While the sensing data ostensibly remain within the sphere of users and their designated contacts, in order to take advantage of these data for other purposes, such as ensuring public safety, the program includes plans for automatically reporting personal alerts to an independent monitoring service (U.S. Department of Homeland Security, 2011a). By expanding the data network in this way, DHS hopes to harness the collective potential of mobile phones as public environmental sensing devices for "crowdsourcing human safety" (U.S. Department of Homeland Security, 2010).

As a starting point, users will be given the choice of opting-in to wider sharing of their sensing data:

> We're asking the public if they would like to opt-in to a network, an anonymous network, an anonymous report, of what is it that their phone has seen to an operations center that can then understand what it is that that sensor and the collection of sensors around them actually means in terms of response. (Dennis, 2011)

One can note in this articulation the incipient unfolding of an argument for access to—and control of—data by organizations that can "understand" what an alert "actually means." Beyond the personal alert functionality, the larger goals are to aggregate data from multiple cell phones located within crowded public areas, such as sports arenas, subway stations, or office buildings. Then in addition to sending an individual alert, each phone on the network could send abnormalities detected by the sensors directly to a centralized network operations center (NOC). The idea is that the NOC will be equipped to analyze the reports within the context of each other (as well as other available data) and the aggregation of sensors in crowded public places will minimize false positives. One phone reporting an abnormal chemical level could be an error; a hundred phones reporting the same levels would be more likely to indicate a situation in need of intervention. When the NOC determines that a threat is likely, it could then contact local agencies and first responders.

In order for Cell-All to succeed as it moves along a path from personal protection to centralized data collection, it must both compel and automate participation in data-sharing schemes. DHS rationalizes this as placing trust in objective technological systems instead of supposedly unreliable and error-prone individuals:

> Currently, if a person suspects that something is amiss, he *might* dial 9-1-1, though behavioral science tells us that it's easier to do nothing. If he does do something, it may be at a risk to his own life... the caller may be frantic and difficult to understand, diminishing the quality of information... An even worse scenario: the person may not even be aware of the danger, like the South Carolina woman who last year drove into a colorless, odorless, and poisonous ammonia cloud. (U.S. Department of Homeland Security, 2010)

In this example, it is not obvious how a cell-phone sensor would have helped, and according to other sources the woman, who died, left her vehicle because she was aware of the gas (Associated Press, 2009). Still, the example hints at scenarios where an automated Cell-All system might save lives, such as if multiple sensor readings prompted a rapid evacuation and quarantine of contaminated areas. Automated data sharing, a fully functional infrastructure, and tight coordination with first responders would be necessary components for this to be effective.

In the marketing of Cell-All, personal protection serves as the initial hook, allowing for data sharing to be expanded gradually. First this will take the form of opting-in to sharing data with a network operations center, with assurances that personal identifiers will be scrubbed from the data. Next, if precedent holds, wider data sharing will occur and participation will become compulsory. A neoliberal ideological context shapes the Cell-All project as a whole, as we will discuss further in the next section, but it also motivates government agencies to formulate problems in such a way that market-based solutions become logical responses to them.[1] Therefore, rather than tackle the health dangers posed by

---

[1] The neoliberal context signifies, in part, a market rationality of privatization of public goods and institutions, deregulation of industry, and responsibilization of individuals for the provision of human security and social reproduction (Monahan, 2010a, 2010b).

cumulative exposure to contaminants or impose tighter regulations upon chemical and other polluting industries, DHS focuses on individual responsibility for mitigating threats as a gateway to supposed wider public protection from catastrophic events. Just as individuals are being charged with maintaining the integrity of their digital identities online (Whitson and Haggerty, 2008), Cell-All hints at new articulations of responsibility where individuals will be enlisted symbolically as data collectors of environmental threats, fulfilling their biochemical duty to keep themselves and their families uncontaminated.

Enrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011). Widespread participation is needed, with members of the public serving as passive data-collection nodes, but the program's goals do not include promoting environmental expertise among everyday users. The model for achieving such protection depends on centralized data collection so that experts and authorities can act to minimize or respond to threats. Although public protection may never actually be achieved by this system, it nonetheless advances public–private partnerships that further normalize the collection of sensitive, personal data for purposes of profit and control.

### 3.3. Forging public–private partnerships

The Cell-All program is funded and managed by HSARPA, whose mission is to facilitate the rapid development *and* deployment of new security technologies, mainly through partnerships and contracts with the private sector (U.S. Department of Homeland Security, 2011a). As DHS representatives explain it:

> The most important component of all is delivering the technology into the hands of those who need it so that we're not one of those government R&D labs that's happy to throw something over the wall or end it with a paper. We're actually trying to take this technology all the way to the end. (Dennis, 2011)

HSARPA accelerates this process through direct commercial partnerships, where it funds researchers from both the public and the private sector to develop products that can then be brought to market, even if the only buyers are government agencies.

The resulting neoliberal arrangements mirror those in other industries—such as pharmaceutical research and development, where in the U.S. the vast majority of research is paid for by public funds and conducted in university labs, after which time pharmaceutical companies acquire those research findings to develop profitable drugs without distributing revenue back to the public sector (Angell, 2004; Fisher, 2009). More than simply being pro-business, such arrangements seek to privatize government functions through partnerships and reconstruct the public good as that which benefits industry. Public subsidization of private companies, whether in the domains of homeland security or pharmaceuticals, is rationalized through discourses of efficiency. In the example of Cell-All, DHS justifies such partnerships by saying:

> We believe that technology transfer directly to the commercial [sector] is an efficient way to go. We know that there are a number of commercial opportunities that have been provided to our sensor manufacturers and to the folks who are involved in this program, so we're looking forward to taking advantage of those [opportunities] directly. (Dennis, 2011)

Therefore, although Cell-All is managed and funded by HSARPA, the technologies and infrastructures are being developed by third party contractors who received funding from DHS for those purposes and who can then profit further from the sale of any resulting systems or services (U.S. Department of Homeland Security, 2011a,c). Currently, the primary contractors working on the project are Synkera Technologies, Qualcomm, NC4, and NASA's Ames Research Center, which is the only public agency receiving a contract.

Each of the organizational entities involved in the project are working on separate system components that will be integrated as the project progresses. The exception is the NASA research center, which appears to be on a parallel development track to the industry partner Synkera, although it is not clear how much intellectual property is being transferred from NASA to Synkera or the other companies. In order for the Cell-All public safety sensing and alerting system to be complete, four links must be forged and joined together: the sensor and computing hardware, the sensing application for mobile phones, a centralized server and network operations center, and the end consumer, whether individuals, emergency operations centers, first responders, government agencies, or private companies. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded "sleeve" for phones—that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011).

Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iPhone operating systems. When the application is installed it will ask the user for permission to share sensor readings and location information over the network; then, whenever abnormal chemical levels are detected, the phone will send those data to a network gateway. According to Doug Hoffman, program manager at Qualcomm, the gateway will authenticate the sensor and phone to determine whether they are authorized to be on the network, scrub personal information from the data, assign a temporary identification number to the phone, and then send data to the network operations center (NOC) (Hoffman, 2011).

The NOC acts as a data-clustering algorithm that combines and analyzes data from multiple phones in terms of geographical location, time, and chemical level in order to determine whether there is an abnormal public safety event. The NOC servers also have the ability to communicate directly with phones to change the frequency with which the phone is reporting data. For example, if there is a major risk-event involving many cell phones, the NOC can request less frequent reporting so that the network is not overloaded.

If the NOC algorithms determine that there is a potentially dangerous situation, an alert is transmitted to a "risk center" run by the California-based security company NC4. Established in 2001 after the attacks of 9/11, NC4 specializes in "situational readiness," which it aspires to obtain by bridging "the communication gap in a post-9/11 environment between the public sector and the private sector" (Needs, 2011). NC4's customers include both private and public sector organizations oriented toward security, risk management, and emergency response. The company operates two "risk centers," one on each U.S. coast, where analysts receive and vet data from NOCs and other sources before communicating threats to others or assisting with responses. Essentially, NC4 risk centers function as private-sector "fusion centers," much like DHS data fusion centers that are intended to identify threats in advance, assist

law-enforcement investigations, and coordinate responses (Monahan and Palmer, 2009).

According to Chris Needs, product and content manager at NC4, the risk centers perform a "human-in-the-loop" function of looking at raw data from the sensors, comparing them with data from other sources, and translating them into alerts that can be sent, for a fee, to end users, whether first responders, government agencies, individual consumers, or private-sector commercial entities.[2] For example, during the Cell-All live demonstration in 2011, alerts were sent to the Los Angeles emergency operations center, which could have then dispatched first responders or managed the threat were it real. The service provided by NC4's risk centers is marketed as generating "value-added" alerts that can include maps of locations with spikes in sensor readings, "so if you're not familiar with the area you can see how far is this incident from my sensitive assets" (Needs, 2011).

There is certainly a great deal of coordination required by DHS to bring the program components together for Cell-All to even approach operational status. From the start, though, the program has fostered public–private partnerships under the assumption that government agencies are too slow or lack the expertise to develop such a system on their own. This position is neatly articulated by HSARPA:

> The acceleration of integrated environmental sensing and the utilization of mobile computing platforms for homeland security establishes a leading edge capability instead of a traditional trailing edge capability that government sometimes has, taking advantage of the latest in new chemical sensor innovation. Delivering these capabilities to the extended homeland security enterprise as a commercial capability makes government technology transfer easier and far more efficient than trying to nurse it along inside of government, so I'm very excited that we have commercial opportunities to take advantage of the technology that's been created here. (Dennis, 2011)

NC4's CEO and president Jim Montagnino puts it a bit more bluntly, actually implying that government bureaucracies invite security threats: "Bureaucratic red tape impedes critical information sharing across organizational boundaries, which leaves the door open to national security threats" (Montagnino, 2012).

Framed in this way, the expedient solution is neither to concentrate on problems that government is equipped to solve, such as passing and enforcing environmental regulations, nor is it to streamline government agencies, although that option certainly exists as an imperative within neoliberal cultures. Rather, the task is seen as finding ways to entice industry to "partner" with government agencies, mainly by ensuring profitability for private companies (Monahan, 2010b). This orientation is evinced by Cell-All's early-stage market research, paid for by HSARPA and administered by Qualcomm. After finding a viable market, industry partners were further persuaded by government contracts to develop systems and services and by the high probability of sustained profits from a range of customers after product development. Clearly, having privileged access to consumer data, even in de-identified, aggregate form, would be of great interest to partnering companies.

### 3.4. Outsourcing privacy protections

During the research and development phase of projects like Cell-All, privacy risks are the responsibility of DHS's S&T Directorate, which conducts privacy impact assessments (PIAs) for

laboratory- and field-testing. However, once S&T raises a technology to operational status, the responsibility for evaluating emerging privacy risks typically falls upon the privacy offices of the respective entities involved, such as Immigration and Customs Enforcement, the Transportation Security Administration, the Coast Guard, or others (U.S. Department of Homeland Security, 2011c). This separation between research and operational responsibilities for privacy protection may have particular implications for Cell-All because the final deployment of the technology will also have a commercial component. When government entities constitute the end-user community, the DHS Privacy Officer may require that privacy impact assessments be incorporated into the implementation process (Clarke, 2009); however, the private companies that will be managing core components of Cell-All are under no such obligations.

While one might expect that the early-stage PIA conducted by DHS would nonetheless anticipate real-world operational deployments of Cell-All, this is not the case. Instead the focus is on ensuring privacy protections for the development and pilot-testing phases (U.S. Department of Homeland Security, 2011b). To accomplish this, DHS adopted what is akin to institutional review board (IRB) review for human subjects research, including obtaining informed consent from participants. Thus, for a 2011 personal safety demonstration of Cell-All at the Los Angeles Fire Department test facilities, first responders participating in the demonstration consented to the transfer of geolocational data over the network but not personally identifiable information, such as mobile phone numbers (U.S. Department of Homeland Security, 2011a). As is standard with informed consent for research, "users participating in the test [were told that they] may turn off their cell phone and stop participating in this test at any time" (U.S. Department of Homeland Security, 2011c: 38). After testing is complete, however, the system "will be transitioned to the private sector and marketed by commercial vendors" (U.S. Department of Homeland Security, 2011c: 39), such that responsibility for privacy protections will be handed-off to those companies.

The model of outsourcing privacy protections to private companies engenders some interesting discursive moves on the part of DHS representatives, who say things like: "While Cell All was designed with privacy protections in mind, the end user community must continue to consider privacy when deploying the system for operational use" (U.S. Department of Homeland Security, 2011b: 7). After deployment, those managing the system will determine whether they want to collect cell phone numbers, users' locations and movement, or all chemical readings, rather than only ones deemed "significant." This position is made clear by a DHS privacy impact assessment that states:

> Decisions regarding the capture and transmission of additional information (e.g., phone numbers, names of cell phone owner) will also be decided by the end user community, with input from the first responder community, and public health organizations, among others. (U.S. Department of Homeland Security, 2011b: 6)

DHS dismisses any future privacy concerns by implying that individual users will always be able to opt-out of the system if they feel uncomfortable: "Privacy is as important as technology… After all, for Cell-All to succeed, people must be comfortable enough to turn it on in the first place" (U.S. Department of Homeland Security, 2010). For DHS, operational risks are narrowly defined in terms of market failure, not potential problematic uses of personal data, lack of transparency about data being collected and shared, or the coercive effect of technological protocols that may resist easy rejection.

As has been demonstrated with other dimensions of surveillance societies, private companies have an interest in amassing

---

[2] The NC4 analysts continually monitor multiple government and media information streams, including social media.

as much personal data as possible in order to profit, whether by selling convenient products and services to users, providing data for a fee to government agencies, or minimizing risk more generally (Andrejevic, 2007; Lyon, 2001; O'Harrow, 2005). Without specific prohibitions against the collection and use of personal data, projects like Cell-All possess a strong valence toward applications that exceed the original scope of the project. The data produced from the system can also be funneled back to government agencies, just like DHS fusion centers pay to tap the repositories of private data aggregators to assist with investigations, even if such data would be illegal for fusion centers to collect on their own (Monahan and Palmer, 2009). In such situations, the systems can effectively evade public accountability because private companies, who maintain the databases, are shielded from open-records requests.

Privacy threats extend beyond the coercive collection and storage of personal information. Control over who has access to such information is also tenuous, as can be seen, for example, with the numerous cases of hundreds of thousands of electronic records of personal information being hacked, lost, or stolen—from private companies and government agencies alike (Gilliom and Monahan, 2013). Furthermore, even if accessed in aggregate form, data mining and big data analytics can produce startlingly accurate profiles, which could be used to further sort, discriminate against, or commercially target users (Andrejevic, 2011). Data analytics of commercial systems have also revealed the ease with which individual users can be reidentified, even when anonymity has been ensured (Gilliom and Monahan, 2013). Thus, Cell-All and similar systems further the process by which individuals become sensing nodes themselves, communicating valuable data to private companies, government authorities, and peers.

With Cell-All, there is also strong potential for mission creep because of organizational arrangements that make robust privacy protection voluntary and mobile technologies that afford the collection of highly granular data. As Katie Shilton has observed, "At the extreme, mobile phones could become the most widespread embedded surveillance tools in history" (Shilton, 2009: 48). When coupled with environmental sensors, the capacity of mobile phones to identify individuals and track their movements could lead to many kinds of social control and discrimination well beyond the disclosure of personal information. For instance, insurance companies could use such data to cancel an individual's medical coverage or increase premiums because one is routinely exposed to high levels of air pollution because of where he or she lives, works, or commutes. This is not that far fetched as there are existing corollaries with companies charging higher rates for property insurance when people live in high-crime areas, or with companies offering "lifestyle discounts" for people who can prove that they exercise regularly and eat healthy foods (Gilliom and Monahan, 2013). Other scenarios could include companies using sensor data from individuals' phones to make decisions about whom to hire or which employees to discipline; just like organizations currently can demand drug testing, sensor-embedded phones could reveal who is exposed to marijuana or tobacco smoke and therefore who might be deemed to be a risk to the company. The same might hold true for landlords requesting sensor data as a condition for considering tenants' applications, just as many landlords presently require credit checks when considering applications (Neighborhood Link, 2010). This list of examples could easily be expanded, but the point is that based on precedent such systems will lend themselves to coerced participation and sorting of populations based on perceived risk levels, so these outcomes should be anticipated in advance of system deployment.

## 4. Toward empowering participatory sensing

Cell-All serves as an influential case study, particularly because the program shapes technological designs and organizational models that will guide future endeavors in the area of mobile environmental sensing. It advances a dominant paradigm of surveillance predicated upon asymmetrical relations of visibility and control, on one hand, and industry profits, on the other. Additionally, as a case study, Cell-All is emblematic of wider trends in the development of restrictive spatial protocols for locational tracking and sensing. As socially constructed systems, though, such spatial and technological systems need not be so restrictive, extractive, or controlling. A variety of alternative, more open and participatory designs are circulating, even as DHS and its industry partners are moving toward technological closure on mobile sensing systems.

Several scholars have been actively involved in theorizing such alternative surveillance trajectories, often in conversation with artists, engineers, and activists. For instance, David Murakami Wood has described the possibility of shared surveillance protocols that might build upon the inclusive ideals of universal design and open source movements to enrich people's lives and produce relationships of sociality (Murakami Wood, 2007). Katie Shilton, working through a number of persuasive case studies, refers to participatory sensing as an activity that "is meant to enable (and encourage) anyone to gather and investigate previously invisible data. It tries to avoid surveillance or coercive sensing by emphasizing individuals' participation in the sensing process" (Shilton, 2009: 50). Dana Cuff, Mark Hansen, Jerry Kang argue for embedded-network-sensing applications that advance social empowerment through the creation of a "data commons" that functions as "a data repository generated through decentralized collection, shared freely, and amenable to distributed sense-making not only for the pursuit of science but also advocacy, art, play, and politics" (Cuff et al., 2008: 29).

Many of the projects being developed by UCLA's Center for Embedded Networked Sensing (CENS) attempt to catalyze empowering participatory sensing. For example, the Personal Environmental Impact Report (PEIR) project encourages individuals to use their mobile phones as self-surveillance devices to track their daily exposure to air pollution and calculate their own carbon footprints (Shilton, 2009, 2012). By reading locational data against air-quality alerts and maps, the system determines the amount of pollution one is exposed to over a given time period. Also, by drawing upon the GPS and accelerometer sensors in most mobile phones, PEIR can surmise what mode of transportation one uses for commutes and estimate one's carbon footprint based on those data. The overall aim is clearly one of cultivating public awareness of pollution problems and motivating individuals to change their own behavior to minimize both exposure and contributions to air pollution. Beyond this, CENS seeks to push participatory sensing toward democratic and environmental justice outcomes, encouraging mobile phone users to document egregious pollution conditions, share those data with others, and mobilize findings—in consultation with scientific experts—to influence policymakers (Center for Embedded Networked Sensing, 2008). Although the vision does problematically imply that one could uncover indisputable truths that would necessarily lead to progressive policy changes, the power of this model of participatory sensing is in its semi-open protocol that foments new spatial imaginaries about pollution in urban environments and invites participants to use data for their own ends, whether for changing individual behaviors or organizing for social change.

Another provocative example is the Safecast system, which originated as a collective of individuals using mobile phones and

Geiger counters to map radiation levels in Japan during the nuclear crises precipitated by an earthquake and tsunami in 2011. During this period, many people purchased radiation detectors and shared "readings" through websites and social media as a mechanism by which to achieve collective knowledge about dangers when official information was seen as being insufficient or untrustworthy (Safecast, 2012). The Safecast network, which received some institutional support from the MIT Media Lab, embodied a hacker ethos of constructing do-it-yourself sensing technologies and openly sharing information to ensure public safety and achieve political aims (PBS NewsHour, 2011). In many respects, Safecast operated through shared protocols to actualize a robust data commons, showing the empowering potential of participatory surveillance. At the same time, the practices of this network may signal an almost complete decline of trust in public institutions, such that the primary purposes may be ensuring self-protection through disaster preparedness and response, not necessarily dismantling risky infrastructures or challenging government truth claims about safety.

The project known as Crowd (Soft) Control offers another foray into empowering possibilities for participatory sensing. Based out of Northwestern University's AquaLab, researchers are designing mobile-phone applications to collect visual and sound data that are currently absent in databases because they exist at sites that are less frequently traversed by mobile phone users (Rula and Bustamante, 2012). For instance, urban sound maps that document sound-pollution hotspots may be skewed because they are populated primarily with data along main travel corridors, leaving less traveled routes underrepresented. Similarly, while personal and public image databases are replete with pictures of the front of buildings, there is a dearth of photographs of the side or rear of buildings, where exhaust fumes may be entering through air intake vents. In both of these situations, voids are left in the empirical record such that environmental problems may be unrecorded and therefore invisible within existing systems, making the likelihood of remediation slim. Crowd (Soft) Control seeks to build upon user familiarity with existing smartphone platforms, such as FourSquare or Facebook Places, to incentivize, through virtual rewards, the collection of missing visual and sound data. For instance, AquaLab researchers have devised a prototype for a game called "Ghost Hunter," wherein players must use their mobile phones to take photographs of supposed ghosts, who happen to be in locations where images are currently missing in existing databases (Rula and Bustamante, 2012). The intention of the researchers is to collect data that could assist with planning for urban sustainability, while drawing attention to environmental problems. User involvement is highly structured and constrained, so this would not necessarily constitute a democratic or truly participatory sensing system, but it does point to the possibility of progressive outcomes emerging from such projects.

Each of these alternative participatory sensing systems, as well as others like them (e.g., Chang, 2012; Monahan, 2010a; Ottinger, 2010; The Impact Project, 2012), offers a strong counterpoint to the controlling tone of security projects like Cell-All. Rather than rely on constructions of threats that invite restrictions of rights, neoliberal outsourcing, and the hardening of urban spaces, such alternatives operate in a register of "cosmopolitan security," which, as Stephen Graham has elaborated, is a mode of security that seeks to "address the real risks and threats that humankind faces in a rapidly urbanizing world prone to resource exhaustion, spiraling food, energy and water insecurity, biodiversity collapse, hyper-automobilisation, financial crises, and global warming…" (Graham, 2012: 326). That said, participatory sensing applications oriented toward cosmopolitan security still exist within states of extreme social inequality, so rather than being empowering in any universal way, they may instead highlight conditions of unequal exposure and invite conversations about persistent environmental racism and injustice (Monahan and Mokos, 2010). As with other forms of interactive surveillance, such systems also run the risk of being captured by commercial or security interests such that the data could be used for purposes that were not initially intended (Ellerbrok, 2011); thus, a certain amount of vigilance will be necessary to keep protocols open and directed toward social justice ends.

## 5. Conclusion

Crowdsourced sensing systems may drastically restructure spatial imaginaries as people learn to see and engage with heretofore largely hidden dimensions of urban spaces. While the design of these technological systems is contingent and currently open to varied outcomes, powerful security and industry players are asserting their influence to set overriding protocols that will ensure widespread ambient data collection, especially for security and commercial applications. In order to assess the politics of these emerging systems, this paper has mapped some of the institutional arrangements guiding technological development and analyzed the logics behind design decisions.

With DHS's Cell-All project, the vision for participation is one where members of the public act as passive data collectors for an almost completely closed system, where participants do not have access to data or environmental alerts beyond the individual level and where there are no opportunities for defining outcomes. The public, in this model, will be enticed or coerced to engage in the labor of being watched. This may happen through promises of protection from gas or chemical poisoning, through patriotic goals of averting mass casualties from terrorist attacks, or simply through invisible protocols that opt users in to data collection and sharing. At the same time, information systems are always embodied (Blanchette, 2012; Kitchin and Dodge, 2011), so as this version of participatory sensing grows, spatial protocols may emerge to sort and direct flows of individuals, perhaps giving priority access at security checkpoints or commercial venues to people voluntarily participating in the system—or singling out non-participants for added scrutiny or exclusion.

The Cell-All system also seeks to produce innovative organizational arrangements that advance research and development through public–private partnerships. DHS programs like Cell-All identify a narrow set of statistically unlikely scenarios, such as chemical attacks of public places or carbon monoxide poisoning, then frame problems in such a way that private-sector solutions are seen as the most reasonable and expedient. Viability for commercial success is measured through market research, and financial risks to participating companies are offset through DHS grants and assurances of a guaranteed market of government agencies and first responders upon project deployment. The program will produce data, which are viewed as being inherently positive. Industry partners stand to profit as well from vast repositories of personal data collected from millions of mobile phones, even if the uses of such sensor data are not yet defined.

Finally, by outsourcing privacy protections to companies and agencies implementing the systems, DHS both sidesteps responsibility for ensuring adequate protection of personal data and opens the field for industry partners to discover profitable uses for data. Privacy impact assessments, which may be required of security systems implemented by government agencies, are conducted only for the relatively innocuous development and testing phases of the project. In actual use, companies can collect data freely as long as they receive consent from users, such as in the form of license agreements that people routinely accept without reading (Böhme and Köpsell, 2010). The mission creep potentials of such surveillance systems are high. More than simply being a threat to privacy,

sensor data could lead to discrimination against individuals or groups who are perceived as living in risky environments or possessing risky lifestyles; precedents are already in place for such institutionalized forms of discrimination based on credit checks, drug tests, or health history, so sensor data from phones—were they readily available—could easily contribute to such practices.

Alternative participatory sensing systems offer templates for how environmental data could be collected in ways that are more democratic, encouraging of the development of user expertise, and dedicated to social and environmental justice. In short, the potential is there to harness such surveillance systems in the pursuit of cosmopolitan security and social equality (Graham, 2012). Because environmental threats are not distributed evenly, in order to achieve the progressive goals of their designers, such alternative systems must foster collective understandings of and responsibility for toxic exposure so that mitigation of risk will not be further individualized without altering the systems producing threats. If encoded in sociotechnical systems and practices, the cultivation of shared risk-topographies of environmental threats could serve as a powerful corrective to Cell-All's emphasis on individual responsibility, centralized control, and industry profits. That said, while some of these alternatives, like Safecast, are much more robust and functional at present than DHS's Cell-All, the restrictive technological protocols being established by DHS and its partners are creating a data enclosure that threatens to defer, perhaps indefinitely, the more laudable vision of a data commons.

## References

Adey, P., 2006. 'Divided we move': the dromologics of airport security and surveillance. In: Monahan, T. (Ed.), Surveillance and Security: Technological Politics and Power in Everyday Life. Routledge, New York, pp. 195–208.

Akrich, M., 1992. The de-scription of technological objects. In: Bijker, W.E., Law, John (Eds.), Shaping Technology/Building Society: Studies in Sociotechnical Change. The MIT Press, Cambridge, MA, pp. 205–224.

Altheide, D., 2006. Terrorism and the Politics of Fear. Altamira Press, Lanham, MD.

Andrejevic, M., 2002. The work of being watched: interactive media and the exploitation of self-disclosure. Critical Studies in Media Communication 19 (2), 230–248.

Andrejevic, M., 2007. iSpy: Surveillance and Power in the Interactive Era. University Press of Kansas, Lawrence, Kan.

Andrejevic, M., 2011. The work that affective economics does. Cultural Studies 25 (4–5), 604–620.

Angell, M., 2004. The Truth about the Drug Companies: How They Deceive Us and What to Do About It. Random House, New York.

Associated Press, 2009. South Carolina: Ammonia Cloud Kills Woman. New York Times. <http://www.nytimes.com/2009/07/16/us/16brfs-AMMONIACLOUD_BRF.html> (accessed 17.09.12).

Barnard-Wills, D., 2012. Surveillance and Identity: Discourse, Subjectivity and the State. Ashgate, Burlington, VT.

Barrie, A., 2011. Smartphones Take on Silent Killers as Portable Danger Detectors. Fox News, September 29. <http://www.foxnews.com/tech/2011/09/28/cell-phones-take-on-silent-killers/> (accessed 17.09.12).

Blanchette, J.-F., 2012. Computing as if infrastructure mattered. Communications of the ACM 55 (10), 32–34.

Boddy, T., 2007. Architecture emblematic: hardened sites and softened symbols. In: Sorkin, M. (Ed.), Indefensible Space: The Architecture of the National Insecurity State. Routledge, New York, pp. 277–304.

Böhme, R., Köpsell, S., 2010. Trained to accept?: a field experiment on consent dialogs. In: CHI '10 Proceedings of the 28th International Conference on Human Factors in Computing Systems, Atlanta, GA, pp. 2403–2406.

Bulkeley, W.M., 2009. Chicago's camera network is everywhere. The Wall Street Journal. <http://www.firetide.com/assets/0/112/138/9C3A795A-82DD-45CE-8BAD-6409B8BC8774.pdf> (accessed 16.09.12).

Center for Embedded Networked Sensing, 2008. Participatory Sensing, June 4. <http://www.youtube.com/watch?v=t-ItfpA3XiY> (accessed 17.09.12).

Chang, C., 2012. Mobile Air Quality. <http://candychang.com/mobile-air-quality/> (accessed 17.09.12).

Charmaz, K., 2006. Constructing Grounded Theory: A Practical Guide through Qualitative Analysis, second ed. Sage Publications, Thousand Oaks.

Clarke, R., 2009. Privacy impact assessment: its origins and development. Computer Law and Security Review 25 (2), 123–135.

Coaffee, J., 2004. Rings of steel, rings of concrete and rings of confidence: designing out terrorism in central London pre and post September 11th. International Journal of Urban and Regional Research 28 (1), 201–211.

Coaffee, J., Murakami Wood, D., Rogers, P., 2009. The Everyday Resilience of the City: How Cities Respond to Terrorism and Disaster. Palgrave Macmillan, Basingstoke, England.

Crang, M., Graham, S., 2007. Sentient cities: ambient intelligence and the politics of urban space. Information, Communication and Society 10 (6), 789–817.

Cuff, D., Hansen, M., Kang, J., 2008. Urban sensing: out of the woods. Communications of the ACM 51 (3), 24–33.

Curry, M.R., Phillips, D.J., Regan, P.M., 2004. Emergency response systems and the creeping legibility of people and places. The Information Society 20, 357–369.

Dennis, S., 2011. Cell-All Program Overview. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12).

Ellerbrok, A., 2011. Playful biometrics: controversial technology through the lens of play. The Sociological Quarterly 52 (4), 528–547.

Finn, R.L., Wright, D., 2012. Unmanned aircraft systems: surveillance, ethics and privacy in civil applications. Computer Law and Security Review 28 (2), 184–194.

Fisher, J.A., 2009. Medical Research for Hire: The Political Economy of Pharmaceutical Clinical Trials. Rutgers University Press, New Brunswick, NJ.

Fussey, P., Coaffee, J., Armstrong, G., Hobbs, D., 2011. Securing and Sustaining the Olympic City: Reconfiguring London for 2012 and Beyond. Ashgate, Burlington, VT.

Gilliom, J., Monahan, T., 2013. SuperVision: An Introduction to the Surveillance Society. University of Chicago Press, Chicago.

Graham, S., 2010. Cities Under Siege: The New Military Urbanism. Verso, London.

Graham, S., 2012. Digital medieval. Surveillance and Society 9 (3), 321–327.

Graham, S., Wood, D., 2003. Digitizing surveillance: categorization, space, inequality. Critical Social Policy 23 (2), 227–248.

Haggerty, K.D., Ericson, R.V., 2006. The new politics of surveillance and visibility. In: Haggerty, K.D., Ericson, R.V. (Eds.), The New Politics of Surveillance and Visibility. University of Toronto Press, Toronto, pp. 3–25.

Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12).

King, M., Bailey, C., 2007. Carbon monoxide – related deaths in the United States, 1999–2004. Morbidity and Mortality Weekly Report (CDC) 56 (50), 1309–1312.

Kitchin, R., Dodge, M., 2011. Code/Space: Software and Everyday life. MIT Press, Cambridge, MA.

Klauser, F.R., 2010. Splintering spheres of security: Peter Sloterdijk and the contemporary fortress city. Environment and Planning D: Society and Space 28 (2), 326–340.

Klauser, F.R., Ruegg, J., November, V., 2008. Airport surveillance between public and private interests: CCTV at Geneva International Airport. In: Salter, M.B. (Ed.), Politics at the Airport. University of Minnesota Press, Minneapolis, pp. 105–126.

Koskela, H., 2010. 'Did you spot an alien?' Voluntary vigilance, borderwork and the Texas Virtual Border Watch Program. Space and Polity 14 (2), 103–121.

Li, J., 2011. Nanosensor-Cellphone Integration for Extended Chemical Sensing Network. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12).

Lianos, M., Douglas, M., 2000. Dangerization and the end of deviance. British Journal of Criminology 40 (2), 261–278.

Lyon, D., 2001. Surveillance Society: Monitoring Everyday Life. Open University, Buckingham, England; Philadelphia.

Lyon, D., 2003. Surveillance as Social Sorting: Privacy, Risk, and Digital Discrimination. Routledge, New York. <http://www.loc.gov/catdir/enhancements/fy0650/2002075104-d.html>.

Magnet, S., 2011. When Biometrics Fail: Gender, Race, and the Technology of Identity. Duke University Press, Durham.

Monahan, T., 2010a. Surveillance as governance: social inequality and the pursuit of democratic surveillance. In: Haggerty, K.D., Samatas, M. (Eds.), Surveillance and Democracy. Routledge, New York, pp. 91–110.

Monahan, T., 2010b. Surveillance in the Time of Insecurity. Rutgers University Press, New Brunswick.

Monahan, T., Mokos, J.T., 2010. Sensing environmental danger in the city. International Review of Information Ethics 12, 21–27.

Monahan, T., Palmer, N.A., 2009. The emerging politics of DHS fusion centers. Security Dialogue 40 (6), 617–636.

Montagnino, J., 2012. NC4 Situational Readiness Solutions to Manage Risks. <http://www.nc4.us/> (accessed 09.09.12).

Murakami Wood, D., 2007. Pervasive Surveillance: Enabling Environments or Embedding Inequalities. Workshop on Surveillance and Inequality, Arizona State University.

Murakami Wood, D., 2009a. Chicago: The Future of US CCTV? Notes from the Ubiquitous Surveillance Society. <http://ubisurv.wordpress.com/2009/02/21/chicago-the-future-of-us-cctv/> (accessed 07.06.11).

Murakami Wood, D., 2009b. Where Will the Big Red Balloons Be Next? Notes from the Ubiquitous Surveillance Society. <http://ubisurv.wordpress.com/2009/12/04/big-red-balloon/> (accessed 16.09.12).

Murakami Wood, D., Webster, C.W.R., 2011. The normality of living in surveillance societies. Innovating Government 20 (3), 151–164.

Needs, C., 2011. NC4 Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12).

Neighborhood Link, 2010. How Landlords Can Use Credit Scoring to Make Rental Decisions. <http://www.neighborhoodlink.com/article/Homeowner/Credit_Scoring_Rentals> (accessed 19.07.11).

O'Harrow, R., 2005. No Place to Hide. Free Press, New York.

Ottinger, G., 2010. Constructing empowerment through interpretations of environmental surveillance data. Surveillance and Society 8 (2), 221–234.

PBS NewsHour, 2011. Safecast Draws on Power of the Crowd to Map Japan's Radiation, November 10. <http://www.pbs.org/newshour/bb/science/july-dec11/japanradiation_11-10.html> (accessed 17.09.12).

Rula, J., Bustamante, F.E., 2012. Crowd (soft) control: moving beyond the opportunistic. In: Proc. of the Thirteenth Workshop on Mobile Computing Systems and Applications (HotMobile), San Diego, CA.

Safecast, 2012. Safecast. <http://blog.safecast.org/> (accessed 17.09.12).

Shilton, K., 2009. Four billion little brothers?: privacy, mobile phones, and ubiquitous data collection. Communications of the ACM 52 (11), 48–53.

Shilton, K., 2012. Participatory personal data: an emerging research challenge for the information sciences. Journal of the American Society for Information Science and Technology 63 (10), 1905–1915.

Synkera Technologies, 2011. Chemical Sensors for Mobile Devices. <http://www.synkera.com/sensors/chemical-sensors-for-mobile-devices.html> (accessed 19.09.12).

The Impact Project, 2012. Trade, Health and Environment Impact Project. <http://theimpactproject.org/index.html> (accessed 17.09.12).

Thrift, N., French, S., 2002. The automatic production of space. Transactions of the Institute of British Geographers 27 (4), 309–335.

U.S. Department of Homeland Security, 2007. Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode=form&id=f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

U.S. Department of Homeland Security, 2010. Cell-All: Super Smartphones Sniff Out Suspicious Substances. <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances> (accessed 17.09.12).

U.S. Department of Homeland Security, 2011a. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12).

U.S. Department of Homeland Security, 2011b. Privacy Impact Assessment for the Cell All Demonstration. <http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_s&t_cell_all.pdf> (accessed 19.09.12).

U.S. Department of Homeland Security, 2011c. Transcript of the Meeting of the Data Privacy and Integrity Advisory Committee. May 19. <http://www.dhs.gov/xlibrary/assets/privacy/dhsprivacy_dpiactranscript_may192011mtg.pdf> (accessed 17.09.12).

Verrico, J.S., 2011. Welcome and Opening Remarks. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12).

Wall, T., Monahan, T., 2011. Surveillance and violence from afar: the politics of drones and liminal security-scapes. Theoretical Criminology 15 (3), 239–254.

Weber, J., 2011. Techno-security, risk and the militarization of everyday life. In: Conference on "The Computational Turn: Past, Presents, Futures?". Aarhus University, pp. 168–173.

Whitson, J.R., Haggerty, K.D., 2008. Identity theft and the care of the virtual self. Economy and Society 37 (4), 572–594.

Winner, L., 1986. The Whale and the Reactor: A Search for Limits in an Age of High Technology. University of Chicago Press, Chicago.

Woodhouse, E., Hess, D., Breyman, S., Martin, B., 2002. Science studies and activism: possibilities and problems for reconstructivist agendas. Social Studies of Science 32 (2), 297–319.

# EXHIBIT G

## Rule 4(c)



*"CELL-ALL"*

Apple, Samsung, Qualcomm & LG
Monitoring Devices with CPUs

Signal sent from
MATTS device to
Phone CPU

Signal sent from
Phone CPU to auto
lock container

*"MATTS"*
gateway receives
detection signal;
transmit signal to
container lock

*"TRUST"*

Power In-Lock®

"Detection of CBRNE-WMDs,
contraband and humans (infrared)
located inside cargo container"

Remotely locks trailer doors; cargo
trailer doors; or container doors;
allowing lock / unlock to be sent
from any Apple or Android smart
device CPU to "disable the lock"

## Limitation

Claim 1 of the '497 patent: "…detection and initiates transmission from the *__cpu__* to the automatic/mechanical lock disabler to lock or disable the lock of the product…" The above figure illustrates how the Defendants' system "performs substantially the same function; in substantially the way; to achieve substantially the same result" under the *doctrine of equivalents* as Plaintiff's multi sensor detection and lock disabling system. In *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation [DHS: "*Cell-All*"; "TRUST"; "MATTS"] that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.*, 806 F.2d at 1060. (Fed. Cir. 1986) ('[a]uthorizarion or consent by the Government can be express [or] [i]n proper circumstances, Government authorization can be implied.').

## Rule 4(c)



*"CELL-ALL"*

Apple, Samsung, Qualcomm & LG
Monitoring Devices with CPUs

Signal sent from
MATTS device to
Phone CPU

Signal sent from
Phone CPU to auto
lock container

"MATTS"
gateway receives
detection signal;
transmit signal to
container lock

"TRUST"

Power In-Lock®

"Detection of CBRNE-WMDs,
contraband and humans (infrared)
located inside cargo container"

Remotely locks trailer doors; cargo
trailer doors; or container doors;
allowing lock / unlock to be sent
from any Apple or Android smart
device CPU to "disable the lock"

## Limitations

Claims 4, 5, 6, of the '189 patent; and, 16, 17, 18, of the '439 patent: "built-in embedded" [construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"] multi sensor detection system. The above figure illustrates how the Defendants' system "performs substantially the same function; in substantially the way; to achieve substantially the same result" under the *doctrine of equivalents* as Plaintiff's "built-in embedded" multi sensor detection system. In *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation [DHS: *"Cell-All"*; "TRUST"; "MATTS"] that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.*, 806 F.2d at 1060.

| Limitation | Patent Local Rule 4 (a), (b), (c), & (d) |
|---|---|
| comprising: "a central processing unit (CPU)"<br><br>*Claim 1 of the '497 patent; Claim 10 of the '752 patent; Claims 1, 2, & 3, of the '189 patent; Claims 13, 14, 15, 22, & 23 of the '439 patent; Claims 4, 5, & 6, of the '287 patent* | Plaintiff believes the Defendant (Government) and third-party contractors; Apple, Samsung, Qualcomm, and LG are infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "central processing units (CPUs) (i.e., SoC or Chipsets)", that are interconnected to, or integrated with, Plaintiff's CMDC device(s), ("substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)<br><br>The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. ***Every action you perform on your smartphone goes straight to the processor.***" https://www.coolblue.nl/en/advice/smartphone-processors.html. "Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. ***A smartphone CPU (central processing unit) is the brains of the entire device.*** Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).<br><br>Apple iPhone 7 Chipset: Apple A10 Fusion (16 nm). Apple iPhone 7 CPU: Quad-core 2.34 GHz (2x Hurricane + 2x Zephyr). Apple iPhone 8 Chipset: Apple A11 Bionic (10 nm). Apple iPhone 8 CPU: Hexa-core (2x Monsoon + 4x Mistral). Apple Watch Series 3 Chipset: Apple S3. Apple Watch Series 3 CPU: Dual-core. Apple iPhone SE Chipset: Apple A9 (14 nm). Apple iPhone SE CPU: Dual-core 1.84 GHz Twister. Apple iPhone XS Chipset: Apple A12 Bionic (7 nm). Apple iPhone XS CPU: Hexa-core (2x2.5 GHz Vortex + 4x1.6 GHz Tempest). Apple Watch Series 4 Chipset: Apple S4. Apple Watch Series 4 CPU: Dual-core. Apple iPhone 11 Chipset: Apple A13 Bionic (7 nm+). Apple iPhone 11 CPU: Hexa-core (2x2.65 GHz Lightning + 4x1.8 GHz Thunder). Apple iPhone 12 Chipset: Apple A14 Bionic (5 nm). Apple iPhone 12 CPU: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). Apple Watch Series 5 Chipset: Apple S5. Apple Watch Series 5 CPU: Dual-core. Apple Watch Series 6 Chipset: Apple S6. Apple Watch Series 6 CPU: Dual-core.<br><br>Samsung Galaxy Note 8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China. Samsung Galaxy Note 8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China. Samsung Galaxy S8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China. Samsung Galaxy S8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China. Samsung Gear S3 Classic Series Chipset: Exynos 7 Dual 7270 (14 nm). Samsung Gear S3 Classic Series CPU: Dual-core 1.0 GHz Cortex-A53. Samsung Galaxy S9 Series Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China. Samsung Galaxy S9 Series CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver) USA/China. Samsung Galaxy S10 Series Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China. Samsung Galaxy S10 Series CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China. Samsung Galaxy Watch Active 2 Series Chipset: Exynos 9110 (10 nm). Samsung Galaxy Watch Active 2 Series CPU: Dual-core 1.15 GHz Cortex-A53. Samsung Galaxy S20 Series Chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA. Samsung Galaxy S20 Series CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA. Samsung Galaxy S21 Series Chipset: Qualcomm SM8350 Snapdragon 888 5G (5 nm). Samsung Galaxy S21 Series CPU: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA. Samsung Galaxy Watch 3 Series Chipset: Exynos 9110 (10 nm). Samsung Galaxy Watch 3 Series CPU: Dual-core 1.15 GHz Cortex-A53. |

LG V30 Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm). LG V30 CPU: Octa-core (4x2.45 GHz Kryo & 4x1.9 GHz Kryo). LG G6 Chipset: Qualcomm MSM8996 Snapdragon 821 (14 nm). LG G6 CPU: Quad-core (2x2.35 GHz Kryo & 2x1.6 GHz Kryo). LG Watch Sport Chipset: Qualcomm MSM8909W Snapdragon Wear 2100. LG Watch Sport CPU: Quad-core 1.1 GHz Cortex-A7. LG G7 Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm). LG G7 CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver). LG G8 Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm). LG G8 CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485). LG Watch Style Chipset: Qualcomm MSM8909W Snapdragon Wear 2100. LG Watch Style CPU: Quad-core 1.1 GHz Cortex-A7. LG V50 Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm). LG V50 CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485). LG V60 Chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+). LG V60 CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585). LG Watch W7 Chipset: Qualcomm MSM8909W Snapdragon Wear 2100. LG Watch W7 CPU: Quad-core 1.3 GHz Cortex-A7.

| Limitation | Patent Local Rule 4 (a), (b), (c), & (d) |
|---|---|
| "plurality of interchangeable detectors"<br><br>"detection of specific chemical, biological, or radiological agents or compounds by the detectors"<br><br>"at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents"<br><br>*Claim 1 of the '497 patent; Claim 10 of the '752 patent; Claims 4, 5, & 6, of the '287 patent* | Plaintiff believes the Defendant (Government) and third-party contractors; Apple, Samsung, Qualcomm, and LG are infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "detectors", that are interconnected to, or integrated with, Plaintiff's CMDC device(s), ("substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)<br><br>According to Monahan and Mokos, 2013; *cell phones, when modified to sense or detect for CBRN&Es, are considered "handheld weapon of mass destruction detector(s)"*. The new cell phones, i.e., sensors and detectors, are developed to form a "dynamic sensor system". "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors." Source: *Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks;* Torin Monahan, Jennifer T. Mokos, Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115<br><br>Detector: "Any device that receives a signal or stimulus (as heat or pressure or light or motion etc.) and responds to it in a distinctive manner. A device capable of registering a specific substance or physical phenomenon, and that optionally sounds an alarm or triggers a warning." https://www.askdifference.com/sensor-vs-detector/<br><br>List of "Detectors": Apple Watch Series 3, 4, 5, & 6; Samsung Gear S3 Classic; Samsung Galaxy Watch Active 2; Samsung Galaxy Watch 3; LG Watch Sport; LG Watch Style; LG Watch 7; Qualcomm's FFA sensor; NASA's ARC nanosensor module for iPhone integration;  Smartphone-based detection for biomedical applications; Smartphone virus scanner; Integrated Biochemiluminescence Detection on Smartphones; Wireless gas detection with a smartphone via rf communication; Cradle that turns smartphone into handheld biosensor; Smartphone-Based Image Capture of Rapid Diagnostic Tests; Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App; Smartphone radiation detector; Thermal infrared camera attachment for smart phone; The NODE+ platform; Low-Cost Smartphone-Based Electrochemical Biosensor; Biosensor attached to the phone to sniff bacteria; Cell phone radiation detection for Android; Sharp Pantone 5 107SH Smartphone comes with a built-in radiation sensor: Android 4.0 preinstalled |

| | Additional List of "Detectors": The relevant devices are: Smartphone Biosensor cradle M-Lock; High-power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; iPhone Biodetector Smartphone; Pathtracker; the Center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded Sensors; Smartphone-Based Rapid Diagnostic Tests; SIN-VAPOR I Smartphone System; Samsung Galaxy Microscope Smartphone; VOCket System; Nett Warrior Smartphone System; GammaPix; NFC Samsung Galaxy Smartphone Sensor; Cell-All Synkera MikroKera Ultra: Biotouch System; FLIR identiFINDER R300; AOptix Stratus MX Peripheral; MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX;1"x2" Detection Device Samsung Galaxy Smartphone; 2"x2" Detection Device Samsung Galaxy Smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy Smartphone; Portable Smartphone attachment to detect viruses and bacteria," [a device] that derives biological signals from your smartphone's accelerometer . . . smartphone medical diagnoses to help track chronic health conditions; cradle and app for iPhone to make a handheld biosensor that uses the phone's own camera to detect any kind of biological molecules or cells; handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaria; portable device for real-time detection of explosives, toxicants; and, highly sensitive rapid medical diagnostic tests. |
|---|---|
| **Limitation** | **Patent Local Rule 4 (a), (b), (c), & (d)** |
| "multi sensor detection [device]"<br><br>"plurality of interchangeable cell phone sensors"<br><br>"built-in, embedded multi sensor detection system"<br><br>"built-in sensor array or fixed detection device"<br><br>"a plurality of sensors for detecting"<br><br>"at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone" | Plaintiff believes the Defendant (Government) and third-party contractors; Apple, Samsung, Qualcomm, and LG are infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "sensors", that are interconnected to, or integrated with, Plaintiff's CMDC device(s), ("substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)<br><br>According to Monahan and Mokos, 2013; cell phones, when modified to sense or detect for CBRN&Es, are considered "handheld weapon of mass destruction detector(s)". The new cell phones, i.e., sensors and detectors, are developed to form a "dynamic sensor system". *"Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors."* Source: *Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks;* Torin Monahan, Jennifer T. Mokos, Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115<br><br>Sensor: In the broadest definition, a sensor is a device, module, machine, or subsystem whose purpose is to detect events or changes in its environment and send the information to other electronics, frequently a computer (i.e., mobile device) processor. A sensor is always used with other electronics. https://www.askdifference.com/sensor-vs-detector/<br><br>7.2 DHS "Cell-All": A program called "Cell-All" is investigating the potential of using nanotechnology-based gas sensors in cellular based phones. The detection system would have to be small, accurate, and draw only a small amount of power from the cell phones battery. The *sensors* currently under investigation are sensors base on new nanotube sensors developed by NASA and Synkera Technologies. In September of 2011, DHS (in collaboration with NASA, Synkera Technologies, Qualcomm, and NC4) gave a Cell-All demonstration of a mock CO release at a Los Angeles Fire Department training facility. https://www.ojp.gov/pdffiles1/nij/grants/246708.pdf<br><br>**Defendants Alleged Infringing Devices Camera Sensors for C/B/R Detection**<br>Apple's camera sensor for C/B/R/ detection: |

| | |
|---|---|
| "at least one sensor for chemical, biological, or human detection in communication with the at least one CPU"<br><br>*Claim 1 of the '497 patent; Claim 10 of the '752 patent; Claims 1, 2, 3, 4, 5, 6, 7, 8, & 9, of the '189 patent; Claims 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, & 23 of the '439 patent; Claims 4, 5, & 6, of the '287 patent* | • Apple iPhone 7 Camera: 12 MP, f/1.8, 28mm (wide), 1/3", PDAF, OIS; Quad-LED dual-tone flash, HDR; 4K@30fps, 1080p@30/60/120fps, 720p@240fps video.<br>• Apple iPhone 8 Camera: 12 MP, f/1.8, 28mm (wide), PDAF, OIS; Quad-LED dual-tone flash, HDR; 4K@24/30/60fps, 1080p@30/60/120/240fps video.<br>• Apple iPhone SE Camera: 12 MP, f/2.2, 29mm (standard), 1/3", 1.22μm, PDAF; Dual-LED dual-tone flash, HDR; 4K@30fps, 1080p@30/60fps, 1080p@120fps, 720p@240fps video.<br>• Apple iPhone XS Camera: (Dual)12 MP, f/1.8, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 52mm (telephoto), 1/3.4", 1.0μm, PDAF, OIS, 2x optical zoom; Quad-LED dual-tone flash, HDR (photo/panorama); 4K@24/30/60fps, 1080p@30/60/120/240fps, HDR, stereo sound rec. video.<br>• Apple iPhone 11 Camera: (Dual) 12 MP, f/1.8, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 120°, 13mm (ultrawide), 1/3.6"; Dual-LED dual-tone flash, HDR (photo/panorama); 4K@24/30/60fps, 1080p@30/60/120/240fps, HDR, stereo sound rec. video.<br>• Apple iPhone 12 Camera: (Dual) 12 MP, f/1.6, 26mm (wide), 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 13mm, 120° (ultrawide), 1/3.6"; Dual-LED dual-tone flash, HDR (photo/panorama); 4K@24/30/60fps, 1080p@30/60/120/240fps, HDR, Dolby Vision HDR (up to 30fps), stereo sound rec. video<br><br>Samsung s camera sensor for C/B/R/ detection:<br>• Samsung Galaxy Note 8 Series Camera: (Dual) 12 MP, f/1.7, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 12 MP, f/2.4, 52mm (telephoto), 1/3.6", 1.0μm, AF, OIS, 2x optical zoom; LED flash, auto-HDR, panorama; 4K@30fps, 1080p@30/60fps, 720p@240fps, stereo sound rec., HDR, gyro-EIS video.<br>• Samsung Galaxy S8 Series Camera: 12 MP, f/1.7, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; LED flash, auto-HDR, panorama; 4K@30fps, 1080p@30/60fps, 720p@240fps, HDR, stereo sound rec., gyro-EIS, OIS video.<br>• Samsung Galaxy S9 Series Camera: 12 MP, f/1.5-2.4, 26mm (wide), 1/2.55", 1.4μm, dual pixel PDAF, OIS; LED flash, auto-HDR, panorama; 4K@30/60fps, 1080p@30/ 60/240fps, 720p@960fps, HDR, stereo sound rec., gyro-EIS & OIS (30fps) video.<br>• Samsung Galaxy S10 Series Camera: (Triple) 12 MP, f/1.5-2.4, 26mm (wide), 1/2.55", 1.4μm, Dual Pixel PDAF, OIS; 12 MP, f/2.4, 52mm (telephoto), 1/3.6", 1.0μm, AF, OIS, 2x optical zoom; 16 MP, f/2.2, 12mm (ultrawide), 1/3.1", 1.0μm, Super Steady video; LED flash, auto-HDR, panorama; 4K@60fps (no EIS), 4K@30fps, 1080p@30/ 60/240fps, 720p@960fps, HDR10+, stereo sound rec., gyro-EIS & OIS video.<br>• Samsung Galaxy S20 Series Camera: (Triple) 12 MP, f/1.8, 26mm (wide), 1/1.76", 1.8μm, Dual Pixel PDAF, OIS; 64 MP, f/2.0, 29mm (telephoto), 1/1.72", 0.8μm, PDAF, OIS, 1.1x optical zoom, 3x hybrid zoom; 12 MP, f/2.2, 13mm, 120° (ultrawide), 1/2.55" 1.4μm, Super Steady video; LED flash, auto-HDR, panorama; 8K@24fps, 4K@30/60fps, 1080p@30/60/240fps, 720p@960fps, HDR10+ stereo sound rec., gyro-EIS & OIS video.<br>• Samsung Galaxy S21 Series Camera: (Triple) 12 MP, f/1.8, 26mm (wide), 1/1.76", 1.8μm, Dual Pixel PDAF, OIS; 64 MP, f/2.0, 29mm (telephoto), 1/1.72", 0.8μm, PDAF, OIS, 1.1x optical zoom, 3x hybrid zoom; 12 MP, f/2.2, 13mm, 120° (ultrawide), 1/2.55" 1.4μm, Super Steady video; LED flash, auto-HDR, panorama; 8K@24fps, 4K@30/60fps, 1080p@30/60/240fps, 720p@960fps, HDR10+, stereo sound rec., gyro-EIS video.<br><br>LG s camera sensor for C/B/R/ detection:<br>• LG V30 Camera: (Dual) 16 MP, f/1.6, 30mm (standard), 1/3.1", 1.0μm, PDAF, Laser AF, 3-axis OIS; 13 MP, f/1.9, 12mm (ultrawide), no AF; LED flash, HDR, |

- panorama; 4K@30fps, 1080p@30/60fps, 720p@120fps, 24-bit/192kHz stereo sound rec., HDR video.
- LG G6 Camera: (Dual) 13 MP, f/1.8, 30mm (standard), 1/3.1", 1.12μm, PDAF, 3-axis OIS; 13 MP, f/2.4, 12mm (ultrawide), no AF; Dual-LED flash, HDR, panorama; 4K@30fps, 1080p@30/60fps, HDR, 24-bit/192kHz stereo sound rec. video.
- LG G7 Camera: (Dual) 16 MP, f/1.6, 30mm (standard), 1/3.1", 1.0μm, PDAF, Laser AF, OIS; 16 MP, f/1.9, 16mm (ultrawide), 1/3.1", no AF; LED flash, HDR, panorama; 4K@30/60fps, 1080p@30/60fps, 720p@240fps, HDR, 24-bit/192kHz stereo sound rec. video.
- LG G8 Camera: (Dual or Triple) 12 MP, f/1.5, 27mm (standard), 1/2.55", 1.4μm, Dual pixel PDAF, OIS; 16 MP, f/1.9, 16mm (ultrawide), 1/3.1", 1.0μm, no AF; or, 12 MP, f/1.5, 27mm (standard), 1/2.55", 1.4μm, dual pixel PDAF, OIS; 16 MP, f/1.9, 16mm (ultrawide), 1/3.1", 1.0μm, no AF; 12 MP, 52mm (telephoto), f/2.4, 1.0μm, 2x optical zoom, dual pixel PDAF, OIS; LED flash, HDR, panorama; 4K@30/60fps, 1080p@30/60fps, 720p@240fps, HDR10, 24-bit/192kHz stereo sound rec. video.
- LG V50 Camera: (Triple) 12 MP, 27mm (wide), f/1.5, 1/2.55", 1.4μm, dual pixel PDAF, 3-axis OIS; 12 MP, 52mm (telephoto), f/2.4, 1/3.4", 1.0μm, 2x optical zoom, PDAF, OIS; 16 MP, 16mm (ultrawide), f/1.9, 1/3.1", 1.0μm, no AF; LED flash, HDR, panorama; 4K@30/60fps, 1080p@30/60/240fps, 24-bit/192kHz stereo sound rec., HDR10 video, gyro-EIS video.
- LG V60 Camera: (Triple) 64 MP, f/1.8, 27mm (standard), 1/1.72", 0.8μm, Dual pixel PDAF, OIS; 13 MP, f/1.9, 12mm (ultrawide), 1/3.4", 1.0μm; 0.3 MP, TOF 3D, f/1.4, (depth); Dual-LED dual-tone flash, HDR, panorama; 8K@30fps, 4K@30/60fps, 1080p, HDR10+, 24-bit/192kHz stereo sound rec., gyro-EIS video.

| Limitation | Patent Local Rule 4 (a), (b), (c), & (d) |
|---|---|
| "lock disabling system"<br><br>"automatic/mechanical lock disabler"<br><br>"locking device"<br><br>"biometric lock disabler"<br><br>"lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries" | Plaintiff believes the Defendant (Government) and third-party contractors; Apple, Samsung, Qualcomm, and LG are infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "locks", that are interconnected to, or integrated with, Plaintiff's CMDC device(s), ("substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)<br><br>Each of Plaintiff's asserted patents ('497, '752, '189, '439, & '287) specifications describes at length various forms of "locking mechanisms". There's no requirement that a locking mechanism is claimed when writing the patents claims. The only claim limitation the Defendant identified, that they believe is in violation of Patent Local Rule 4(d), is claim 1 of Plaintiff's '497 patent: *"detection of specific chemical, biological, or radiological agents or compounds by the detectors causes… the automatic/mechanical lock disabler to lock or disable the lock of the product… "* **(Refer back to the circle illustrations on pages 2 & 3 of this document)**. Plaintiff has satisfied the requirement of Patent Local Rule 4(c) of "identifying where each element of each asserted claim is found within each accused product, process, or method…" when Plaintiff specifically identified the chipsets / CPUs of the accused devices, and the biometric fingerprint scanner of the accused devices.<br><br>Example: Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock |

| | |
|---|---|
| "at least one locking mechanism in communication with the at least one CPU for locking the communication device"<br><br>*Claim 1 of the '497 patent; Claim 10 of the '752 patent; Claims 1, 2, 3, 4, 5, 6, 7, 8, & 9, of the '189 patent; Claims 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, & 23 of the '439 patent; Claims 4, 5, & 6, of the '287 patent* | the phone. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br>Therefore, when a signal is received at the CPU, signifying a security threat (unauthorized user, detection of a bomb, lost or stolen device), the CPU processes instructions to lock or disable the lock on the Defendants' accused devices.<br>Plaintiff has demonstrated and complied with Patent Local Rule 4 (c) & (d), by specifically pointing out the alleged infringing products' central processing units (CPUs) i.e., chipsets or system-on-a-chip (SoC)s; and, the alleged infringing products' fingerprint biometric lock disablers i.e., lock disabling systems.<br><br>**Allowed and Issued Claims 1, 2, & 3 of the '287 Patent covering Plaintiff's "Locks", that are Grouped Together by Common Features of Design Similarities.**<br><br>*Note: Claims 1, 2, & 3 of the '287 Patent are not presented here as an amendment to the current case. The claims are presented here to illustrate how the alleged infringing devices of the Defendants', that comprises a CPU/SoC/Chipset, "is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries..." and, "the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of..." any of the locks grouped together by design similarity (i.e., interconnected to the alleged infringing products—cell phone; smartphone; smartwatch), for communication therebetween. (The claims are issued with the "presumption of validity")*<br><br>      **Claim 1.** Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising... *at least one of a central processing unit (CPU)*... a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries... the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.<br>      **Claim 2.** Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising... *at least one of a central processing unit (CPU)*... a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries... the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. |

| | **Claim 3.** Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising... *at least one of a central processing unit (CPU)*... a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries... the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. |
|---|---|
| **Limitation** | **Patent Local Rule 4 (a), (b), (c), & (d)** |
| "[A]n Internet connection, a GPS connection", is claimed in *Claim 1 of the '497 patent, and Claim 10 of the '752 patent.*<br><br>"WiFi connection, internet connection... cellular connection... or GPS connection", is claimed in *Claims 1, 2, & 3 of the '189 patent;* and,<br>"WiFi connection, internet connection... cellular connection", is claimed in *Claims 7, 8, & 9 of the '189 patent.*<br><br>"WiFi connection, internet connection... cellular connection... or GPS connection", is claimed in *Claims 13, 14, 15, 22, & 23 of the '439 patent*; and,<br>"WiFi connection, internet connection... cellular connection", is claimed in *Claims 19, 20, & 21 of the '439 patent.* | Plaintiff believes the Defendant (Government) and third-party contractors; Apple, Samsung, Qualcomm, and LG are infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "WiFi connection, internet connection, cellular connection, GPS connection, or NFC", that are interconnected to, or integrated with, Plaintiff's CMDC device(s), ("substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)<br><br>    The particular facts of Qualcomm, Apple, Samsung, and LG raise the question of how the Federal Circuit's broader view of divided infringement may impact cases in which "use or manufacture of a patented invention by or for the United States" is alleged to infringe a patent under 28 U.S.C. § 1498. Section 1498 explicitly states that: "the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."<br>    The Federal Circuit's holding that a reasonable Judge presiding in the CFC could find divided direct infringement in Qualcomm, Apple, Samsung, and LG hinges on the view that third-party defendants Qualcomm, Apple, Samsung, and LG's actions arguably conferred a benefit upon at least that of the DHS, TSA, CBP, FEMA, or the DoD. If this Court found that a benefit was conferred, it arguably follows that Qualcomm, Apple, Samsung, and LG's alleged acts of infringement (and the DHS's acts imputed to Qualcomm, Apple, Samsung, and LG) were performed "by or for the United States" and would fall within the purview of Section 1498.<br><br>    According to Lee (2019), Apple contacted Qualcomm as a potential supplier for modem chips in the first iPhone that was released in 2007. Qualcomm also responded to a request for proposals in the 2007 DHS S&T "CELL-ALL" solicitation as a supplier of the cellular—modem chips for the new and improved cell phones, capable of detecting for at least that of hazardous chemical, biological, and radiological agents. In order for the new and improved cell phones (i.e., smartphones) to provide users with instant access to the internet, anytime, anywhere, and without wires; the "CELL-ALL" devices must have cellular and Wi-Fi to achieve this wireless data flow.<br>    Cellular-modem chips, also known as thin modems, are paired with application processors in high-end smartphones such as Apple's iPhone, Samsung's Galaxy series, and LG's series of mobile devices (Lee, 2019). They also power USB dongles and data cards that provide cellular access in tablets and laptops (Lee, 2019). Wi-Fi technology is |

| | |
|---|---|
| "WiFi connection, internet connection… cellular connection… or GPS connection", is claimed in *Claims 4, 5, & 6 of the '287 patent*.<br><br>"Near-field communication (NFC), i.e., radio frequency", is claimed in *Claims 3, 6, & 9 of the '189 patent; Claims 15, 18, & 21 of the '439 patent; and, Claims 4, 5, & 6 of the '287 patent*. | evolving. It is most often delivered in a combo chip that may also include Bluetooth, GPS, and even NFC. Qualcomm is the first vendor to integrate Wi-Fi into its application processors, an option that is expected to increase in popularity. More than one billion mobile Wi-Fi chips shipped in 2012, a number that was expected to grow to more than 1.6 billion in 2016 (Lee, 2019).<br><br>"Qualcomm has monopoly power over certain cell phone chips, and they use that monopoly power to charge people too much money," says Charles Duan, a patent expert at the free-market R Street Institute. "Instead of just charging more for the chips themselves, they required people to buy a patent license and overcharged for the patent license."<br><br>According to Lee (2019), *"Qualcomm's patent licensing fees were calculated based on the value of the entire phone, not just the value of chips that embodied Qualcomm's patented technology. This effectively meant that Qualcomm got a cut of every component of a smartphone—most of which had nothing to do with Qualcomm's cellular patents."*<br><br>Lee, T. B., (2019, May,30). *No License, No Chips?* —How Qualcomm shook down the cell phone industry for almost 20 years. Retrieved from: https://arstechnica.com/tech-policy/2019/05/how-qualcomm-shook-down-the-cell-phone-industry-for-almost-20-years/<br><br>Patent specifications: "[t]he detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections" … FIG. 10… illustrating the GPS, Internet… [t]he rear side 30 has connections or contacts that can include an Internet connection 32, a GPS connection 34… the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172… The system 10… for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency [NFC] interconnected to a central processing unit (cpu), such as cpu 40… Product grouping 5 (communication methods) include… Bluetooth, Wi-Fi, Wi-Max, Internet… Wireless, Wired, Text Messaging, Cellular, Satellite… Wireless Wide Area Network (WWAN)… Radio Frequency (RF) [NFC], Broadband Wireless Access (BWA), Global Positioning System (GPS)"<br><br>More about the WiFi connection, internet connection, cellular connection, GPS connection, and NFC will be revealed during discovery. More on the wireless carriers of AT&T, Verizon, & T-Mobile as possible third-party subcontractors for mobile devices and wireless services during discovery: "The Navy has awarded three wireless carriers' positions on a potential five-year, $993 million contract for mobile devices and services to defense and other federal agencies. AT&T, T-Mobile and Verizon are the winners for this "Spiral 3" edition of the Navy's Wireless and Telecommunications Services contract. The new contract iteration is for one base year and four option years, the Defense Department said Monday." https://washingtontechnology.com/articles/2017/10/30/navy-wireless-1b-contract.aspx<br><br>"In *FastShip LLC v. United States*, a unanimous panel of the Federal Circuit addressed an issue of first impression, construing "manufactured" in § 1498 to mean "suitable for use," thereby affirming Court of Federal Claims Judge Charles Lettow, who rejected FastShip's argument that "manufactured" means "substantially manufactured."<br><br>Based on the alleged facts, the court should be able to reasonably infer that AT&T, T-Mobile and Verizon are government subcontractors and that their "manufacture and use" [suitability for use] of the asserted alleged infringing products was "for the benefit of [DHS]." See *Advanced Software Design Corp.*, 583 F.3d at 1378.<br><br>In light of the allegations that the inventions disclosed in patents '497, '752, '189, '439, and '287 were designed to prevent terrorist activity, it is plausible that AT&T, T-Mobile and Verizon made *"suitable for use"* [manufactured] the alleged infringing devices for the benefit of DHS, to promote national security. *See, e.g., Hughes Aircraft Co.*, 534 |

F.2d at 898 (finding that the government's participation in a cell phone for detection [satellite] program was "for the Government," because the program was vital to the military defense and security of the United States). Moreover, under section 1498(a), "Government authorization or consent" can be implied by circumstances". *See TVI Energy Corp*, 806 F.2d at 1060.

Authorization or consent can be implied from the circumstances, (e.g., "by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement") *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.*, 806 F.2d at 1060.

**EXPRESS MALL**
TES POSTAL SERVICE ®

LY URGENT   Please Rush To Addressee

NTE   Favor de entregar urgentemente

DuPont™ Tyvek®
Protect What's Inside.™

DESTINATARIO
3l remitente ha requerido notificación
inmediata contra entrega. Por favor llame.
Nombre:
Teléfono:

RECIPIENT
The sender has requested notification upon delivery.
Immediately upon receipt, please telephone:
Name:
Tel. No. :

**UNITED STATES POSTAL SERVICE ®**

PRI
M
EXP

CUSTOMER USE ONLY

FROM: (PLEASE PRINT)   PHONE 864 288

Larry Golden
740 Woodruff Rd.
#1102
Greenville, SC 2

DELIVERY OPTIONS (Customer Use Only)

SIGNATURE REQUIRED

Delivery Options

TO: (PLEASE PRINT)   PHONE

Clerk
U.S. Court of Appeals, Fox
U.S. Courthouse Annex, 5
1100 East Main Street
Richmond, VA
23219

• For pickup or USPS Tracking™, visit USPS.com or call 800-222-
• $100.00 insurance included.

PEEL FROM THIS CORNER

AFFIX POSTAGE OR
CORPORATE ACCOUNT
LABEL HERE.

Adhiera aquí el franqueo
o su etiqueta
de cuenta corporativa.

www.usps.com

 

U.S. POSTAGE PAID
PME 2-DAY
GREENVILLE, SC
29616
OCT 16,21
AMOUNT
**$45.50**
R2304M112676-32

1007   23219

EP-13CS OCTOBER 2001
© 1995 USPS

This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Express Mail. Misuse may be a violation of federal law.

**FOR PICKUP OR TRACKING CALL 1-800-222-1811**
1-800-222-1811

INSPEC

EJ 829 307 678 US

PAYMENT BY ACCOUNT (if applicable)
USPS® Corporate Acct. No.   Federal Agency Acct. No. or Postal Service™ Acct. No.

5605

9607

ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code
29615

Date Accepted (MM/DD/YY)
10-16-21

Time Accepted
12:16

Scheduled Delivery Date
10-18-21

Scheduled Delivery Time

Postage
$45.50

Insurance Fee   COD Fee

Return Receipt Fee   Live Animal Transportation Fee

Weight
3 lbs. oz.

Flat Rate

Acceptance Employee Initials
JPA

Total Postage & Fees
$45.50

DELIVERY (POSTAL SERVICE USE ONLY)

LABEL 11-B, MAY 2021   PSN 7690-02-000-9996

Llame al 1-800-222-1811 para nuestro servicio de recolección fácil.
(Solamente un cargo bajo, para cualquier número de envíos) o entregue su
paquete de "Express Mail" en cualquier oficina de correos o depósito en un
buzón marcado "Express Mail".